IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| CHARLES CAMPBELL, <br><br> Plaintiff, <br><br> v. <br><br> CLIFTON T. PERKINS, <br> JOHN MBAH, <br> KEVIN THOMPSON, <br> TOM FOLOMSELE,[1] <br> DR. VANWINKLE, <br> DR. PACHAN, <br><br> Defendants. | Civil Action No.: SAG-23-478 |

**MEMORANDUM**

In response to the above-entitled civil rights lawsuit, defendants filed a motion to dismiss, or in the alternative, for summary judgment. ECF No. 16. Self-represented plaintiff Charles Campbell opposes the motion. ECF No. 18. Additionally, Campbell filed a motion to compel discovery. ECF No. 15. No hearing is required to resolve the matters pending before the court. *See* Local Rule 105.6 (D. Md. 2023). For the reasons that follow, Defendants' motion shall be granted in part and denied in part and Campbell's motion to compel discovery, construed as an affidavit filed pursuant to Fed. R. Civ. P. 56(d), shall be terminated as a motion. Moreover, Defendants' motion will not be considered under a summary judgment standard until discovery has occurred.

**BACKGROUND**

At all times relevant to the complaint, Campbell was confined to Clifton T. Perkins Hospital Center ("Perkins") for determination of whether he was competent to stand trial for

---

[1] The Clerk shall be directed to correct the spelling of defendant Tom Folomsele's name.

attempted carjacking in the Circuit Court for Baltimore County, Maryland. Perkins is a mental health facility operated by the Maryland Department of Health. After he was found competent to stand trial in April 2023, Campbell was released from Perkins. He is currently confined to Baltimore County Detention Center. Campbell claims that while at Perkins (1) he was subjected to excessive force and (2) he received substandard medical care.[2] ECF Nos. 1 at 6.

**A.     Excessive Force Claim**

On October 7, 2022, an incident occurred in the unit where Campbell was assigned, prompting a contraband search which uncovered prescribed medication of one of the patients. ECF No. 6-1 at 1, ¶ 1. Defendant Dr. VanWinkle placed the unit on "safety time" which required each patient to return to their rooms. *Id*. Security began telling patients to return to their rooms to comply with the "safety time" order. *Id*.

Campbell did not think the safety time decision was correct and refused to return to his room. ECF No. 6-1 at 1, ¶ 2. Campbell explains that he was contesting the authority to implement safety time and "made various logical and reasonably sound arguments as to the lack of authority." *Id*. Among the arguments he made, Campbell states that patients were not given any notice and there were no circumstances present that constituted a threat to the safety of patients or staff. *Id*. He claims that he never became "irrate [sic], unmanageable, assaultive, physically or verbally threatening, or a danger to [him]self or others." *Id*.

Campbell recalls that Dr. VanWinkle "attempted redirection by deception" by telling him that "if he complies, he will return once all patients are in their rooms and explain the reason for safety time and elaborate on authority to do so." ECF No. 6-1 at 1, ¶ 3. When it became clear to

---

[2]     Campbell asserts a wide variety of tort claims based on the underlying facts alleged, including assault and battery, false imprisonment, intentional infliction of emotional distress, negligence, inducement of contract, immoral conduct in the practice of medicine, abandonment of patient, and willfully making and filing false reports and records. ECF No. 6-1 at 9.

Dr. VanWinkle that the attempt to redirect Campbell was not going to be successful, Dr. VanWinkle returned to his office where he remained until the conclusion of the incident. *Id*. According to Campbell, Dr. VanWinkle was duty-bound to remain on scene until the incident was resolved. *Id*.

After Dr. VanWinkle left the scene, John Mbah approached Campbell and began to tell him to return to his room. ECF No. 6-1 at 1, ¶ 4. Campbell responded that he had already explained that he did not agree with the order for safety time, he was not going to comply, and he respectfully refused. *Id*. at 2, ¶ 4. Mbah told Campbell that the order did not allow for a refusal; Campbell simply kept repeating, "I respectfully refuse." *Id*. As Mbah began to get irritated with Campbell, he began to raise his voice and Campbell "no longer responded or even acknowledged" what Mbah was saying. *Id*. at ¶ 5. In Campbell's view, the "interaction was clearly deteriorating." *Id*.

