**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| Charles Campbell,<br>Plaintiff,<br>vs.<br>John Mbah, et al.<br>Defendants. | *<br>*<br>*<br>*<br>*<br>* | Civil Action No. SAG-23-478 |

**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO QUASH**

Dated: October 29, 2025

Dwight Draughon
Daniel S. Blynn
Andrew Magloughlin
**STEPTOE LLP**
1330 Connecticut Ave NW
Washington, DC 20036
(202) 429-3000
amagloughlin@steptoe.com
ddraughon@steptoe.com
dblynn@steptoe.com

Michael O'Rourke
**STEPTOE LLP**
227 West Monroe Street
Chicago, IL 60606
(312) 577-1239
morourke@steptoe.com

*Counsel for Plaintiff Charles Campbell*

## TABLE OF CONTENTS

**I. BACKGROUND ..... 4**

A. Allegations and This Lawsuit ..... 4

B. Relevant Discovery ..... 8

C. Press Coverage of Perkins leading to the Report ..... 9

**II. ARGUMENT ..... 13**

D. Defendants lack standing to seek to quash the Perkins subpoena, and the subpoena imposes no burden on them in any event ..... 13

E. The Report is relevant because it goes to Campbell's ability to impeach witnesses and prove his claims and punitive damages ..... 14

1. The Report may bear on many witnesses' credibility. ..... 15

2. The Report may be relevant to Mr. Campbell's excessive force and First Amendment retaliation claims. ..... 16

3. The Report could be important evidence supporting an award of punitive damages. .. 17

F. The medical review committee privilege does not shield the Report because no such privilege exists under federal common law ..... 18

G. The deliberative process privilege does not shield the facts in the Report from discovery… ..... 21

**III. CONCLUSION ..... 23**

**IV. HEARING REQUESTED ..... 23**

Defendants' Motion to Quash (ECF No. 106) tries to shield with strained privilege claims a Report that the Clifton T. Perkins Hospital Center ("Perkins") plans to publicly release in the future. This Report—the interim and final versions of an audit of Perkins conducted by the National Association of State Mental Health Program Directors—details the leadership failures at Perkins during the time when Plaintiff Charles Campbell was a patient. According to public reporting from the *Washington Post*, the former Secretary of Health ordered this Report after she realized the Perkins administration lied to her about the facts of major incidents of violence and patient harm. One instance involved Perkins' failure to preserve video footage that law enforcement had requested related to a patient's death. Other instances revealed the Perkins administration directing employees not to respond to internal complaints and retaliating against staff members who raised concerns.

Mr. Campbell issued a subpoena for the Report in this case because it is relevant to his ability to impeach witnesses and prove his excessive force and First Amendment retaliation claims. More specifically, Mr. Campbell alleges that Perkins staff, Defendants Dr. Matthew Van Winkle, John Mbah, Kevin Thompson, and Temitope Folowosele, restrained him without justification, injured him by making the restraints too tight, and that Defendant Thomspon beat him while he was restrained. He also alleges that Defendant Mbah retaliated against him for filing a grievance about these issues. The chorus of the Defendants' testimony in this case is that nobody remembers anything. The Report could shed light on a possible motive for that lack of memory, namely, fear of retaliation from the Perkins administration. It also potentially could impeach Perkins' claim that the missing video footage of the restraint room in this case is attributable to a broken camera. Further, it might demonstrate that the Perkins administration instructed employees to ignore policy, lie in witness statements, and retaliate against anyone who makes the Perkins

administration look bad, all of which would be relevant to Mr. Campbell's claims. Finally, the Report could help demonstrate a reckless motive that justifies punitive damages. Combined, these good faith justifications for seeking the Report refute Defendants' arguments that Mr. Campbell is conducting a fishing expedition.

Defendants, who lack standing to file this Motion in the first place, also claim that the Report is privileged—a curious position to take regarding a document that Perkins plans to release publicly in the future. Regardless, the privilege arguments are baseless. Maryland's state law medical review committee privilege does not exist under federal common law. And the deliberative process privilege cannot shield the Report on balance, let alone its purely non-privileged factual findings. Because the Report is relevant, non-privileged evidence, this Court should deny the Defendants' Motion and compel the Report's production.

# I. BACKGROUND

## A. Allegations and This Lawsuit

On October 7, 2022, Defendant Van Winkle, a psychiatrist staffed at Perkins, initiated "safety time" in response to the alleged discovery of contraband prescription drugs on his unit.[1] Mr. Campbell—who was a patient at Perkins at the time—returned to the hallway in front of his room from a fresh air break about an hour and a half later.[2] Security personnel, including Defendants Thomspon and Folowosele, began to search Mr. Campbell and other patients for contraband.[3] Mr. Campbell complied.[4] Thereafter, security staff began directing patients to return

[1] Second Am. Compl., ECF No. 60 ¶ 2.

[2] Ex. 1 (Campbell Dep. Tr.) at 40:21–41:5. Safety time began at 10:00 AM. Ex. 2 (Perkins Dep. Tr.) at 72:2–5. In the video produced by Perkins in this case, Campbell appears at about 11:25 AM.