Mbah then gave security staff permission to grab Campbell by the arms and push him into his room. ECF No. 6-1 at 2, ¶ 6. Two security officers began trying to push Campbell into his room without success. *Id*. at ¶ 7. Mbah then ordered all of the officers present to put Campbell "in the chair," referring to the restraint chair. *Id*. at ¶ 8. Mbah then changed the order and told officers to carry Campbell to the bed. *Id*. At this point, Campbell was being restrained by two officers, one on each arm. *Id*. at ¶ 9. Two other officers then reached for Campbell's leg while another put him "in a headlock." *Id*. Although he was being restrained by five officers, Campbell recalls that a "wall of bodies formed by more officers" materialized and he was then overcome by a barrage of punches in quick succession." *Id*. at 2-3, ¶ 10.

Campbell recalls that defendant Kevin Thompson had control of this upper body on his left side when the officers began carrying him to the "restraint room." ECF No. 6-1 at 3, ¶ 11. Campbell states that as they were carrying him into the room, Thompson and another officer

entered the room first along with a third officer who was holding Campbell's right leg. *Id*. Campbell claims that "Thompson yanked on . . . Campbell's upper body which then angled [his] entire body in his direction causing the fourth officer to push Plaintiff Campbell's left leg through the doorway in an attempt to keep up with Defendant Thompson." *Id*. Campbell describes his left leg being struck by the doorframe at the shin, then becoming caught on the doorframe as it "continued to bend and hyperextend in the opposite direction as the other officers on the inside of the door kept pulling." *Id*. This caused an injury to Campbell's shin, inner thigh, and groin area. *Id*.

Once inside the room, Campbell was placed on the restraint bed. ECF No. 6-1 at 3, ¶ 12. Campbell claims that Thompson "elbowed him multiple times in the face around his left eye." *Id*. Campbell further alleges that Thompson struck him in the throat twice and then placed his elbow on Campbell's throat and leaned on it until Campbell was gasping for air and coughing. *Id*. The restraints on the bed were then fastened. *Id*. Campbell states that after approximately five minutes, he began to feel "an excruciating, burning, stretching and almost pulling appart [sic] sensation in his shoulders, forearms, bicepts [sic], [and] front and back of his elbows." *Id*. at ¶ 13.

Campbell called out to Corporal Tom Folomsele who was outside of the restraint room in the hallway. ECF No. 6-1 at 4, ¶ 14. When Folomsele came into the room and asked Campbell what was wrong, Campbell told him that he was in a lot of pain and that the restraints were too tight. *Id*. Folomsele told Campbell that the restraints were punishment, and they were supposed to be painful. *Id*. at ¶ 15. Folomsele further opined that the pain of the restraints was supposed to make Campbell comply with orders in the future and added that he could not do anything about the restraints because he is not a doctor. *Id*. Campbell asked Folomsele to call Dr. VanWinkle,

but Folomsele never did. *Id*. at ¶ 16. Campbell claims he spent two to two and one-half hours restrained on the bed in excruciating pain. *Id*.

When Dr. VanWinkle came to the restraint room two and one-half hours after Campbell was restrained, Campbell described all of the events as well as his injuries. ECF No. 6-1 at 5, ¶ 17. Campbell claimed that a pre-existing back condition had been aggravated by the restraints and told Dr. VanWinkle that he should not have been restrained in this manner. *Id*. Campbell claims that Dr. VanWinkle apologized to him and told him that he could file a grievance. *Id*. at ¶ 18. Campbell asked to see a medical doctor and Dr. VanWinkle issued both written and verbal orders for Campbell to be sent to the in-hospital clinic. *Id*. Campbell claims that he was never seen for the physical injuries he sustained. *Id*.

According to Campbell, Mbah harassed him after the incident by throwing away his meals, writing him up for sitting in the day room while he filled out a grievance form, instructing staff not to assist him, and speaking to Campbell in a condescending, demeaning manner. ECF No. 6-1 at ¶ 19.