[3] Ex. 1 (Campbell Dep. Tr.) at 45:9–17. The video produced by Perkins corroborates this fact.

[4] *Id.*

to their rooms.[5] This time, Campbell did not fully comply.[6] He explained to security that he believed Perkins lacked authority to put the unit on safety time under the circumstances.[7] Thus, as shown in Image One below, Mr. Campbell stood next to his door in the hallway with his back against the wall in protest:[8]




**IMAGE ONE**

[5] Second Am. Compl., ECF No. 60 ¶ 2.

[6] *Id.* ¶ 3.

[7] *Id.*

[8] Mr. Campbell appears in the top middle of Image One, wearing a burgundy-colored jacket with white shirt, standing to the left of the woman wearing pink scrubs.

Over the course of about six minutes, Defendants Van Winkle and Mbah spoke to Mr. Campbell, attempting to convince him to enter his room; over a dozen security guards and medical staff surrounded Mr. Campbell as well.[9] Mr. Campbell respectfully declined to enter his room, remaining with his back against the wall.[10] Defendant Van Winkle eventually walked away.[11] Then, Defendant Mbah attempted to convince Mr. Campbell to return to his room, but Mr. Campbell again respectfully declined.[12] Mr. Campbell continued to maintain a calm, non-aggressive posture throughout this interaction. Less than two minutes later, Defendant Mbah then said "it's okay, if he won't go in just make him. . . . [G]rab his arms and push him in there, just push him in."[13] Accordingly, the guards attempted to push Mr. Campbell in his room.[14] Defendant Mbah then ordered security guards to restrain Mr. Campbell instead.[15] These guards, including Defendants Thompson and Folowosele, carried Mr. Campbell to the restraint room by his arms and legs.[16]

All of that is on video. But the events that followed in the restraint room are not. Conveniently, Defendants claim that the restraint room camera was broken at the time.[17] Mr. Campbell alleges that, once he was restrained, the guards pulled the restraints so tight towards the

---

[9] *Id.* ¶¶ 3–4.

[10] *Id.* ¶ 3. The video produced by Defendants shows that Mr. Campbell's back remained against the wall.

[11] *Id.*

[12] *Id.* ¶ 4.

[13] *Id.* ¶¶ 5–6.

[14] *Id.* ¶¶ 7–10.

[15] *Id.* ¶ 8.

[16] *Id.* ¶¶ 10–11.

[17] *Campbell v. Perkins*, No. 23-cv-478, 2023 WL 6161086, at *6 (D. Md. Sept. 21, 2023) ("The incident report provided by defendants indicates that the cameras inside the restraint room were part of an old system, had not been connected to the new system, and did not capture any of the events occurring inside the room.").

ground, outstretching his limbs, that it caused a severe burning sensation in his arms.[18] Mr. Campbell further asserts that Defendant Thompson, who stands 6'9" and weighs approximately 260 pounds, used his arm to hit Mr. Campbell twice in the face and lean on his neck.[19] Mr. Campbell also claims that he asked for immediate medical attention from the Perkins staff members near him but, rather than providing such help, Defendant Folowosele ridiculed Mr. Campbell and others ignored him.[20]

Once Defendant Van Winkle returned 2.5 hours later and released Mr. Campbell from restraints, Campbell reported injury to his neck, back, and limbs to Van Winkle, who, in turn, ordered the medical clinic to tend to Campbell.[21] Mr. Campbell subsequently began completing a grievance form after the lockdown ended.[22] But as he was filling out his grievance, Defendant Mbah retaliated against him.[23] Mbah—the individual responsible under Perkins policy for ensuring that Mr. Campbell reached the medical clinic—disciplined Campbell for violating the lockdown again by writing him up, threw out his lunch, and refused to send him to the clinic that day.[24] Mr. Campbell did not receive medical treatment until October 12, 2022, after he filed a second grievance on this issue.[25] The Perkins clinic, in turn, paid mere lip service to Mr. Campbell's injuries, simply ordering an X-ray and otherwise clearing him with no injuries. However, Mr. Campbell began suffering and still suffers from untreated nerve damage to this day.

---

[18] ECF No. 60 ¶ 13.

[19] *Id.* ¶ 12; Ex. 1 (Campbell Dep. Tr.) at 79:9–11; 80:6–15; *2011–12 Men's Basketball Roster: Kevin Thompson*, https://morganstatebears.com/sports/mens-basketball/roster/kevin-thompson/2551 (last visited Oct. 29, 2025).

[20] ECF No. 60 ¶¶ 14–16.

[21] *Id.* ¶¶ 17–18.

[22] *Id.* ¶ 19.

[23] *Id.*

[24] *Id.* Being written up has consequences for a patient's privileges within the hospital.

[25] *Id.* ¶ 18; Ex. 2 (Perkins Dep. Tr.) at 101:4–17

As a result, Mr. Campbell filed this lawsuit, asserting Section 1983 excessive force claims against all Defendants, common law assault and battery against Defendants Thompson and Folowosele, and First Amendment Retaliation against Defendant Mbah.