**B.     Medical Care**

Campbell captions this portion of his complaint as concerning "misdiagnosis, prescribing incorrect medication or dosage ect. [sic] (08/31/22 – Present)." ECF No. 6-1 at 5. Campbell claims that when he was admitted to Perkins he was evaluated by Dr. VanWinkle, Dr. Natter, LPN Olu, Ms. Ashley, Mr. Out, and a sergeant from security. *Id*. at ¶ 20. After he was interviewed, Campbell states that he was given a provisional diagnosis of cannabis use disorder, but he claims that he was "admitted under the pretence [sic] that he suffered from an unspecified schitzophernia [sic] spectrum . . . and that incarceration . . . would be unsafe" due to his mental illness. *Id*. at 6, ¶ 21.

Campbell was "continued on Olanzapine" and started on diphenhydramine, but claims that Olanzapine was "prescribed falsely" and had been discontinued by Dr. Haroon at Baltimore County Detention Center on August 11, 2022. ECF No. 6-1 at 6, ¶ 22. Campbell informed Dr. VanWinkle and the other staff present that he missed doses of Olanzapine while at the detention center because of the side effects which included grogginess, dizziness, light-headedness, swollen feet and calves, joint pain, and abnormal heartbeat. *Id*. at ¶ 23. Despite those side effects, Olanzapine was still prescribed. *Id*.

Campbell claims that Dr. Pachan told him that the cannabis use disorder diagnosis was her diagnosis, and that Campbell should concern himself with his case rather than the diagnosis. ECF no. 6-1 at 6, ¶ 24.

Campbell claims that VanWinkle, Pachan "and colleagues" did not provide him with anything that would help him return to competency. ECF No. 6-1 at 6, ¶ 25. In Campbell's view, defendants went beyond the scope of the order requiring his admission to Perkins by diagnosing him with conditions that were not relevant to his competency, such as learning disabilities. *Id*. at 7, ¶ 25. Campbell states that this failure to provide any aid in restoring his competency is a failure to uphold the standard of care due a patient. *Id*.

Campbell states that he was evaluated on September 28, 2022 and found to be incompetent. ECF No. 6-1 at 7, ¶ 26. In Campbell's view, this finding was the direct result of the "inaction or omission" of VanWinkle, Pachan, and the entire treatment team at Perkins. ECF No. 6-1 at 7, ¶ 26. In addition to the finding of incompetency, Defendants also found that Campbell was a danger to himself and others and that he would continue to be dangerous if he was released with pre-trial conditions. *Id*. Campbell takes umbrage with these findings because he has never been

violent. *Id*. Campbell spoke with Dr. Ojimba about the perceived discrepancies in his record and Dr. Ojimba promised that his record would be updated. *Id*.

Campbell's claims that when his record was not updated, the inaccuracies in his record led a forensic evaluator to conclude that Campbell "would pose a danger to society if released" and would likely abuse drugs. ECF No. 6-1 at 7-8, ¶ 26. Campbell also takes issue with the statement in his record that he "'seemed to have been suffering from underlying psychological condition, and would likely refuse pharmacological intervention,'" because pharmacological intervention was "never required." *Id*. at 8. Campbell states that he had no need for medication, and that should have been documented for the evaluator and the courts. *Id*.

**C.     Defendants' Response**

Defendants assert that the force used against Campbell complied with State law and Perkins' policy permitting restraints on a patient who poses a serious and imminent danger. ECF No. 16. Defendants assert that Campbell, by his own admissions, was refusing to enter his room for safety time and then struggled with staff when they carried out a lawful order given by the treating physician, Dr. VanWinkle, to confine Campbell to his room. They further assert that the complaint fails to state an Eighth or Fourteenth Amendment claim. In the event this Court finds that Campbell has stated a constitutional claim, Defendants assert that they are entitled to qualified immunity because they did not violate a clearly established right.

With respect to Campbell's medical claim, Defendants state that his allegedly improper diagnosis of cannabis use disorder and the alleged improperly prescribed medications do not state a federal claim. Further, Campbell has failed to comply with the requirements of Maryland's Health Care Malpractice Act which requires the filing of a claim with the Health Care Alternative Dispute Resolution Office. *See* Md. Code Ann., Cts & Jud. Proc. §§ 3-2A-01 *et seq*.