**B. Relevant Discovery**

The depositions taken by Mr. Campbell to-date in this case reveal a consistent and concerning theme among the Defendants and Perkins employees who were present during Mr. Campbell's restraint: "I don't remember." Indeed, Defendant Van Winkle testified that he does not remember "anything" about October 7, 2022.[26] Defendant Thompson testified that he is "100 percent sure" that he does not remember anything about the Campbell restraint because it "was too long ago."[27] Defendant Mbah testified that he "wouldn't remember" anything about October 7, 2022.[28] And Defendant Folowosele testified that he didn't remember anything about his participation in Mr. Campbell's restraint or the events that led up to it.[29] A slew of third-party witnesses, including two nurses and three security guards also each testified that they did not remember anything about October 7, 2022.

Only two witnesses testified that they remembered anything significant about Mr. Campbell's restraint: Richard McFee and Iris Mielke. Mr. McFee, a security guard at Perkins, testified that Mr. Campbell said, "if anyone puts hands on me, I'm going to . . . fuck them up" prior to guards restraining him.[30] Yet, Mr. McFee failed to document anything like this in his contemporaneous witness statement at the time. In sharp contrast to Mr. McFee's testimony, Ms.

---

[26] Ex. 3 (Van Winkle Dep. Tr.) at 128:11–16.

[27] Ex. 4 (Thompson Dep. Tr.) at 40:9–12.

[28] Ex. 5 (Mbah Dep. Tr.) at 19:7–13.

[29] Ex. 6 (Folowosele Dep. Tr.) at 42:6–25.

[30] Ex. 7 (McFee Dep. Tr.) at 45:16–22.

Mielke, the Director of Performance Improvement at Perkins, testified that Mr. Campbell "very politely said, 'I want to talk to my doctor'" when she entered the restraint room alone just minutes after the assault occurred.[31] According to Ms. Mielke, Mr. Campbell's polite demeanor never changed while at Perkins.[32]

### C. Press Coverage of Perkins leading to the Report

According to the *Washington Post*, the tenure of Perkins' recent former CEO and Clinical Director Scott Moran "was an era of discontent exacerbated by employee departures—including trusted psychiatrists—that destabilized and endangered the facility."[33] This included reduction of internal incident reviews, causing "doubt over whether serious incidents were being properly handled."[34] For example, under Mr. Moran's leadership, Perkins failed to conduct an autopsy of and failed to report the death of a patient to Disability Rights Maryland, an organization with state authority to review all patient deaths at Perkins.[35] Law enforcement had requested video footage related to this patient's death, but Perkins failed to preserve it, even though the request was timely under Perkins' retention policy.[36] In another incident, after a patient punched a staff member in the face and the staff member asked leadership to address "deficits" that led to her assault, Mr. Moran wrote to a subordinate: "Do not reply verbally or in any other way to this . . . . That is a direct order."[37] Perkins' leadership never followed up with the employee.[38]

---

[31] Ex. 8 (Mielke Dep. Tr.) at 28:5–7.

[32] *Id.* at 28:8–15.

[33] Ex. 9 at CAMPBELL_0000029.

[34] *Id.*

[35] *Id.* at CAMPBELL_0000032.

[36] *Id.* at CAMPBELL_0000033.

[37] *Id.* at CAMPBELL_0000030.

[38] *Id.*

Perkins also purportedly failed to investigate "dozens of sexual assault allegations from patients in a timely manner, violating the terms of a lawsuit settlement mandating immediate police notification of such incidents and coordinated follow-up care."[39] This was the conclusion of Perkins social worker, Nina Diana, who Mr. Moran tasked with reviewing Perkins' responses to alleged sexual assaults in 2022 and 2023. After Ms. Diana reached that conclusion, Mr. Moran "disregarded her findings and instead blamed her for not updating hospital policies to comply with the settlement" and "handed her a pre-written demotion letter[.]"[40] Perkins likewise failed to conduct an "internal incident review" requested by a lead psychiatrist after an all-out brawl between multiple patients.[41]

Defendant Van Winkle corroborated the Post's reporting in his testimony in this case. According to him, Perkins "was a horrible place to work" because he "did not feel safe from a personal or professional standpoint" as "staff were . . . afraid of the administration due to them being punitive."[42] He went further: "We had a particularly unpleasant person running the hospital as the medical director and then the CEO [Mr. Moran] and the toxic culture that he created trickled down to a lot of things."[43] Asked for more specifics, Defendant Van Winkle testified that Mr. Moran "would target people who made him look bad. He prevented, in at least one instance that I heard about, a physician was trying to . . . provide a treatment that would've been standard of care, and [Mr. Moran] said no."[44]

---

[39] *Id.* at CAMPBELL_0000031.

[40] *Id.*

[41] *Id.* at CAMPBELL_0000030.

[42] Ex. 3 (Van Winkle Dep. Tr.) at 15:21–16:4,

[43] *Id.* at 16:5–8.

[44] *Id.* at 16:5–17.