**D.      Motion to Compel Discovery**

In addition to his opposition response, Campbell filed a motion to compel discovery (ECF No. 15), which this court construes as an affidavit filed pursuant to Fed. R. Civ. P. 56(d).[3] Campbell seeks to compel defendants to provide service records for any inoperable cameras located in the restraint room and all incident reports written on and after October 7, 2022. ECF No. 15 at 1. Campbell explains that he obtained copies of the incident reports during a chart review and with "RGS Complaint responses," but claims that these "sources do not contain all the discovery requested and neither source was in response to the request for discovery." *Id*. Campbell further states that he spoke with Quality Control Supervisor Iris Mielke about the documents he wanted, and she informed him that there were no service records for the cameras because they were never installed. *Id*. Campbell claims that Mielke also told him she had been instructed by her supervisors not to provide him with copies of the documents he requested and suggested he schedule a chart review. *Id*.

> Federal Rule of Civil Procedure 56(d) provides that:
>
> If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts to justify its opposition, the court may:
>
> (1) Defer considering the motion or deny it;
> (2) Allow time to obtain affidavits or declarations or to take discovery; or
> (3) Issue any other appropriate order.

Ordinarily, summary judgment is inappropriate "where the parties have not had an opportunity for reasonable discovery." *E.I. du Pont de Nemours and Co. v. Kolon Industries, Inc.*, 637 F.3d 435, 448-49 (4th Cir. 2011). However, "the party opposing summary judgment 'cannot

---

[3] Discovery has not commenced in this case as no scheduling order has been entered. *See* Local Rule 104.4 (D. Md. 2023) ("[D]iscovery shall not commence and disclosures need not be made until a scheduling order is entered."). Accordingly, a motion to compel discovery is not properly filed at this juncture in the case and no discovery will be ordered yet. Campbell can request the discovery once a scheduling order issues.

8

complain that summary judgment was granted without discovery unless that party has made an attempt to oppose the motion on the grounds that more time was needed for discovery.'" *Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 244 (4th Cir. 2002) (quoting *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 961 (4th Cir. 1996)). To raise adequately the issue that discovery is needed, the non-movant typically must file an affidavit or declaration pursuant to Rule 56(d) (formerly Rule 56(f)), explaining why, "for specified reasons, it cannot present facts essential to justify its opposition," without needed discovery. Fed. R. Civ. P. 56(d); *see Harrods*, 302 F.3d at 244-45 (discussing affidavit requirement of former Rule 56(f)).

Notably, "'Rule 56(d) affidavits cannot simply demand discovery for the sake of discovery.'" *Hamilton v. Mayor & City Council of Baltimore*, 807 F. Supp. 2d 331, 342 (D. Md. 2011) (quoting *Young v. UPS*, No. DKC-08-2586, 2011 WL 665321, at *20, 2011 U.S. Dist. LEXIS 14266, at *62 (D. Md. Feb. 14, 2011)). "Rather, to justify a denial of summary judgment on the grounds that additional discovery is necessary, the facts identified in a Rule 56 affidavit must be 'essential to [the] opposition.'" *Scott v. Nuvell Fin. Servs., LLC*, 789 F. Supp. 2d 637, 641 (D. Md. 2011), *rvs'd on other grounds*, (alteration in original) (citation omitted). A non-moving party's Rule 56(d) request for additional discovery is properly denied "where the additional evidence sought for discovery would not have by itself created a genuine issue of material fact sufficient to defeat summary judgment." *Strag v. Bd. of Trs., Craven Cmty. Coll.*, 55 F.3d 943, 954 (4th Cir. 1995); *see Amirmokri v. Abraham*, 437 F. Supp. 2d 414, 420 (D. Md. 2006), *aff'd*, 266 F. App'x. 274 (4th Cir. 2008), *cert. denied*, 555 U.S. 885 (2008).