In 2024, the *Washington Post*'s reporting convinced then-Maryland Secretary of Health Laura Herrera Scott that the Perkins leadership team at the hospital between 2020 and 2024 may have lied to her about the facts of major incidents of violence and other patient harm.[45] That leadership team, led by Mr. Moran, often covered up violence or failed to investigate allegations at all. Mr. Moran was first clinical director and then CEO while Mr. Campbell was a Perkins patient, and Moran investigated both of Campbell's grievances underlying this case.[46]

After investigating the incidents covered by the *Washington Post*, Secretary Herrera Scott concluded that there was a "severe lack of oversight" and "failure to follow standardized incident reporting procedures and protocols" at Perkins under Moran's leadership.[47] This necessitated the Report that is the subject of the subpoena in this case.[48] In Secretary Herrera Scott's words, Perkins had leaders who were "supposed to be doing their jobs and advising appropriately" but "unfortunately, I had leaders in place that were not," some of whom she fired.[49]

Secretary Herrera Scott corroborated a claim that Mr. Moran failed to preserve video footage timely requested by law enforcement related to a patient's death.[50] She fired Mr. Moran and ordered a full review of Perkins' policies, administration, and care.[51] She tasked the National

---

[45] Ex. 9 at CAMPBELL_0000026, 0000044; Ex. 2 (Perkins Dep. Tr.) at 46:1–18 ("Q: So this article reports on Maryland Health Secretary Laura Herrera Scott's testimony before, I believe, the legislature, that top Perkins staffers, [']misrepresented the facts,['] about troubling complaints of violence, specifically a rape and a riot. Does Perkins know if the misrepresentations she's speaking about were attributable to Perkins administration or Perkins line employees beneath administration. A: Perkins administration. Q: Okay. And so that would be . . . People like Scott Moran . . . ? A: That's correct.").

[46] Ex. 2 (Perkins Dep. Tr.) at 100:2–102:16; Ex. 9 at CAMPBELL_000027, 0000030.

[47] Ex. 9 at CAMPBELL_0000041.

[48] Ex. 10 (Sept. 30, 2025 Subpoena).

[49] *Id.* at CAMPBELL_0000044.

[50] *Id.*at CAMPBELL_0000025.

[51] *Id.* at CAMPBELL_0000040, 0000042; Ex. 2 (Perkins Dep. Tr.) at 23:12–24:6 ("Q: Is it true that Scott Moran was suspended by the Mayland State Board of Physicians? A: The department would know, yes."); *id.* at 48:9–20 ("Q: Did the secretary of health fire anybody in response to learning that the facts were, in her words, misrepresented? A: Yes. Q: Did any of people who were fired have involvement in the administration's review of the October 7, 2022

Association of State Mental Health Program Directors with drafting the Report, which documents the culture and conduct at Perkins under Mr. Moran—the period during which Mr. Campbell was a Perkins patient—based on evidence and staff testimony, and makes recommendations to fix them.[52] It specifically investigated "the hospital's leadership team; medical treatment programs; the security apparatus; employee and patient morale; and culture and patient complaints."[53]

Secretary Herrera Scott testified that she received the preliminary version of the report on November 18, 2024, and that she would receive the final version of the report on January 1, 2025. She promised to publicly release the report shortly after receiving it in January 2025.[54] The Report, however, was not released in January 2025, and Secretary Herrera Scott resigned a month later. Perkins' current CEO has received the final version of the Report.[55] Perkins testified that its intention remains to publicly release the report at some point.[56] Yet, the Report remains publicly unavailable to this day.

On October 1, 2025, Campbell issued a subpoena[57] for the final version of the Report as well the earlier interim draft of it as part of his affirmative discovery in this case.[58]

---

restraint of Charles Campbell? A: Yes. Q: Who were those? A: "Dr. Moran, because he was part of the RGS investigation. So definitely him, Dr. Moran.").

[52] Ex. 9 at CAMPBELL_0000043, 0000047.

[53] *Id.*; Ex. 2 (Perkins Dep. Tr.) at 49:18–50:4. (Q: "Turning to 17, the article says that the third-party audit that we were previously discussing before the break would, quote, 'scrutinize [the] hospital's leadership team, medical treatment programs, security apparatus, employee and patient morale, and culture and patient complaints. Is that an accurate statement? A: Yes, it is.").

[54] Ex. 9 at CAMPBELL_0000047.

[55] ECF No. 106-2 at 1; Perkins Dep. Tr. at 43:18–44.

[56] Perkins Dep. Tr. at 51:7–19.

[57] Ex. 10 (Sept. 30, 2025 Subpoena).

[58] All references to "the Report" refer to both documents.

## II. ARGUMENT

Federal Rule of Civil Procedure 26(b)(1) permits discovery requests of non-privileged material that are relevant and proportionate to the needs of the case. Fed. R. Civ. P. 26(b)(1); *see also Virginia Dep't of Corr. v. Jordan*, 921 F.3d 180, 188 (4th Cir. 2019). Discovery under Rule 26 is broad. *Mylan Lab'ys, Inc. v. Akzo, N.V.*, 2 F.3d 56, 64 (4th Cir. 1993).