If a nonmoving party believes that further discovery is necessary before consideration of summary judgment, the party fails to file a Rule 56(d) affidavit at his peril, because "'the failure to file an affidavit . . . is itself sufficient grounds to reject a claim that the opportunity for discovery

was inadequate.'" *Harrods*, 302 F.3d at 244 (citations omitted). But, the nonmoving party's failure to file a Rule 56(d) affidavit cannot obligate a court to issue a summary judgment ruling that is obviously premature. And, a court "should hesitate before denying a Rule 56(d) motion when the nonmovant seeks necessary information possessed only by the movant." *Pisano v. Strach*, 743 F.3d 927, 931 (4th Cir. 2014).

According to the Fourth Circuit, failure to file an affidavit may be excused "if the nonmoving party has adequately informed the district court that the motion is premature and that more discovery is necessary" and the "nonmoving party's objections before the district court 'served as the functional equivalent of an affidavit.'" *Id.* at 244-45 (internal citations omitted); *see also Putney*, 656 F. App'x at 638; *Nader v. Blair*, 549 F.3d 953, 961 (4th Cir. 2008). Moreover, "[t]his is especially true where, as here, the non-moving party is proceeding pro se." *Putney*, 656 F. App'x at 638.

Here, Campbell's motion technically falls short of the standard for a Rule 56(d) motion as he does not allege he cannot oppose the dispositive motion without first obtaining the requested discovery. Campbell acknowledges that one of the cameras inside the restraint room was covered during the alleged assault and speculates that the second camera could not have also been inoperable but again does not explain the basis of that belief. ECF No. 6-1 at 12. The incident report provided by defendants indicates that the cameras inside the restraint room were part of an old system, had not been connected to the new system, and did not capture any of the events occurring inside the room. ECF No. 16-2 at 7. Campbell does not allege, and there is no evidence to support a finding, that video surveillance was destroyed or is otherwise being hidden. Rather, it is clear that there is no video recording of the events taking place inside the restraint room. There is, however, video surveillance of the events that took place in the hallway before Campbell was

removed to the restraint room.  To the extent that video still exists, it could impact greatly on Campbell's ability to oppose the pending dispositive motion.

Campbell also seeks to obtain all reports prepared about the October 7, 2022 incident. While Defendants provide one such report as an exhibit to their motion, Maryland law clearly requires more documentation that what has already been supplied.  *See* Md. Code Regs. § 10.21.12.10 (documentation required).  These documents directly impact on the reasonableness of the force used and the necessity for Campbell's continued restraint for more than two hours. Because Campbell has identified discovery that is essential to his ability to prove his case, this Court declines to treat Defendants' motion as one for summary judgment and will adjudicate it as a motion to dismiss.

## STANDARD OF REVIEW

To survive a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6), the factual allegations in a complaint "must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations omitted).  "To satisfy this standard, a plaintiff need not 'forecast' evidence sufficient to prove the elements of the claim.  However, the complaint must allege sufficient facts to establish those elements."  *Walters v. McMahen*, 684 F.3d 435, 439 (4th Cir. 2012) (citation omitted).

The Court is mindful that Campbell is a self-represented litigant.  A federal court must liberally construe pleadings filed by pro se litigants to allow them to fully develop potentially meritorious cases.  *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007).  But liberal construction does not mean a court can ignore a clear failure in the pleadings to allege facts which set forth a claim. *See Weller v. Department of Social Services*, 901 F.2d 387, 391 (4th Cir.1990).

## ANALYSIS

**A.     Immunity**

Under the Eleventh Amendment to the United States Constitution, a state, its agencies and departments are immune from citizen suits in federal court absent state consent or Congressional action. *See Pennhurst State Sch. and Hosp. v. Halderman*, 465 U.S. 89, 100 (1984). Claims against state employees acting in their official capacities are also subject to Eleventh Amendment immunity because a suit against the state actor is tantamount to a suit against the state itself. *Brandon v. Holt*, 469 U.S. 464, 471-72 (1985). The State of Maryland has not waived such immunity for claims brought pursuant to § 1983. Thus. to the extent that Campbell sues the Defendants in their official capacity, the claims must be dismissed.