Mr. Campbell's request is proportionate to the needs of the case because there is no burden on Defendants, who lack standing to object to the subpoena. Notably, Perkins itself has not objected to producing the Report. And the Report is relevant because, among other things, it could (1) be used to impeach witness testimony on grounds of bias, prejudice, and motive; (2) provide probative evidence that Defendants used objectively unreasonable force and that Defendant Mbah retaliated against Campbell; and (3) help prove a reckless motive that warrants punitive damages. The Report is not privileged because the medical review committee privilege does not exist under the federal common law, and the deliberative process privilege cannot shield the factual findings of this document.

### D. Defendants lack standing to seek to quash the Perkins subpoena, and the subpoena imposes no burden on them in any event

It is black-letter law that "a party does not have standing to challenge a subpoena issued to a nonparty unless the party claims some personal right or privilege in the information sought by the subpoena." *United States v. Idema*, 118 F. App'x 740, 744 (4th Cir. 2005). Defendants do not have a personal right or privilege in the Report because the Report does not belong to them, and in any event, they have not asserted one. *See Eichenwald v. Rivello*, 321 F. Supp. 3d 562, 564 (D. Md. 2018) ("Defendant makes no argument that he has a personal right or privilege in any of the information sought, and therefore he lacks standing to challenge these subpoenas."). All the alleged privileges asserted here belong to Perkins, who has not objected to Mr. Campbell's

subpoena. For this reason alone, Defendants' Motion should be denied.

Even if they did have standing, and assuming that they—not Perkins—were the ones required to produce the Report, Defendants have not specified any burdens from complying with the subpoena. Rule 26(b)(1) obligates the Court to consider multiple factors that weigh on proportionality, including "the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b)(1). Mr. Campbell's subpoena for the Report possessed by a state government agency is clear, narrow, inexpensive, and imposes no burden on Perkins (nor has Perkins even asserted a burden). Mr. Campbell's claims also relate to physical violence and misconduct at an institution plagued by similar issues, making them important. Proportionality is no barrier to Perkins' production of the Report.

### E. The Report is relevant because it goes to Campbell's ability to impeach witnesses and prove his claims and punitive damages

Relevance is "broadly construed to encompass any possibility that the information sought may be relevant to the claim or defense of any party." *O'Malley v. Trader Joe's E., Inc.*, 2020 WL 6118841, at *3 (D. Md. Oct. 15, 2020) (cleaned up). This includes "any matter that bears or may bear on any issue that is or may be in the case." *Carr v. Double T Diner*, 272 F.R.D. 431, 433 (D. Md. 2010). It also includes evidence used for witness impeachment. *Beckner v. Bayer Cropscience, LP*, 2006 WL 6906942, at *4 (S.D.W. Va. June 28, 2006). Relevance is not a high bar. *Jordan*, 921 F.3d at 188. In fact, relevance for discovery purposes is a much looser standard than relevance for evidentiary purposes. *United Oil Co. v. Parts Assocs., Inc.*, 227 F.R.D. 404, 409 (D. Md. 2005). Evidence "need not be admissible . . . to be discoverable." Fed. R. Civ. P. 26(b)(1).

#### 1. The Report may bear on many witnesses' credibility.

One of the cornerstone issues in this case is whether Defendant Thompson used excessive force while Mr. Campbell was restrained. ECF No. 60 at 6. While much of Mr. Campbell's complaint has been corroborated by the video footage from the hallway leading up to his restraint, there is no footage from inside the restraint room where Defendant Thompson beat him. All the Defendants and almost all the third-party witnesses in this case testified that they do not remember anything that happened prior to the restraint or in the restraint room. *See supra* § I(B). Mr. Campbell is entitled to cast doubt on the witness' lack of memory by presenting extrinsic evidence of bias, prejudice, or motive to testify in a particular way. *Behler v. Hanlon*, 199 F.R.D. 553, 556–57 (D. Md. 2001) (citing *United States v. Abel*, 469 U.S. 45, 49–52 (1984)). Among the limitless examples of bias and prejudice are fear. *Id.* at 557. The Report, that former Secretary Herrera Scott ordered after finding that the Perkins administration repeatedly lied, may demonstrate that Perkins had a pattern and practice of pressuring employees to lie in witness statements, intentionally omit details, or, as Defendant Van Winkle put it, retaliate against anyone that made Perkins "look bad." Ex. 3 (Van Winkle Dep. Tr.) at 16:11–13. These practices of the Perkins administration likely detailed in the Report could explain witnesses' fearful motive for repeatedly testifying "I don't remember" under oath.

The Report is also relevant to Perkins' own credibility. Perkins' Rule 30(b)(6) designee testified that the camera in the 1 West restraint room where Mr. Campbell was restrained was non-functional on October 7, 2022 and that this camera had been broken for over a year. Ex. 2 (Perkins Dep. Tr.) at 59:14–60:5. Perkins also testified that the only reason it discovered this issue was Mr. Campbell's grievance, triggering a video footage request from that broken camera. *Id.* at 58:20–59:2. The only documents Perkins produced in this case purporting to prove that the camera was

broken are a few emails between Perkins administrators, including Mr. Moran, about moving a new camera to the restraint room in 2023. Yet, as the *Washington Post* reported and former Secretary Herrera Scott confirmed, in response to another incident, "Police alleged in documents that Perkins's leadership had failed to comply with a request to preserve surveillance footage from before and after [a patient's] death, so its automated system permanently deleted critical evidence." Ex. 9 at CAMPBELL_0000025. The Report may contain facts that impeach Perkins' broken camera story, particularly if the Report determined that Perkins' leadership had a policy of intentionally failing to preserve video footage during a period that includes this incident.