Additionally, Campbell's claims against Perkins, must be dismissed as the hospital is not a "person" for purposes of a § 1983 suit. *See* 42 U.S.C. § 1983; *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 & n.55 (1978) (noting that for purposes of § 1983 a "person" includes individuals and "bodies politic and corporate"); *see generally* 5 Charles Alan Wright, *et al.*, Fed. Prac. & Proc. § 1230 (2002).

**B.     Excessive Force Claim**

As a pre-trial detainee, Campbell's claim that he was subjected to excessive force is analyzed under the Fourteenth Amendment's[4] due process clause. Campbell may prevail upon evidence that "the use of force is deliberate – *i.e.*, purposeful or knowing." *Kingsley v. Hendrickson*, 576 U.S. 389, 395 (2015). His claim need not detail a subjective element of his alleged assailant's subjective state of mind, "a pretrial detainee must show only that the force purposely or knowingly used against him was objectively unreasonable." *Id.* at 396, *see also*

---

[4]     Defendants are correct in their assessment that Campbell's claims are not covered by the Eighth Amendment's prohibition on cruel and unusual punishment.

*Dilworth v. Adams,* 841 F.3d 246, 255 (4th Cir. 2016). Objective reasonableness "turns on the 'facts and circumstances of each particular case.'" *Id.* at 397, quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989). This Court is obliged to "make this determination from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with 20/20 vision of hindsight." *Kingsley* 576 U.S. at 397.

Campbell was an involuntarily committed patient in the custody of the Maryland Department of Health at the time of this incident. The due process clause of the Fourteenth Amendment requires the State to provide involuntarily committed patients with such services as are necessary to ensure "reasonable safety" from themselves and others. *Youngberg v. Romeo*, 457 U.S. 307, 324 (1982). Under *Youngberg*, the State "may not restrain residents except when and to the extent professional judgment deems this necessary to assure . . . safety or to provide needed training." *Id*. The State must "provide adequate safe conditions, reasonable freedom from bodily restraint, and 'minimally adequate or reasonable training to ensure safety and freedom from undue restraint.'" *Williams v. Wasserman*, 937 F. Supp. 526 (D. Md. 1996) (quoting *Youngberg*, 457 U.S. at 319).

In determining whether a substantive right protected by the due process clause has been violated, it is necessary to balance "the liberty of the individual" and "the demands of an organized society." *Youngberg*, 457 U.S. at 319 (quoting *Poe v. Ullman*, 367 U.S. 497, 542 (1961)). The Court applies the "professional judgment" standard, in which "the Constitution only requires that the Court make certain that professional judgment in fact was exercised." *Youngberg*, 457 U.S. at 321. Decisions made by professionals are presumptively valid and "liability may be imposed only when the decision by the professional is such a substantial departure from . . . professional judgment, practice, or standard as to demonstrate that the person responsible actually did not base

the decision on such a judgment." *Id*. at 323 (emphasis added).  In applying this standard, the Fourth Circuit has held that a defendant's actions must have "so substantially departed from professional standards that their decisions can only be described as arbitrary and unprofessional." *Patten v. Nichols*, 274 F.3d 829, 843 (4th Cir. 2001).  In balancing the legitimate interests of the State with the rights of involuntarily committed patients, "'[i]t is not appropriate for the courts to specify which of several professionally acceptable choices should have been made.'"  *Matherly v. Andrews*, 859 F.3d 264, 275 (4th Cir. 2017) quoting *Youngberg*, 457 U.S. at 321.

      Taking the complaint allegations as true, Campbell caused a disruption in the effort to confine all patients on the unit to their rooms because he disagreed with the decision to do so. While he maintains that he did not represent a danger to anyone present, a finding of possible danger was not required.  Rather, under applicable regulations, restraints may be applied to a patient when a physician or a registered nurse determines that the restraints are appropriate by assessing whether there is an emergency situation; or the "degree to which the patient presents a serious disruption to the therapeutic environment." Md. Code Regs. § 10.21.12.05.A.  Campbell admits that he steadfastly refused to return to his room and repeatedly said that he "respectfully refused" until he decided to simply stop responding.  The fact that he presented a serious disruption to the therapeutic environment is apparent from the description Campbell provides of the events leading up to his restraint.  Thus, Campbell has not pled facts plausibly alleging an arbitrary or unprofessional decision to place him in restraints.