**2. The Report may be relevant to Mr. Campbell's excessive force and First Amendment retaliation claims.**

The standard for whether a defendant used excessive force on a plaintiff is objective unreasonableness. *Simmons v. Whitaker*, 106 F.4th 379, 387 (4th Cir. 2024). Many circuits and courts within the Fourth Circuit have held that objective unreasonableness "may include, among other considerations . . . noncompliance with training and established policy." *Fulton v. Nisbet*, 2018 WL 565265, at *3 (D.S.C. Jan. 25, 2018); *Wyatt v. Owens*, 317 F.R.D. 535, 542 (W.D. Va. 2016) (collecting cases); *c.f. Brooks v. Johnson*, 924 F.3d 104, 122 (4th Cir. 2019) (explaining that violation of prison policy is "highly relevant" to Eighth Amendment excessive force claims). Moreover, the two elements that Mr. Campbell must prove for First Amendment retaliation are that Defendant Mbah took action that adversely affected Mr. Campbell's First Amendment rights and that there was a causal relationship between Mr. Campbell's protected speech and Defendant Mbah's conduct. *Martin v. Duffy*, 977 F.3d 294, 299 (4th Cir. 2020). Defendants have admitted that Campbell engaged in First Amendment-protected activity in their answer. ECF No. 69 at 2 ("Defendants admit that Campbell filled out a grievance against the named Defendants after the restraint."); *Booker v. S.C. Dep't of Corr.*, 855 F.3d 533, 545–46 (4th Cir. 2017) (holding that

"inmates possess a First Amendment right to be free from retaliation for filing a grievance").

The Report is a "top-to-bottom review and investigation into all aspects of policy and procedure at Perkins," including review of "the hospital's leadership team; medical treatment programs; the security apparatus; employee and patient morale; and culture and patient complaints." Ex. 9 at CAMBELL_0000040, 0000043, 0000047. As Defendant Van Winkle testified in this case, the Perkins administration retaliated against people who made the administration "look bad." Ex. 3 (Van Winkle Dep. Tr.) at 16:12–13. And as Secretary Herrera Scott found, the Perkins administration had a pattern of failing to investigate patient complaints—a key reason she ordered the audit and resulting Report. If the Report found that the Perkins administration maintained a general practice of disregarding policy, failing to train employees, or retaliating against employees and patients who followed policy or complained of misconduct at the time of Mr. Campbell's restraint, it would make it more likely that Defendants used excessive force on him or retaliated against him for filing his grievance.

**3. The Report could be important evidence supporting an award of punitive damages.**

Juries can assess punitive damages in Section 1983 cases "when the defendant's conduct involves reckless or callous indifference to the plaintiff's federally protected rights, as well as when it is motivated by evil motive or intent." *Smith v. Wade*, 461 U.S. 30, 30 (1983). For example, in a Section 1983 case against individual police officers for false arrest and malicious prosecution, the Northern District of Georgia found that the Fulton County Sheriff's Department's "wrestling title belt" award for officers on the shift with the highest number of arrests during the week was relevant to punitive damages. *Warren v. Scott*, 2015 WL 11199160, at *3 (N.D. Ga. Feb. 23, 2015). This was because the award may have recklessly encouraged officers to violate constitutional rights to rack up additional arrests. *Id.* In any event, background evidence on past wrongs can

prove motive or intent. *Synnova Inscore v. Doty*, 2009 WL 2753049, at *3 (E.D. Ark. Aug. 27, 2009) (permitting evidence of incidents that occurred before but close in time to plaintiff's discrimination complaint). If the Report contains evidence that the Perkins administration encouraged employees to violate policies in ways that may have contributed to their decision to restrain Mr. Campbell and deny him medical care on October 7, 2022, it could establish recklessness and motive by Defendants that warrants punitive damages.

* * *

In sum, Mr. Campbell has an "intelligible explanation" for why the Report may bolster his claims, distinguishing his request from the inapposite "fishing expedition" line of cases cited by Defendants. ECF No. 106-1 at 10; *see, e.g.*, *Gross v. Morgan State Univ.*, 2018 WL 9880053 (D. Md. Feb. 9, 2018). Thus, the Court should order production of the Report.