      The force used to restrain Campbell escalated after he resisted efforts by security officers to "'grab his arms and push him in there.'" ECF No. 6-1 at 2, ¶¶ 6, 7, 8. Defendants maintain that Campbell became combative when they attempted to remove him from the hallway and place him in restraints, but the only evidence provided to support that assertion is an unverified business

document describing Campbell as combative and aggressive, *i.e.*, the incident report. ECF No. 16-2 at 6-7. The Complaint alleges that Campbell was neither combative or aggressive. Thus, Campbe;; has adequately states a claim for use of excessive force.

Defendants raise a qualified immunity defense citing their lack of awareness that their actions violated well-established law such that a reasonable person in their place would have known that Campbell's constitutional rights were being violated. "Under our precedents, officers are entitled to qualified immunity under § 1983 unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was 'clearly established at the time.'" *Dist. of Columbia v. Wesby*, _ U.S. _, 138 S.Ct. 577, 589 (2018) citing *Reichle v. Howards*, 566 U.S. 658, 664 (2012). "The 'clearly established' standard also requires that the legal principle clearly prohibit the officer's conduct in the particular circumstances before him." *Wesby*, 138 S.Ct. at 590.

"Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). "In particular, . . . qualified immunity protects law officers from 'bad guesses in gray areas' and it ensures that they may be held personally liable only 'for transgressing bright lines.'" *Gomez v. Atkins*, 296 F.3d 253, 261 (4th Cir. 2002) (quoting *Maciariello v. Sumner*, 973 F.2d 295, 298 (4th Cir. 1992)). The defense provides protection for public officials for mistakes of law, mistakes of fact, or a combination of the two. *See Groh v. Ramirez*, 540 U.S. 551, 567 (2004) (Kennedy, J., dissenting). Qualified immunity is a defense from suit, not simply liability, which is lost if a matter is improperly permitted to go to trial. *See Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). Resolution of whether an official is entitled to

qualified immunity must be determined "at the earliest possible stage in litigation." *Hunter v. Bryant*, 502 U.S. 224, 227 (1991).

In order to determine if a public official is entitled to the protections afforded by qualified immunity, two inquiries must be addressed by this court. Although the Supreme Court's decision in *Saucier v. Katz*, 533 U.S. 194 (2001) directed a rigid approach to the inquiries involved, the requirement that the two-prong analysis must be "considered in proper sequence" has since been revised. *Katz*, 533 U.S. at 200. Courts are now "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson*, 555 U.S. at 818.

The first prong is whether "[t]aken in the light most favorable to the party asserting the injury, . . . the facts alleged show [that] the officer's conduct violated a constitutional right[.]" *Saucier*, 533 U.S. at 201. If the evidence establishes a violation of a constitutional right, the second prong is to assess whether the right was "clearly established" at the time of the events at issue. *Id*. If the right was not clearly established, the qualified immunity doctrine shields a defendant officer from liability. The "answer to both *Saucier* questions must be in the affirmative in order for a plaintiff to defeat a . . . motion for summary judgment on qualified immunity grounds." *Henry v. Purnell*, 501 F.3d 374, 377-78 (4th Cir. 2007) (citing *Batten v. Gomez*, 324 F.3d 288, 293-94 (4th Cir. 2003)).

Here, qualified immunity cannot shield defendants from possible liability at this juncture because Campbell has adequately pled that excessive force was ued to restrainhim. Once the evidence can be properly considered, if Campbell was aggressive and combative as alleged by Defendants, the force used may have been reasonable under the circumstances and may not amount to a constitutional violation. However, if Campbell was calm, reasonable, and logical as he claims,

16

which must be accepted as true when considering a motion to dismiss, the amount of force used may be unreasonable. At this stage, dismissal is not warranted.