**F. The medical review committee privilege does not shield the Report because no such privilege exists under federal common law**

Defendants cannot rely on Maryland's medical review committee privilege because it does not apply in federal question cases, as the Fourth Circuit and courts within this district have held. Rather, federal law governs privileges in federal question jurisdiction cases, even when there are pendent state law claims. *Virmani v. Novant Health Inc.*, 259 F.3d 284, 286 n.3 (4th Cir. 2001). State-law privileges "do not supply the rule of decision in federal question cases and they have no binding authority on federal courts." *Bost v. Wexford Health Sources, Inc.*, 2017 WL 3084953, at *3 (D. Md. June 19, 2017). Instead, Federal Rule of Evidence 501 applies. *Cappetta v. GC Servs. Ltd. P'ship*, 266 F.R.D. 121, 125 (E.D. Va. 2009). Rule 501 states, in relevant part, that federal common law "governs a claim of privilege unless any of the following provides otherwise: the United States Constitution; a federal statute; or rules prescribed by the Supreme Court." Fed. R. Evid. 501. Because this case is before the Court on federal question jurisdiction with pendent state

law claims, Federal Rule of Evidence 501 governs privileges in this case. *Virmani*, 259 F.3d at 286 n.3.

Rule 501 "authorizes the recognition of new privileges on a case-by-case basis." *Jaffee v. Redmond*, 518 U.S. 1, 18 (1996). New evidentiary privileges, however, are not lightly created. *Virmani*, 259 F.3d at 287. This is because courts "start with the primary assumption that there is a general duty to give what testimony one is capable of giving, and that any exemptions which may exist are distinctly exceptional, being so many derogations from a positive general rule." *Jaffee*, 518 U.S. at 9. And courts should be "especially reluctant to recognize a privilege in an area where it appears that Congress has considered the relevant competing concerns but has not provided the privilege itself." *University of Penn. v. E.E.O.C.*, 493 U.S. 182, 189 (1990).

Notably, the Fourth Circuit has already rejected the recognition of state medical review committee privilege under federal common law. *Virmani*, 259 F.3d at 293. Even though the Fourth Circuit agreed with a hospital that North Carolina's medical review committee privilege law protects important interests, it nonetheless rejected the privilege, in part because federal discrimination cases advance important public interests. *Id.* at 291; *see also Tucker v. United States*, 143 F. Supp. 2d 619 (S.D. W.Va. 2001) (rejecting medical review committee privilege in a Federal Tort Claims Act case). The Seventh Circuit came to a similar conclusion in an antitrust case. *Mem'l Hosp. for McHenry Cnty. v. Shadur*, 664 F.2d 1058, 1063 (7th Cir. 1981) ("The public interest in private enforcement of federal antitrust law in this context is simply too strong to permit the exclusion of relevant and possibly crucial evidence by application of the Hospital's privilege."). The Ninth Circuit also rejected the privilege in a Section 1983 case about the death of a prisoner case because Congress had the opportunity to adopt the medical review committee privilege but declined to do so while deliberating on the Health Care Quality Improvement Act of

1986. *Agster v. Maricopa Cnty.*, 422 F.3d 836, 839 (9th Cir. 2005) (citing *Univ. of Penn.*, 493 U.S. at 189).

Consistent with most courts, at least one district in the Court has also rejected the medical review committee privilege. *Bost*, 2017 WL 3084953, at *4. Judge Copperthite noted that every circuit court that considered the medical review committee privilege under Rule 501, and almost every district court that considered the privilege under Rule 501 in Section 1983 cases, has rejected it. *Id.* at *4. He then joined those courts by declining to adopt the privilege for a healthcare provider in a Section 1983 case. *Id.*; *see also Nilavar v. Mercy Health Sys.-W. Ohio*, 210 F.R.D. 597, 604 (S.D. Ohio 2002) (collecting over 20 cases declining to adopt medical review committee privilege). Judge Copperthite's decision contrasts with an earlier decision from Judge Blake that lacked the Supreme Court's guidance from *Jaffee*. *See Brem v. DeCarlo, Lyon, Hearn & Pazourek, P.A.*, 162 F.R.D. 94, 101 (D. Md. 1995) (holding that "Federal Rule of Evidence 501 leaves the application of privileges to the trial court's discretion"). As the Supreme Court held in *Jaffee* one year later, privileges under federal common law are "exceptions to the general rule disfavoring testimonial privileges," not discretionary whims. *Jaffee*, 518 U.S. at 9.

This case is no different than the rest. Defendants ask this Court to be an outlier and adopt the medical review committee privilege into federal common law despite prior decisions from the Fourth Circuit and districts in this Court and a legion of other authorities rejecting it. To the extent that Defendants might argue on reply that this Court should reverse course based on some fact-specific aspect of this case, at least one court has pilloried that argument: "[T]his Court doubts the wisdom of reading Rule 501 so flexibly as to find that an almost universally-rejected privilege may yet have merit under the totality of circumstances of an isolated case." *Nilavar*, 210 F.R.D. at 606. This Court should, again, decline to adopt the medical review committee privilege.