**D.     Medical Claim**

To the extent that Campbell's claim regarding his diagnoses, medication, and evaluation is also raised pursuant to the Fourteenth Amendment, the claim fails. To establish that a particular condition or restriction of detention constitutes impermissible punishment in violation of the Fourteenth Amendment, a plaintiff must show either (1) an expressed intent to punish or (2) that the restriction was not reasonably related to a legitimate non-punitive governmental purpose. *Martin v. Gentile,* 849 F.2d 863, 870 (4th Cir. 1988).

In the case of involuntarily committed patients at state psychiatric facilities, the United States Supreme Court has provided additional guidance. Under *Youngberg*, 457 U.S. at 319 (1982), "[p]ersons who have been involuntarily committed are entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish." *Id*. at 321–22; *see Patten*, 274 F.3d at 837–38 (applying the *Youngberg* standard to involuntarily committed psychiatric patients). Under the *Youngberg* standard, a state must provide such an involuntarily committed patient with reasonable conditions of safety, including "adequate food, shelter, clothing, and medical care," as well as "freedom from unreasonable restraints." *Youngberg*, 457 U.S. at 315, 321.

In assessing whether conditions are constitutionally adequate, courts apply the "professional judgment" standard, under which "the Constitution only requires that the courts make certain that professional judgment in fact was exercised." *Youngberg*, 457 U.S. at 321. Decisions made by medical or other professionals are presumptively valid, and "liability may be imposed only when the decision by the professional is such a substantial departure from accepted

17

professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Youngberg*, 457 U.S. at 323; *see Patten*, 274 F.3d at 845–46 (stating that the defendant's actions must have "so substantially departed from professional standards that their decisions can only be described as arbitrary and unprofessional").

Campbell's assertion that the diagnosis of cannabis use disorder damaged his reputation and that the medicine he was prescribed was not appropriate cannot be characterized as arbitrary and unprofessional. His disagreement with the medical assessments of his condition is not a basis for finding that the Fourteenth Amendment was violated or that professional judgment was not exercised. To the extent that he was in fact misdiagnosed, the claim amounts to one of negligence that is not cognizable as a basis for a constitutional claim. The claims related to Campbell's diagnosis and treatment shall therefore be dismissed for failure to state a claim.

**E.     State law claims**

Campbell includes a list of state law claims in his Complaint, but beyond listing the causes of action he has not explained how any of the claims are supported by the facts alleged. ECF No. 6-1 at 9. Although a complaint need not contain detailed allegations, the facts alleged must be enough to raise a right to relief above the speculative level and require "more than labels and conclusions," as "'courts are not bound to accept as true a legal conclusion couched as a factual allegation.'" *Twombly*, 550 U.S. at 555. The Complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Id*. at 570. Once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint. *Id*. at 561.

Further, under Fed. R. Civ. P. 8(a), a pleading which sets forth a claim for relief, shall contain "(1) a short and plain statement of the grounds for the court's jurisdiction, unless the court

already has jurisdiction and the claim needs no new jurisdictional support (2) a short and plain statement of the claim showing that the pleader is entitled to relief, and (3) a demand for the relief sought . . . " Moreover, each "allegation must be simple, concise, and direct." Fed. R. Civ. P. 8(d)(1). "Threadbare recitals of the elements of a cause of action, supported by mere statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 555). Most of the state law claims listed by Campbell including false imprisonment, intentional infliction of emotional distress, negligence, inducement of contract, immoral conduct in the practice of medicine, abandonment of patient, and willful creation of false reports must be dismissed. To the extent that "assault and battery" is premised on the facts supporting Campbell's excessive force claim, it will remain in the case.

## CONCLUSION

For the reasons stated herein, Defendants' motion to dismiss or for summary judgment is GRANTED as to the official capacity claims, the medical claims, and the state tort law claims other than assault and battery and is DENIED as to the excessive force claim and the state law assault and battery claim. Campbell's motion to compel discovery is construed as an affidavit filed pursuant to Fed. Civ. P. 56(d) and will be terminated as a motion. A separate order follows.


September 20, 2023                                /s/
Date                                              Stephanie A. Gallagher
                                                  United States District Judge