**G. The deliberative process privilege does not shield the facts in the Report from discovery**

Unlike the medical review committee privilege, the deliberative process privilege exists under federal common law. *Jones v. Murphy*, 256 F.R.D. 510, 515 n.5 (D. Md. 2008). The deliberative process privilege "protects from disclosure documents generated during an agency's deliberations about a policy, as opposed to documents that embody or explain a policy that the agency adopts." *United States Fish & Wildlife Serv. v. Sierra Club, Inc.*, 592 U.S. 261, 263 (2021). The party asserting deliberative process privilege must articulate specific facts that support non-disclosure. *E.K. by & through Keeley v. Dep't of Def. Educ. Activity*, -- F. Supp. 3d --, 2025 WL 1921928, at *3 (E.D. Va. July 11, 2025). As the Fourth Circuit has explained, the key reasons for protecting the deliberative process are shielding internal deliberations from public ridicule, stopping the release of unfinalized policies, and preventing public confusion about an agency's rationale for issuing a decision. *Cipollone v. Liggett Grp. Inc.*, 1987 WL 36515, at *2 (4th Cir. 1987). In contrast, documents that describe an already-adopted policy are not protected by deliberative process privilege. *E.K.*, 2025 WL 1921928, at *4 (citing *Reps. Comm. for Freedom of the Press v. Fed. Bureau of Investigation*, 3 F.4th 350, 363 (D.C. Cir. 2021)).

Documents protected by the deliberative process privilege must be both pre-decisional and deliberative. *City of Virginia Beach, Va. v. U.S. Dep't of Com.*, 995 F.2d 1247, 1253 (4th Cir. 1993). The Fourth Circuit has adopted the "give-and-take test" for determining whether documents are pre-decisional and deliberative. *Jones*, 256 F.R.D. at 518. This give-and-take exists for documents that intend to fuel a dialogue, like "recommendations, draft documents, proposals, suggestions, and other subjective documents that reflect personal opinion." *Id.* (citing *City of Virginia Beach*, 955 F.2d at 1253). But the deliberative process privilege only covers opinions, not facts. *Cippollene*, 1987 WL 36515 at *2; *accord City of Virginia Beach*, 955 F.2d at 1255.

Even if documents meet the give-and-take test, the deliberative process privilege may not apply because it is not absolute. *Stone v. Trump*, 356 F. Supp. 3d 505, 514 (D. Md. 2018), *amended on reconsideration*, 402 F. Supp. 3d 153 (D. Md. 2019). Courts "balance the public interest in nondisclosure with the need for the information as evidence" to determine if the privilege applies. *Id.* (cleaned up). Factors relevant to this balance are "(1) the relevance of the evidence to the lawsuit; (2) the availability of alternative evidence on the same matters; (3) the government's role (if any) in the litigation, and (4) the extent to which disclosure would hinder frank and independent discussion regarding contemplated policies and decisions." *Cippollene*, 1987 WL 36515 at *2.

Defendants have not shown that deliberative process privilege protects the Report from discovery. The facts contained in the Report clearly are not protected by deliberative process privilege because they are facts, not deliberations. *Cippollene*, 1987 WL 36515 at *2; *City of Virginia Beach*, 955 F.2d at 1255. Moreover, the facts are indicative of Perkins' already-adopted policies that predate the Report and any recommendations therein, making them wholly separate from any deliberation over reforms that Perkins might make in response to the Report. *E.K.*, 2025 WL 1921928, at *4. According to the Affidavit of Aliya Jones, M.D., submitted by Defendants with their Motion to Quash, production of the Report in this litigation would be harmful because "Perkins has not finalized a policy based on the information contained in the [R]eport." ECF No. 106-2 at 2. But the facts in the Report are final and are agnostic as to whether, in fact, Perkins has finalized a policy or not.

The *Cipollone* balancing factors weigh in favor of discovery of the entire Report. As discussed above, the Report is relevant to Mr. Campbell's claims. He is unlikely to obtain the key evidence on the practices and policies of Perkins' leadership from other sources, as only the National Association of State Mental Health Program Directors' Report had unfettered access to

Perkins facilities, staff members, and records for fact-finding on those issues. This lawsuit is against government employees who are indemnified by the government and represented by government lawyers. And production of the Report would not hinder the deliberative process because Perkins testified under oath that it plans to publicly release the Report at some point in the future.

Dr. Jones' Affidavit asserts that the Report "makes recommendations and expresses opinions on legal and policy matters" that are "being used currently to make improvements in health, safety and welfare of individuals at Perkins." ECF No. 106-2 at 1–2. If the Court finds that the balance weighs in favor of shielding those recommendations from discovery, then it should conduct an *in camera* review of the Report to determine which parts of the Report, if any, might be privileged and should be redacted. But under no circumstance does the deliberative process privilege extend to the facts in the Report.

## III. CONCLUSION

The Report is relevant evidence that would help Campbell impeach witnesses and prove his claims and damages. It is not privileged and is even slated for eventual public release. Because Defendants must produce relevant non-privileged evidence, the Court should deny Defendants' Motion and compel production of the Report.

## IV. HEARING REQUESTED

Counsel for Plaintiff Campbell requests a hearing on this dispute.

**CERTIFICATE OF SERVICE**

I, Andrew Magloughlin, certify that on October 29, 2025 this document will be sent electronically through the Court's ECF system to the registered participants as identified on the notice of electronic filing and paper copies will be sent to those indicated as non-registered participants.

/s/ *Andrew Magloughlin*
Andrew Magloughlin