Planet Depos
We Make It Happen™

# Transcript of Iris Mielke - Corporate Designee

**Date:** September 22, 2025
**Case:** Campbell -v- Mbah, et al.

**Planet Depos**
**Phone:** 888.433.3767 | **Email:** transcripts@planetdepos.com
**www.planetdepos.com**
**Michigan #8598 | Nevada #089F | New Mexico #566**

WORLDWIDE COURT REPORTING & LITIGATION TECHNOLOGY

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

------------------------------x
CHARLES CAMPBELL, :
Plaintiff, :
v. : Case No. SAG-23-478
JOHN MBAH, et al., :
Defendants. :
------------------------------x

DEPOSITION OF CLIFTON T. PERKINS HOSPITAL CENTER,
BY AND THROUGH ITS CORPORATE DESIGNEE,
IRIS MIELKE
Jessup, Maryland
Monday, September 22, 2025
11:07 a.m.

Job No.: 592360
Pages: 1 - 108
Recorded By: Brendon Cuenca



Deposition of CLIFTON T. PERKINS HOSPITAL CENTER, held at the offices of:

CLIFTON T. PERKINS HOSPITAL CENTER
8450 Dorsey Run Road
Jessup, Maryland 20794
(410) 724-3000

Pursuant to Notice, before Brendon Cuenca, Notary Public in and for the State of Maryland.



A P P E A R A N C E S

ON BEHALF OF THE PLAINTIFF:
ANDREW MAGLOUGHLIN, ESQUIRE
MIHIR DESAI, ESQUIRE
DWIGHT DRANGHON, ESQUIRE
STEPTOE LLP (DC)
1330 Connecticut Avenue NW
Washington, D.C. 20036
(202) 429-3000

ON BEHALF OF THE DEFENDANTS:
MUSA EUBANKS, ESQUIRE
MARISA CAPON, ESQUIRE
ATTORNEY GENERAL OFFICE
300 West Preston Street
Baltimore, MD 21202
(410) 767-1861



C O N T E N T S


| EXAMINATION OF CLIFTON T. PERKINS HOSPITAL CENTER | PAGE |
|---|---|
| By Mr. Magloughlin | 6, 106 |
| By Mr. Eubanks | 105 |


E X H I B I T S
(Retained by Counsel)


| DEPOSITION EXHIBIT | | PAGE |
|---|---|---|
| Exhibit 2 | Perkins Hospital Standard Procedure | 68 |
| Exhibit 3 | Perkins Hospital Seclusion and Restraints Standard Procedure | 72 |
| Exhibit 4 | The Prevention and Management of Aggressive Behavior Manual | 75 |
| Exhibit 7 | Video | 88 |
| Exhibit 19 | Medical Clinic Referral Procedure | 78 |
| Exhibit 35 | Document | 13 |
| Exhibit 36 | Subpoena | 14 |
| Exhibit 37 | Record Retention Policy | 19 |
| Exhibit 38 | Document | 22 |

EXHIBITS CONTINUED

(Retained by Counsel)



| DEPOSITION EXHIBIT | | PAGE |
|---|---|---|
| Exhibit 39 | Article | 25 |
| Exhibit 40 | Article | 44 |
| Exhibit 41 | Standard Procedure Document | 62 |
| Exhibit 42 | Patient Bill of Rights | 81 |
| Exhibit 43 | Resident Grievance Letter | 97 |
| Exhibit 44 | Grievance Report | 100 |



CERTIFIED QUESTIONS

Page 43, Line 1



PROCEEDINGS

THE REPORTER: Okay, raise your right hand again, please.

Whereupon,

CLIFTON T. PERKINS HOSPITAL CENTER,

by and through its corporate designee,

IRIS MIELKE,

being first duly sworn or affirmed to testify to the truth, the whole truth, and nothing but the truth, was examined and testified as follows:

EXAMINATION BY COUNSEL FOR THE PLAINTIFF

BY MR. MAGLOUGHLIN:

Q Okay. It is September 22nd, 11:07 a.m. We're at the Clifton T. Perkins Hospital Center with Iris Mielke, who will be the corporate representative for the Clifton T. Perkins Hospital Center. And me, Andrew Magloughlin, Dwight Dranghon from Steptoe, Mihir Desai from Steptoe. Everybody stipulated no officer from -- employed by the Court itself. I'm Andrew, you met us already, from Steptoe. We represent Charles Campbell.



Can you please state your name for the record?

**A Iris Mielke.**

Q Okay. And I want to go through the instructions you already heard, but there are some new ones specific to being a corporate representative.

I assume your attorney gave you instructions about the procedures and your obligations today; is that correct?

**A That's correct.**

Q I'm going to emphasize a few. Please speak loudly and clearly so the court reporter can hear you. For the same reason, it's important we take turns speaking and don't speak over each other. Please wait until I'm done asking a question fully before responding.

In conversation, it is common for people to assume what someone is asking before they finish saying whatever they're saying, but we don't want you to do that here. All this is to ensure that the transcript is nice and clean and



not intersecting because it could be used in court.

If your attorney objects, you should still answer the question unless your attorney tells you not to do so. You're testifying under oath just as if you were in a courtroom. All responses must be truthful. Lying under oath constitutes perjury.

Do you understand?

**A Yes, I do.**

Q Again, I have to ask these because you're a brand new person in this context. We're interested in finding out everything you know about the events and facts that underlies this lawsuit. And for that reason, we are looking for full and complete answers to the questions that I'm going to ask.

In other words, we're looking for the whole truth. Do you understand?

**A Yes. I do.**

Q Listen carefully to the entire question before answering. If you don't understand a question ask for clarification before responding.

9

Do you understand?
**A Yes, I do.**
Q Please provide verbal responses such as yes or no rather than nodding or shaking your head. If you need a break at any time, just let us know; however, if there is a question pending, you must answer it before we break, unless you need to talk to your attorneys about a matter of privilege; is that okay?
**A Yes.**
Q During breaks, you cannot discuss your testimony with anyone including your attorney. Do you understand?
**A Yes.**
Q If you're shown a document, take your time to review it before answering. If you do not recognize or recall a document, just say so. Do you understand?
**A Yes.**
Q And that'll be a little more important here because we got a lot more exhibits for this deposition than the last one and some of them --

10

some of them are a little longer than the ones that we had last time, too. We don't want you to guess or assume, but we are entitled to your best estimate.
For example, if I ask you to tell me the length of the table we -- we are sitting at, you can estimate it because it is here and you can perceive it. If I ask you to tell me the length of the table in my home, you would have to guess because you've never seen it before. Do you understand?
**A Yes.**
Q If you remember additional information or want to clarify something, whether five minutes or five hours later, just let us know so we can revisit the topic. Do you understand?
**A Yes.**
Q Have an opportunity to review your testimony and make corrections. Have you taken any medications or substances in the past 24 hours that would impact your ability to give your best testimony here today?

11

**A No, I have not.**
Q Is there any other reason why you do not believe you can give your best testimony here today?
**A No.**
Q Do you work at the Clifton T. Perkins Hospital Center?
**A Yes, I do.**
Q What is your position of employment there?
**A Director of performance improvement.**
Q And what is your name?
**A Iris Mielke.**
Q So do you understand that you are testifying on behalf of the Clifton T. Perkins Hospital Center as its corporate representative?
**A Yes, I do.**
Q This means that your testimony is as if the organization were here in person sitting in your chair answering questions, even though that is literally not possible; do you understand?
**A Yes.**

12

Q Typically, when you testify, you are supposed to testify to facts that you personally know because you observed them, meaning you saw, heard, touched, taste, or smelled something with your own senses, but that is not the case in this deposition.
Here, you must testify to facts that you, Iris Mielke, may not personally know, but the Perkins Hospital itself would know or would have reasonably available to it if we treated it as a living person. Do you understand?
**A Yes.**
Q Did you review any documents in preparation for this deposition?
**A Yes.**
Q Can you generally describe the documents you reviewed?
**A I reviewed the actual initial RGS complaint documentation surrounding the allegation and the statements from -- that were submitted by the security officers who needed to submit a statement.**

13

Q Anything else?
**A The report that I sent to MDH Police and then their report.**
MR. MAGLOUGHLIN: Okay. I'm now going to show you what is marked as Exhibit 35.
(EXHIBIT 35 MARKED)
Q Have you seen this document before?
**A Yes.**
Q Okay. I want you to flip to Page 2 and read the list of deposition topics that starts at the bottom all the way until the end. The last one's on the very top of Page 5. Let me know when you're done.
**A Okay.**
Q Are you aware that you are expected to answer on behalf of Perkins for all the topics you just read?
**A Yes.**
MR. MAGLOUGHLIN: Okay. So now I'm going to show you Exhibit 36, which is the subpoena that our law firm, Steptoe, LLP, issued to the Clifton T. Perkins Hospital Center on

14

behalf of Charles Campbell on December 17th, 2024.
(EXHIBIT 36 MARKED)
BY MR. MAGLOUGHLIN:
Q You can let me know when you're ready.
**A Okay.**
Q Did Perkins receive the subpoena?
**A Yes.**
Q What steps did Perkins take to respond to this subpoena?
**A I can't really answer that.**
Q Okay. That was one of the topics on the list.
**A Right. Outside of, you know, gathering the documentation and everything that's listed here and trying to get video that wasn't available. Those kind -- produce all the documents and everything, yeah.**
Q So Perkins searched through physical records it had?
**A Yes. Oh, yeah.**
Q Okay. And -- and Perkins --
**A Put everything on hold. Everything was**

15

**placed on hold not to get rid of anything related to Mr. Campbell.**
Q Okay. Do you know when about that hold was issued?
**A No.**
Q Okay. Did Perkins search, for example, Charles Campbell's patient file for documents?
**A Yes.**
Q Okay. Did Perkins search any staff e-mail accounts?
**A I can't answer that. Besides mine, I know mine.**
Q Okay. Did Perkins search records, for example, that might have been contained in the control room?
**A Yes.**
Q Okay. And was there any method that was used to identify responsive documents? For example, searching for e-mails, like, you know, searching for the word Campbell or --
**A Oh, yes. Yes.**
Q Okay, got you. Do you -- do you know

16

what any of those methods were?
**A The department would follow up with IT to make sure that any kind of e-mail. We also, the department also sent out a document that stated whatever you have needs to be secured, do -- do not destroy anything, keep everything on file.**
Q Okay. And is it safe to say that every document that Perkins produced to Steptoe, my firm, is a document that was created in the ordinary course of business at Perkins?
**A Yes.**
Q And is it safe to say that it's a regular practice for Perkins' employees to create the type of documents that Perkins produced?
**A Yes.**
Q Is it safe to say that the patient records created at Perkins are -- are made around the time of events they discuss?
**A Yes. During the event, during that process, yeah.**
Q Got you. Yeah. So -- so for example,

17

if something happened on, well, let see, it was October 7th, 2022. There's a record written about October 7th, 2022, and -- and dated as such. It was likely, you know, sometime close to that date?
**A It -- that's -- that's the department's standard procedure. Things that happened have to be documented at the time of the incident or shortly after. Otherwise, it has to be entered as a late entry.**
Q Excellent. Is there anything that would mark late entry on a document?
**A It would say late entry from such and such based on the department's policy on medical record documentation.**
Q Understood. Does Perkins issue work e-mail accounts to employees?
**A Yes.**
Q What type of employees get a work e-mail account?
**A Every employee that's employed at Clifton T. Perkins has access to e-mails for the facility.**

18

Q Is that the truth for security guards?
**A Yes.**
Q Okay. Do they regularly receive work e-mails on those accounts?
**A I couldn't really answer that. They do receive e-mails, whether they open them or not, I can't answer that.**
Q Okay. Do they have a -- their own computer or tablet or phone? Sorry, let me, rephrase. Do security guards have their own electronic device provided by the hospital that allows them to access the e-mail account?
**A They have access. Every employee of Perkins has access to a computer, whether it's at their workstation or in the computer lab, yes.**
Q Okay. So they -- it's like a communal device --
**A Yes.**
Q -- they can use if they needed it?
**A Right.**
Q Okay. And -- and so medical staff also get e-mails?

19

**A Yes.**
Q E-mail accounts, I should say. And so for example, Dr. Van Winkle would've had an e-mail account and John and Bob would've had an e-mail account?
**A (No verbal response).**
MR. MAGLOUGHLIN: So I'm now going to show you Exhibit 37.
(EXHIBIT 37 MARKED)
THE WITNESS: Record retention.
MR. MAGLOUGHLIN: What's that?
THE WITNESS: Record retention.
MR. MAGLOUGHLIN: Yes. Okay.
Q So this document doesn't have a Bates number. It's one that Musa e-mailed me as a standalone long time ago, 2023.
Like you said, this is -- is this Perkins' document retention policy?
**A Yes.**
Q Okay. And please read the section marked 1A, adult residence, on the first page. And let me know once you've read that.

20

**A Good.**
Q Does Perkins retain adult patient records for six years following their discharge?
**A Yes.**
Q Now let's look to the second page and read the section marked 4, and you can read it in both columns there at the top.
**A That is correct. We follow -- Perkins -- the department does follow the disposal and retention policy already created.**
Q Got you. So -- so Perkins retains incident reports for six years for any patient above the age of 21?
**A Yes.**
Q Okay. Are you aware that Mr. Campbell was discharged in April 2023?
**A Yes.**
Q And so under Perkins' policy, should Perkins still have all of Mr. Campbell's records?
**A Yes.**
Q Was Scott Moran a Perkins employee on October 7th, 2022?

**A Yes.**
Q What was Scott Moran's role at Perkins on October 7th, 2022?
**A Chief executive officer.**
Q You sure about that?
**A No.**
Q Okay.
**A He was the clinical director.**
Q Okay. I -- I only ask because I --
**A Thank you.**
Q I heard differently earlier.
**A Yeah.**
Q So okay. Okay, clinical director. And you're now sure of that?
**A Yes.**
Q Okay.
**A I am sure.**
MR. MAGLOUGHLIN: Okay. So I'm going to hand you Exhibit 38. It says Bates number Campbell 0000001. I regret thinking that my client will have a million documents to produce because now I have to read all the zeros when I



enter the document.
(EXHIBIT 38 MARKED)
Here you go. Sorry. Okay. We were once again having printer issues where the Bates numbers were not cut off, I produced them electronically. They should be there with the Bates number on it. But on this print copy, I had to handwrite them again.
BY MR. MAGLOUGHLIN:
Q Okay, I want you to flip to Page 6, 000006 and read the story titled, State Board Suspends License of Ex-Official Former Psychiatric Hospital Director. Barred at Least One Year. And this is a Baltimore Sun Story from September 25th, 2024, reproduced in a Lexis format, I believe.
**A Okay.**
Q Is it true that Scott Moran was suspended by the Maryland State Board of Physicians?
MR. EUBANKS: Objection as to relevance. You can answer.
THE WITNESS: Right. I can't answer



that. I don't know if he was suspended or not from the Board of Physicians. I don't know.
BY MR. MAGLOUGHLIN:
Q Would the hospital know that?
**A The -- oh, I'm sorry, the hospital would know.**
Q Okay.
**A Forgetting to flip my hat here.**
Q Yes. No worries. It's -- it's -- it's not natural because it's impossible. So I'm -- I'm going to ask you again.
Is it true that Scott Moran was suspended by the Maryland State Board of Physicians?
**A The department would know, yes.**
MR. MAGLOUGHLIN: Did you want to re-object there?
MR. EUBANKS: Yeah, same objection.
MR. MAGLOUGHLIN: Okay.
Q Is it true that Maryland State Board of Physicians suspended Scott Moran for threatening other Perkins' employees?



**A The department would know, yes.**
Q So that is yes. Okay.
MR. EUBANKS: Make sure to answer. You nodded, make sure to answer.
THE WITNESS: Okay. I said it quiet, but yes.
Q Okay. When did the allegations that led to Mr. Moran's suspension first arise?
**A The department would have the exact date. Based on this article, it would've been in November, October -- I mean, September.**
Q Of what year?
**A '24.**
Q Were the allegations detailed in this story, the first allegations of workplace misconduct raised against Mr. Moran at Perkins?
MR. EUBANKS: Same. Standing objection to this whole line. Go ahead.
THE WITNESS: Yeah, the department would know any other allegations that were made.
Q So were there other allegations made prior to this?

**A That's a hard question for me to answer, because I wouldn't know it, the department would know it, but I wouldn't necessarily be made aware of that.**
Q Okay. So this was a topic that was on the list. Do you want to maybe come back to this after a break?
**A Okay.**
MR. MAGLOUGHLIN: Okay. So I'm now going to show you Exhibit 39, which has the Bates number Campbell 0000020.
(EXHIBIT 39 MARKED)
Okay. This also was supposed to have the Bates numbers and I did not write them on it. The first page is supposed to be 20. I want to turn to what should be 24. So that's -- oh, after the first page, are there two blank pages?
MR. EUBANKS: Yeah.
THE WITNESS: Yeah.
MR. MAGLOUGHLIN: Okay. Let me see if that's -- something's missing or -- for the record, we're looking at The Washington Post



article titled, How a Climate of Chaos Went Unchecked at Maryland's Max Security Psych Hospital.
MR. EUBANKS: Wait, that's not what I have. I have Acting CEO.
THE WITNESS: Yeah.
MR. MAGLOUGHLIN: Oh, there it is. Okay, okay, okay, good. It's not a problem. The first -- the first few pages we're not looking at. So turn to where it says, How a Climate of Chaos Went Unchecked at Maryland's Max Security Psych Hospital. Okay. And that should have been Campbell 0000024. So we're -- I -- I don't believe there's missing material, which is good.
BY MR. MAGLOUGHLIN:
Q Okay. Can you read this article? It's -- it's a longer one.
**A The department was aware of this article.**
Q Was aware, okay.
**A Yeah, they were aware.**
Q Okay. So on what should be Campbell



0000025, which is the second page of this story, article says, in the top, the bullet point on the top of the page, second sentence, Police alleged in documents that Perkins' leadership had failed to comply with -- or a request to preserve surveillance footage from before and after Morgan's death. So it's automated system permanently deleted critical evidence.
What year did this happen?
**A Ms. Morgan passed away in 2023.**
Q And I -- I'm sorry, I actually missed a question in the outline here. Back on the first page of the article, in the fourth paragraph, starting, Since then, it says, A Washington Post investigation into Moran's tenure found that the allegations outlined in this restraining order petition were not isolated, but a culmination of years of well-documented but unaddressed complaints about hospital mismanagement and safety that had prompted staff departures and at times left employees and patients vulnerable.
Were employees and patients complaining



about hospital management in 2022?
**A Yes.**
Q Okay. Now, I want to go back, and I apologize, I won't be this disorganized after this. I want to go back to the second page of the article and -- and again, on that same bullet point, the sentence about surveillance footage involving Ms. Morgan's death.
Do you know which leaders at Perkins were involved in the decision not to comply with the surveillance footage request?
MR. EUBANKS: Objection. She hasn't testified that we didn't comply. You can answer. You can answer.
THE WITNESS: There were several videos saved on that incident. The timeframes were different from the request, but the -- but the video surveillance was saved for the entire thing. There were several requests that came in from different agencies wanting video surveillance for different times.
Q Okay. So is it safe to -- fair to say

29

that some period of the incident was not recorded on video?
**A Not to my knowledge. Not for the -- I can't get my head straight with that.**
Q I can re-ask.
**A Yeah, please.**
Q Yes. So first of all, because of Musa's objection, let me ask, does Perkins believe that it complied with the surveillance preservation request?
**A Yes.**
Q Okay. And you testified that different entities requested different timestamps or angles of the incident?
**A That's correct.**
Q I know it's -- it's so weird. Is it fair to say that there was part of the event that was not captured on footage and -- and that's why this article alleges that that was permanently deleted?
**A That is correct. There are no cameras in patients' bedrooms and that's where the**

30

**incident occurred.**
Q Okay. Was there a camera that might have captured some of the patient's bedroom?
**A From the hallway and that was -- that was per -- kept.**
Q So is The Washington Post just wrong about this?
MR. EUBANKS: Objection to what The Washington Post reported? How would she know?
THE WITNESS: I wouldn't --
MR. EUBANKS: You can answer.
THE WITNESS: I wouldn't know where they got their information.
Q Well, sorry, in Perkins' belief, is this -- is this statement in here inaccurate?
**A Yes.**
Q Okay. Were any of the leaders -- administration at Perkins involved in -- sorry, let me rephrase.
Was the Perkins -- were any of the members of the Perkins' administration at the time of this incident also employed on October 7th,

31

2022?
**A Correct, yes.**
Q Okay. Do you know which ones?
**A Dr. Moran, Dr. Wisner Carlson, Nisha Madhaven, Major Hall, and, of course, myself, and the staff that were working on the unit at the** time. And Dr. Wasim (phonetic), who was the physician on call that night.
Q Okay. Is there anybody who, in Perkins' administration at the time of Ms. Martina Morgan's death, who wasn't employed until after October 7th, 2022?
**A No.**
Q Okay. So staying on this page, article farther says, let me find where. The third bullet point towards the top. Employees made at least 18 complaints over four years to state officials warning of the facility's critical understaffing, dangerous conditions, and Moran's behavior. These complaints were made to the governor's office, human resources, state oversight agencies, the health department's equal employment office and

32

during meetings between state leaders and the state employee's union.
State officials prompted Morgan twice -- sorry, State officials promoted Moran twice despite those complaints, which included allegations that he engaged in bullying and discriminatory behavior, failed to address concerns over staff safety, drove high employee turnout during the years he was in leadership.
When did Scott Moran join Perkins?
**A October 20th, 2020.**
Q Okay. So is the four-year period discussed in this article more or less 2020 to 2024?
**A Yes.**
Q What are the dangerous conditions discussed in this paragraph?
MR. EUBANKS: I -- I'm going to object. She didn't write the article, so --
MR. MAGLOUGHLIN: Okay. Okay.
MR. EUBANKS: Answer if you know.
Q Is -- is the -- I'll -- I'll rephrase.

33

Is the hospital aware of any of these 18 complaints involving dangerous conditions?
**A I can't answer. I didn't write this article, so I can't really answer if it was all reported or not.**
Q Okay. Okay. Apart from the article itself, is it -- is it true that there were 18 complaints involving understaffing, dangerous conditions, and Scott Moran's behavior made between 2020 and 2024?
**A I don't know what complaints were reported to state officials for me to be able to really answer that adequately.**
Q If -- if a state official that's not stationed within this building receives a complaint, does Perkins typically receive it?
**A Yes.**
Q Okay. And so for example, the governor's office, if somebody complains to the governor's office about Perkins, is it sent to -- to Perkins?
**A Yes.**

34

Q And I imagine human resources is something that's located within Perkins?
**A Yes.**
Q Okay. So if somebody complained to human resources, inherently Perkins would have that complaint?
**A Right.**
Q Okay. And how about state oversight agencies? If somebody submits a complaint to a state oversight agency, do they always send it to Perkins or is it possible that they just decide to dismiss it and, you know, never send it over here?
**A It comes to Perkins.**
Q Okay. And the health department's equal employment office, if a complaint is made there, would Perkins receive it?
**A Yes.**
Q Okay. Who would receive those complaints at Perkins?
**A The CEO or the COO or the clinical -- it would be higher level would receive those complaints, and then it would be addressed as it**

35

**came out from that way. HR would be involved, but it would come to a higher level.**
Q Okay. If Perkins receives a complaint, does it always investigate that complaint?
**A Yes.**
Q Okay. And did The Washington Post contact the hospital about this article?
**A Yes.**
Q Did they show any complaints to Perkins that they had in their possession?
**A Upper management would've received these upper -- those complaints.**
Q Well, so you're saying The Washington Post showed the complaints that it had somehow collected to --
**A Right.**
Q -- management of Perkins?
**A Right.**
Q Okay.
**A Right.**
Q Okay. And to -- to the hospital's knowledge, was there any complaint The Washington

36

Post showed to hospital management that was never submitted and basically fake, not the allegations, but the complaint itself was fake?
**A It was investigated. The department would always investigate what was brought forward.**
Q Okay. Got it. So then it is likely true that -- that the 18 complaints discussed in this paragraph existed?
**A Yes.**
Q Okay. Understood. Okay. We're going to turn to the next page.
And in the top paragraph, it says, But it wasn't until months later after The Post brought the findings of its reporting to current state leaders that Herrera Scott -- this is house secretary -- said she began personally investigating. She ultimately confirmed the issues The Post raised, she said, which prompted her to change the department system for reporting serious incidents and hire an independent evaluator to examine the hospital top to bottom.
When this article says that Herrera

Scott confirmed the issues the post raised, does this mean that Perkins admitted the substance of the complaints were true to Secretary Herrera Scott?
**A I -- I don't know what was reported to Herrera Scott.**
Q Okay. Is it --
**A She did send an outside agency in here to review from top to bottom and interview several different people that were employed at Perkins to gather information.**
Q Does the hospital disagree with Secretary Herrera Scott's conclusion that these were complaints about Perkins were legitimate? Let me rephrase.
This Perkins dispute -- sorry. I'm going to rephrase again.
How I read this paragraph is that Secretary Herrera Scott believes that the substance of those 18 complaints, after her investigation, she concluded were true; does Perkins dispute that?



**A No.**
Q Okay. So the substance of the complaints were ultimately true?
**A Yes.**
Q Okay. Now, on what I think should be the next page, which is supposed to be 0000027, you should see the black heading of Climate of Chaos in bold on here just in case we're lost and -- but that's not where I actually want you to look.
Oh, here it is. Okay. That was the correct page. The fourth paragraph down, it's a bigger one, five lines.
The second line there starts a sentence, 24 Perkins psychiatrists, psychologists, and social workers, considered a patient's core clinical treatment team, left the hospital from 2020 to 2024.
Was one of those people Dr. Matthew Van Winkle?
**A Yes.**
Q Now, we're going to turn on to three



pages to what should be 0000030. This page should have a bold heading that says A Riot, a Rape, and a -- A Riot, a Rape, a Death.
The article says here -- in the sixth paragraph down, it says, Many of the requested changes, staff said, including reinstituting -- sorry. Many -- strike that.
Many of the requested changes, staff said, including reinstituting transparent reviews of major incidents, were ignored or rebuffed.
Were there transparent reviews of major incidents at Perkins in 2022?
**A Yes.**
Q Do you know why it says or -- or implies there wasn't in this paragraph?
**A No, I can't.**
Q Is -- was a review of a major incident in 2022 something that Perkins conducted itself?
**A Yes.**
Q Did that eventually change to an outside organization?
**A Yes.**



Q Okay. Understood. At the bottom of this page and following onto the next page, 0000031, article says that Scott Moran directed Nina Diana (phonetic) to investigate claims about Perkins ignoring patients' reports of sexual assault. On Page 31, the article farther says that Nina Diana confirmed the allegations.
It then says that Moran disregarded her findings and instead blamed her for not updating hospital policies to comply with the settlement. He then handed her a pre-written demotion letter, which she appealed.
What year did Scott Moran Hand Nina Diana a pre-written demotion letter?
**A I can't answer that. That would've been supervisor to subordinate.**
Q Do you know what year Scott Moran ordered Nina Diana to investigate allegations of patient sexual assault?
**A '22 and '23.**
Q Okay. And were there any patients who complained about alleged sexual assault in 2022?

41

**A Yes. And they were investigated.**
Q And -- and how about in 2023? Same question.
**A They were investigated.**
Q Okay.
**A And to clarify that, those allegations come to me, and everything is sent to MDH Police and everybody. If the -- if it is an actual rape, based on that, the facility's policy, they are sent out to the hospital and evaluated there, and MSP is notified.**
Q Okay. So now I'm going to hand you Exhibit 38 for the second time -- or I'm not going to hand it to you. You have it.
It's the one where I wrote Campbell 601 in the bottom right corner in pen. And now we're going to flip to Page 4, which I did not mark, but it -- it's the page starting with a -- a Baltimore Sun article from October 8th, 2024, titled State's Main Psychiatric Hospital to Undergo Third Party Evaluation.
And you can read that article and let

42

me know when you're done.
**A I'm good.**
Q This article says that the health secretary ordered a national mental health organization to investigate Perkins to, quote, Ensure that we are doing our best to treat patients while maintaining a self and -- safe and healthy environment, end quote.
Is that statement true?
**A Yes.**
Q The article later says that The National Association of State Mental Health Program Directors conducted the investigation.
Is that the organization that conducted the investigation?
**A Yes.**
Q The article also says that That organization will be reviewing things related to concerns about hospital leadership.
Is it true that the investigation reviewed concerns about hospital leadership?
**A Yes.**

43

Q Did this relate to discipline of hospital leadership?
MR. EUBANKS: I'm going to object. Don't answer that question.
Medical review committee privilege, everything about that report. I told you I'm not going to go into this, so we object.
And don't answer.
MR. MAGLOUGHLIN: Okay. I mean, one of the statutory criteria for whether it's privileged or not is whether it involved discipline.
MR. EUBANKS: We're not going to answer it. File a motion to go to the judge if we need to.
MR. MAGLOUGHLIN: Okay.
MR. DRANGHON: Mark the record.
MR. EUBANKS: It's in the record.
Q Can you tell me which persons received the results of this investigation within Perkins?
**A It was the acting CEO at the time.**
Q Anybody else?
**A And then it was shared with the current**

44

**CEO, and then upper management was allowed to review the -- were -- was allowed to review the document, not copy the document, and weren't allowed to make any notes regarding the document.**
Q Okay. Was there any sort of committee that received this -- the results of the investigation?
**A No.**
MR. MAGLOUGHLIN: I'll hand you Exhibit 40.
(EXHIBIT 40 MARKED)
MR. DRANGHON: Andrew, it's noon. I don't know if you'd like to -- just so we don't start half --
MR. MAGLOUGHLIN: Do you want to --
MR. EUBANKS: You said 12:00, 12:30? Or it's up to guys.
MR. DRANGHON: Yeah. If you're about to transition now, it might be a good time.
MR. MAGLOUGHLIN: Okay. That's --
MR. DRANGHON: Is this a good break for you?

MR. MAGLOUGHLIN: It's fine with me. I don't -- I don't mind.
MS. CAPON: Great.
(OFF THE RECORD)
THE REPORTER: Back on the record, Counsel.
MR. MAGLOUGHLIN: Okay.
BY MR. MAGLOUGHLIN:
Q I believe we were talking about subjects related to Secretary of Health. I'm going to hand you Exhibit 40. This is Campbell 13, 0000013. It's an article called MD, Maryland, Seeks Permanent Solution for Failing HVAC at Embattled Perkins Hospital, except that's not the one I want you to look at.
I want you to look at Page 15 in here, MD, Maryland, Lawmakers Grill State Health Secretary About Cover-Up at Psych Hospital.
So if you could go ahead and read this article. It's from The Philadelphia Tribune, December 12th, 2024.
**A Okay.**



Q So this article reports on Maryland Health Secretary Laura Herrera Scott's testimony before, I believe, the legislature, that top Perkins staffers, quote, Misrepresented the facts, end quote, about troubling complaints of violence, specifically a rape and a riot.
Does Perkins know if the misrepresentations she's speaking about were attributable to Perkins administration or Perkins line employees beneath administration?
**A Perkins administration.**
Q Okay. And so that would be the individuals you talked about before. I mean, I don't know what the -- the time period. People like Scott Moran, a bunch of people we saw in your e-mails in the first deposition, other administrators?
**A That's correct.**
Q Got it. Okay. Do you know what facts specifically she believes that Perkins misrepresented?
**A The department is aware. When the alleged riot, I can recall that one, and then the rape and then death of the patient. Yeah.**



Q So just the facts surrounding what happened in those events?
**A What happened in those events? As far as the --**
Q I -- I'm sorry. I wasn't asking you to recount --
**A Oh. The department is aware.**
Q Yeah. Right. So -- so I was -- I was asking, were -- was it just, like, the facts of the events that happened that she believed were misrepresented?
**A Yes.**
Q Okay. Got it.
**A Sorry.**
Q No problem. No, that was my fault. I was linking my current question to the last one.
So according to the article, Ms. Herrera Scott testified that there were leaders at the Maryland Department of Health and Perkins who were quote, supposed to be doing their jobs and advising appropriately, end quote. But, begin quote, Unfortunately, I had leaders in place that were not, end quote and begin quote, All those people are now gone, end quote.



Were Perkins employees fired because of Ms. Herrera Scott's Revelations about these misrepresentations? Let me rephrase.
Were people at -- did -- rephrase again.
Did the secretary of health fire anybody in response to learning that facts were, in her words, misrepresented?
**A Yes.**
Q Did any of the people who were fired have involvement in the administration's review of the October 7th, 2022, restraint of Charles Campbell?
**A Yes.**
Q Who were those?
**A Dr. Moran, because he was part of the RGS investigation. So definitely him, Dr. Moran.**
Q Okay. And what do you mean by he was part of the RGS investigation?

**A With any kind of resident grievance system, when the allegation is made, the first step is to send it to the department head. Once the department head makes that determination as to what they think and it goes back to the patient, if the patient doesn't agree, then it goes to the next step, in this case. Would've been Dr. Moran.**
Q Okay. Understood. And I'll ask about that a little more a little later when there's an exhibit related to it.
Later in this article on Campbell 0000016 in the next page says, Perkins leadership failed to comply with a subpoena for records -- wait a minute. Oh, yeah. Sorry. I'm restarting.
Let me make sure I didn't already ask about this. Okay. Yeah. Forget that. We already covered that.
Turning to 17, the article says that the third-party audit that we were previously discussing before the break would, quote, Scrutinize a hospital's leadership team, medical treatment programs, security apparatus, employee



and patient morale, and culture and patient complaints.
Is that an accurate statement?
**A Yes, it is.**
Q Okay. So I'm now going to re-hand you, or you have it in your stack, Exhibit 39, which -- oh, it's probably here.
This one should say Campbell -- or maybe it's the one that should've said Campbell 20 at the bottom. Yeah, it's a Washington Post article. Looks like this.
MR. EUBANKS: Okay.
Q So now we're looking at the first page, and this is an article titled, Acting CEO of Troubled Maryland Psych Hospital Resigns Amid Mounting Problems. And the Bates number on the first page should have been Campbell 0000020.
Go ahead and read this. Okay. I'm hoping the blank pages on this one are not omitted content.
Read what's there, and -- and hopefully, we can make it work. Good?



**A I actually have this article. I read it already.**
Q Okay. Got it. So on -- and -- and it looks like there isn't omitted material, or if there is, it isn't much of the -- the stuff that matters for our purposes.
On the first page after the blank pages, which should be 0000021, in the -- towards the middle in the paragraph that starts with The Post investigation, the second sentence there says, Herrera Scott has promised to publicly release the evaluator's final report, which was due to state leaders at the end of 2024.
Does Perkins know if the report is still slated for public release at some point?
**A Yes.**
Q Okay. So at some date in the future, the report will be released?
**A That's probable. Yeah.**
Q Okay. Got it. Got it. Okay. We're now going to flip -- oh, boy. Let me find it first. We're going to flip to what should be Page



44. It's an article, Maryland Lawmakers Grill State Health Secretary About Cover-Up at the Psych Hospital. Looks like this. It's a little more than -- maybe -- maybe about two-thirds of the way through the document.
Actually, you know what? Forget it. You've already answered this in -- with -- with prior testimony. Okay. Okay.
So moving on from those, apart from this case specifically, has Dr. Matthew Van Winkle ever been accused in writing of using excessive force?
**A The department is not aware of any.**
Q Okay. Apart from this case, has John Mbah ever been accused in writing of using excessive force?
**A No.**
Q And -- and to clarify for those two questions and the next few I'm going to ask, they -- I'm talking about complaints within Perkins, so --
**A Right.**

Q For example, I believe Dr. Van Winkle now works at Spring Grove. Not talking about Spring Grove.
Apart from this case, has Temitope Folowosele ever been accused in writing of using excessive force?
**A No.**
Q And apart from this case, has Kevin Thompson ever been accused in writing of using excessive force?
**A No.**
Q Is Kevin Thompson the tallest person at Perkins?
**A It's funny. The first time I saw him, I said, just how tall are you?**
Q And I'm -- I'm entitled to your best estimate if he's the -- the tallest person here?
**A Yes. Yes. We do have a couple very tall --**
Q Got you. Maybe overall size tallest, most muscular.
Were there any written reports alleging



use of excessive force on 1 West in 2022, apart from this case?
**A No. None.**
Q Okay. Apart from this case, has Dr. Matthew Van Winkle ever been accused in writing of denying a patient medical treatment?
**A No.**
Q Apart from this case, has John Mbah ever been accused in writing of denying a patient medical treatment?
**A No.**
Q Were there any written reports of -- of denial of medical treatment on 1 West in 2022, apart from this case?
**A No.**
Q Did Perkins ever fire any of the following individuals? Dr. Matthew Van Winkle?
**A No.**
Q John Mbah?
**A No.**
Q Temitope Folowosele?
**A No.**



Q Kevin Thompson?
**A No.**
Q Denard Abraham (phonetic)?
**A No.**
Q Jordan Wiggins (phonetic)?
**A No.**
Q Tabon Williams (phonetic)?
**A No.**
Q Has Perkins ever disciplined any of these individuals for dishonesty?
Dr. Matthew Van Winkle?
**A No.**
Q John Mbah?
**A No.**
Q Temitope Folowosele?
**A No.**
Q Kevin Thompson?
**A No.**
Q Octavia Pender (phonetic)?
**A No.**
Q Denard Abraham?
**A No.**



Q Jordan Wiggins?
**A No.**
Q Richard McFee (phonetic)?
**A No.**
Q Tabon Williams?
**A No.**
Q And Andre Bruce?
**A No.**
Q If an employee has been disciplined for dishonesty, would it be included in their employment file?
**A Yes.**
Q If an employee has been disciplined for use of force, would it be included in their employment file?
**A Yes.**
Q If an employee has been disciplined for denying medical care, would it be in their employment file?
**A Yes.**
Q Is there any type of discipline that wouldn't be in an employment file?

57

**A No.**
Q And if an employee had been fired, should it be included in their employment file?
**A Yes.**
Q Okay. Should there be operable security cameras in restraint rooms at Perkins?
**A Yes.**
Q Why should there be operable security cameras in restraint rooms at Perkins?
**A For patient safety and protection.**
Q Okay. Was there an operable security camera in the 1 West restrain room on October 7th, 2022?
**A No.**
Q Why not?
**A When the system was upgraded in 2021, the camera wasn't updated in that room at the time of the system upgrade.**
Q And what -- what do you mean by upgrade?
**A New cameras were brought in and placed in by Securitas.**
Q Okay. Did someone request security

58

footage from the 1 West restraint room camera related to the Charles Campbell restraint?
**A Yes.**
Q Okay. And I imagine the response was it doesn't exist.
**A Exactly.**
Q Do you know when the security footage from the 1 West restraint room was first requested?
**A Let's see the allegation was -- no.**
Q Okay. Would it have been around the time that Mr. Campbell filed his grievance?
**A Yes.**
Q Okay. Do you know who would've requested it?
**A The rights advisor.**
Q Okay. And you said that -- sorry. Who -- who was -- who do you believe the rights advisor was for Mr. Campbell --
**A Jerry Willis (phonetic).**
Q Okay. How did Perkins discover that the 1 West restraint room camera was inoperable?
**A When we were searching to save the**

59

**video, that's when it was found that it wasn't operable.**
Q Okay. And when was that search?
**A It would've -- let me see. After the RGS complaint came in and the request to save the video.**
Q Okay. Were there issues with security cameras and other restraint rooms at Perkins at the time?
**A No.**
Q Do you know about how long the 1 West restraint camera was inoperable? Sorry, I'm -- I'm going to avoid that.
How long was the 1 West restraint room camera inoperable?
**A From the time of the upgrade, which would've been 2021.**
Q Okay. So maybe about a year, maybe a little less.
**A Well, the up -- well, the -- when we changed it, when we moved the camera, that was in 2023. And there was no other complaints related**

60

**to a restraint episode in there, which would've pushed that.**
Q Okay. So -- so -- so maybe a little more like two years?
**A Yeah.**
Q One and a half years, something like that?
**A Yeah.**
Q Okay. Who typically receives a request for security footage at Perkins?
**A I receive the request based on the monitor for HIPAA compliance and then the request is sent to the administrative captain to save it.**
Q And so when you say I that means Iris Mielke?
**A Yes.**
Q And is that because Iris Mielke is the director of performance improvement?
**A Yes. And I'm also the HIPAA compliance officer.**
Q Got you. And -- and so if there's a request made, does it always go to the director of

61

performance improvement?
**A Based on our standard procedure, yes.**
Q Okay. Standard procedure typically followed with this?
**A Yes.**
Q Okay. So if you didn't receive the request, somebody would be screwing up then basically?
**A Yes.**
Q Got it. What does a director of performance improvement do when they receive a request for security footage?
**A I actually review it to see if it's HIPAA-compliant, who's asking for it. And then I follow the request, I approve the request. And then send it to the administrative captain to save the request and log it. And then if they decide, say MDH police wants it, then it's downloaded on the USB and then sent, picked up.**
Q Got it. Do you notify the administration of the request?
**A They're part of the circle, yeah.**

62

Q Got it. Okay. And how would you notify them of the request?
**A E-mail.**
MR. MAGLOUGHLIN: Okay. So I'm now I'm going to show you Exhibit 41. Behind that.
(EXHIBIT 41 MARKED)
Q Do you recognize this document?
**A Yes.**
Q What is it?
**A It's the policy -- the standard procedure that we use at Perkins for copying and viewing video surveillance.**
Q Great. I'd like you to read Section 1B under procedure on the first page to yourself. For the record, this document has Bates number DEF 3272.
Can you describe to me what a written request for footage looks like?
**A It's a form that has the date and time, the location, who's requesting it, for what reason are you requesting it. And then they submit that form in order to be viewed.**

63

Q Is it this?
**A Yes. But this has been updated -- okay. Yeah. Same -- it's the same premise, date, time, request, who requested it, and everything.**
Q Understood. When I said this, I meant the document on DEF 3277 and --
**A Yeah.**
Q -- 3278.
**A Right.**
Q Are written requests for footage electronic?
**A Yes.**
Q So would they be stored on e-mail or on internal computer system of some sort?
**A The hard -- there's a hard copy kept in a book.**
Q Okay. Do you know where that book is located?
**A Yes. I --**
Q Where is it?
**A I have the book in my office currently.**
Q Okay. Do you know if the requests

64

related to Charles Campbell would be in that book?
**A There were two books during that time frame.**
Q Okay.
**A When the acting COO at that time left, only part of the book was saved. And then the -- I had the book that contained October through, but the video -- and I submitted all those video requests for viewing. It's a hard copy book.**
Q What do you mean by you submitted them for viewing?
**A I copied everything and submitted it to our attorney.**
Q Okay.
**A Department's attorney.**
Q Got it. Now, looking at Section 1C on the same page, it says, all CTPHC VRS [sic], I believe that means Clifton T. Perkins Hospital Center Video Footage Requests -- oh, I'm sorry, Video Request Forms, will be sent via e-mail to the director of performance improvement for review to ensure the following are present.

65

And is it accurate that a VRF is a Video Footage Request?
**A Yes.**
Q And does the Perkins document preservation policy cover VRFs?
**A Yes.**
Q Do you know how long a VRF would -- is supposed to be preserved for?
**A For, I don't know, I'm going to say seven years.**
Q Okay. Would it help if I pulled that document back up?
**A Yeah, because we're redoing it. That's why I'm puzzled.**
Q Yeah. Okay. Okay. I for -- I -- I think it might be 37 in your file the -- the document preservation files. Okay. You can review that and --
**A Okay. Yeah.**
Q -- and just let me know if you think you see what covers a VRF.
**A Okay. Okay. I'm going to be honest, I**

66

**don't see it listed in here for video surveillance. I see all kinds of documentation, incident reports and the video is not part of the medical record.**
Q Okay. So is it possible that Perkins document preservation policy just doesn't cover VRFs?
**A Right.**
Q Okay. Would it be the same for an e-mail that contains a VRF or -- or would there be a separate part of that policy that covers e-mails?
**A It would be a separate part of the policy, but once there's a tort or anything like that, we get the e-mail to save everything no matter what it is.**
Q Okay. Do you know if Perkins still has in his possession that the e-mail containing a VRF for the restraint incident involving Charles Campbell on October 7th, 2022?
Do you want me to repeat?
**A No -- no, I understand the question. I'm trying to think.**

67

Q Okay.
**A Yes, it should be kept with the book.**
Q Okay. Now looking at 1E, which I believe is on the next page, going back to I think this is Exhibit 41. Yeah, 41. Looking at 1E on DEF 3273, it says, The director of performance improvement will notify the chief executive officer, chief operating officer and the clinical director of all requests.
Is this what you said earlier about how you would send an e-mail to the administration team?
**A Yes.**
Q And does Perkins still have the notice that the director of performance improvement would've provided to the administration for the restraint involving Charles Campbell? And by notice, I mean e-mail.
**A Well, yeah, I would e-mail everybody because I request statements and everything regarding that one incident.**
Q Got it.

68

**A And they're all on that. They get the police report and statements and everything.**
MR. MAGLOUGHLIN: Okay. Okay. I'm going to show you Exhibit 2.
(EXHIBIT 2 MARKED)
BY MR. MAGLOUGHLIN:
Q And this document as Bates number DEF 2988 at the bottom. Do you recognize this document?
**A Yes.**
Q What is it?
**A Psychiatric emergencies and how we address the issue.**
Q Policy for psychiatric emergencies.
**A Yep.**
Q Got it. If you look at the bottom of Page 1, which specifically the unit, safety, time. And -- and that says, Unit safety time is a temporary measure used in response to severely elevated acuity level of a unit thus placing patients and staff in extreme danger.
What does extreme danger mean in this

69

context?
**A If several of the patients are escalating to the point where they -- there's the potential for rioting type behaviors then -- or in this case, where would there have to be a search of the entire environment because of possibility of contraband that could impact the safety of all staff and patients that would be a reason to do unit safety time.**
Q Okay. Now let's flip to 2992 -- DEF 2992, and read Section 3B. Let me know when you're ready. So this says, Unit safety time requires a physician order that must be obtained within 30 minutes of initiation of the unit, safety, time. The security order form green is faxed to the control center and a copy is filed in the unit orders binder kept behind the nurse's station.
Would physician orders from October 7th, 2022 be in a unit orders binder kept behind the nurse's station right now?
**A Yes.**

70

Q That's not something that would've been discarded under Perkins document preservation policy?
**A No.**
Q Now read Section 3C. Let me know when you're ready.
**A I'm ready.**
Q This says, The initial physician order for the unit safety time is written for no more than four hours. A reassessment of the situation is required after the initial four hours to determine the need for continuation of the unit safety time, which requires documentation of specific safety issues on the unit and an additional physician order for up to 12 hours. Clinical director approval is required for extending the unit safety time beyond the initial four hours. How does efficient a -- sorry, strike that.
How would a physician obtain clinical director approval?
**A They would contact the clinical**

71

**director by phone, by the cell phone, their office phone and get permission for it and then it would be documented.**
Q Okay. And when you say then it would be documented, do you mean the clinical director sign something?
**A Well, the physician requesting the permission would say spoke to clinical director at such and such a time, authorize the extension of the quiet time.**
Q And would they put that on like an order that --
**A It would be in a progress note.**
Q Okay. And is that something that would be behind the nursing station in binders?
**A Yes.**
Q I'm sorry. Let me make sure I didn't just -- oh, yeah, yeah. Okay. Behind the nursing station in binders.
**A Right.**
Q Okay. And so --
**A And I can tell you that we've never had**

72

**one more than four hours.**
Q Really? So on October 7th, 2022, do you know when the safety time started?
**A It wasn't till -- it was like I want to say 10 o'clock.**
Q Okay. So it would've ended about 2 p.m. then?
**A Uh-huh.**
MR. MAGLOUGHLIN: Okay.
THE REPORTER: Is that a yes?
THE WITNESS: Yes. Sorry.
Q Who was the Perkins clinical director on October 7th, 2022?
**A The clinical director of 2022 would've been Dr. Moran.**
Q All right. What is the purpose of a restraint?
**A To prevent harm, the patient to harm themself or others.**
MR. MAGLOUGHLIN: Now I'm going to hand you Exhibit 3.
(EXHIBIT 3 MARKED)

73

BY MR. MAGLOUGHLIN:
Q This document has Bates number DEF 2995. Do you recognize this document?
**A Yes. It's a standard procedure for seclusion and restraint.**
Q Excellent. Could you please read to yourself a definition of psychiatric emergency that starts at the bottom of the front page and continues on to DEF 2996? And I also want you to now go to DEF 2997 and read number one under considerations prior to initiating restraint/seclusion?
**A Yes.**
Q Is there any circumstance of Perkins where a restraint could be used without a psychiatric emergency?
**A No.**
Q Now turn to DEF 3000 and look at section five here at the bottom of the page. Read it to yourself first. This says, Security attendant nursing staff will offer/provide the following, meals at a regularly scheduled hour and

74

under the supervision of nursing personnel. Toilet facilities at least every two hours. Fluids at least every two hours. And perform active or passive range of motion, ROM, parentheses at least every two hours for patients in any type of restraints. At least two staff members must be present when doing ROM release one limited time.
And that's section one under DEF 3001.
Does this mean that Perkins policies require staff to offer lunch to a patient in restraints during lunchtime?
**A Yes, that's accurate.**
Q Does this mean that Perkins policies require staff to offer toilet breaks, fluids and range of motion to a patient restrained longer than two hours?
**A That's correct.**
Q What do you mean by range of motion in this policy?
**A In this policy it would be how they can move the -- I got to demonstrate. How they move**

75

**their arms, how they move their legs, flexing their hands, fist, see if they can tighten their fist to make sure there's adequate circulation in all areas.**
Q Perkins do that for Charles Campbell on October 7th, 2022?
**A According to the documentation it was offered.**
MR. MAGLOUGHLIN: I'm going to show you Exhibit 4, which is the big one.
(EXHIBIT 4 MARKED)
Although I have to say I took a look at your 860-page employment file and decided not to -- not to bring that one with me today.
THE WITNESS: Wow. No.
MR. MAGLOUGHLIN: This is a -- there's two in there in the folder.
THE WITNESS: Be it may be.
Q And this says Bates number DEF 0153 at the bottom. Do you recognize this document?
**A Yes.**
Q What is it?

76

**A It's the manual for how to do prevention management of aggressive behavior.**
Q Okay. I want you to flip to 158 and my print has two Bates numbers on each page. The bottom right corner is always the number of the first page of the document. So you want to look at the bigger one.
**A Right.**
Q 158. Towards the top of the page, the document says that first paragraph, We as mental health providers are moving towards a seclusion/restraint-free environment. Does this mean that Perkins tries to limit restraints to incidents where they're absolutely necessary?
**A That is correct.**
Q Now, let's turn to zero -- DEF 0177. And I'm going to direct you to Section C2 in that page, which has the word rationale in bold. And you can read that.
**A Okay.**
Q Based on that section, can restraints be used in absence of aggressive behavior?

**A No, not unless there are danger to themself.**
Q Can you be a danger to yourself while being non-aggressive?
**A Yes.**
Q How would that be?
**A Say they attempt to hang their self or something along those lines, they're a danger to themself. So in order to protect them, we would have to use extreme measures to keep them from harming their self.**
Q Okay. I understand. Is there any time where they could be a danger to others, but also be non-aggressive?
**A Verbal threats, spitting.**
Q Wouldn't this be aggressive?
**A Yes.**
Q Okay. So -- so my question was, could a patient be dangerous to other people, but also be non-aggressive at the same time?
**A No.**
MR. MAGLOUGHLIN: Okay. Now I'm going



to hand you Exhibit 19.
(EXHIBIT 19 MARKED)
Oh, that was a fail. Right into the speaker.
BY MR. MAGLOUGHLIN:
Q And this is the one that we previously discussed, defense team that for whatever reason when you download it or -- or you -- you go to the print button on the relativity page of the -- the board scrunched together, even though it doesn't look like that on the screen. It's for the record, DEF 2947.
Do you recognize this document?
**A Yes. It's medical clinic referral, our standard procedure.**
Q Got it. And again, it might be hard to read, but you can object to my reading if you -- if you think I got it wrong here. Under number four under 1A on the first page, I believe it says referral sheet will be reviewed by the charge nurse for completeness before submission.
Does that sound -- look right?



**A That's correct.**
Q Does this mean that the charge nurse is always responsible for submitting referrals to the clinic?
**A Yes.**
Q And now I'm going to show you this one. There we go.
**A Thank you.**
Q This has Bates number 2970. Is this -- I'm sorry. Do you recognize this document?
**A Yes. This is a standard procedure for the clinical status system.**
Q Great. You can read the document to determine this if you want, or if you know off the top of your head, you know, feel free to rely on that. But what are the differences between gold and platinum status for a patient who would've been on 1 West in 2022?
**A It would be -- that would determine what kind of activities and things that they could go to off ward as well as on ward.**
Q And -- and do you know -- is there



something like -- do you -- specifically do you know any examples of something a -- a person on platinum could do that a person on gold couldn't?
**A It would be -- go to the -- we have what we call from volunteer services. They have an area where the patients can go get snacks, drink coffee, watch TV, those kind of thing.**
Q Got you.
**A They don't require as much supervision to do that.**
Q Is there any like additional criteria to move from gold to platinum or is it more about just keep doing the same good things for a longer time?
**A Yes, that's accurate.**
Q My -- to keep doing the same good things.
**A Keep doing the same things. Show that you're making improvement, you're compliant and you're not aggressive and creating issues on the unit.**
Q Okay. So person who achieve gold if

81

they just kept up how they're keeping up eventually would reach platinum if they didn't change their behavior.
**A Correct.**
MR. MAGLOUGHLIN: Okay. My outline has that same error with a random two blank pages and then but nothing omitted. Okay. Now I'm going to show you -- I actually thought I was going to show you Exhibit 21, but apparently I don't have it. Yeah. We're just -- we're just going to forego that. Okay.
Now I'm going to hand you Exhibit 42.
(EXHIBIT 42 MARKED)
And this -- oh, sorry. This one has a sheet of paper that's folded in half. Why it printed in long -- this printer, I'm telling you guys, it has a mind -- mind of its own.
Q Is -- do you recognize this document?
**A It's the Patient Bill of Rights that comes out.**
Q Does every patient receive this at Perkins?

82

**A Yes. It's posted on every unit in English and in Spanish.**
Q Okay. Does the Perkins Medical Clinic use third party providers for X-ray services?
**A Yes.**
Q Are any X-ray machines within Perkins?
**A Dental.**
Q Oh, okay. Okay.
**A Not typical.**
Q Non-dental?
**A Right. Right. No.**
Q Okay. When Perkins contracts with a third party provider of X-ray services, would they receive the imaging from that provider?
**A Yes.**
Q So like, the -- the pictures of the bones would be sent to Perkins?
**A Yes.**
Q Is it -- are the pictures of the bones supposed to go in the patient's medical file?
**A No.**
Q Why --

83

**A Just the report itself.**
Q Just the report itself.
**A Yeah.**
Q Why would that not be placed in the medical file?
**A They just go by whatever the diagnostic person writes in their report.**
Q Okay. It says it's not necessary for the patient?
**A Right. Right.**
Q And I assume that the images are discarded then, if they're not put into the patient file?
**A No. They're kept on -- the actual vendor keeps records. And if we need the record, we need the actual picture, then we would contact the vendor.**
Q Okay. But the copy that the vendor sends to Perkins would be discarded; is that correct?
**A Yes.**
Q Okay. Was Unit Safety Time issued on 1

84

West on October 7th, 2022?
**A Yes.**
Q Why was Unit Safety Time issued on 1 West on October 7th, 2022?
**A The cameras, the securities officers noticed the possible passing of contraband. And we knew that we would have to do a unit wide search to make sure whatever contraband was being passed.**
**And part of the Unit Safety Time, when we started to ask people to go to their -- go to their room and wait, they started arguing and fighting, different patients, and weren't going to go and standing outside their rooms.**
Q Did Perkins ever find the contraband that's suspected?
**A There was contraband found on one patient. There was contraband found in a deck of cards where the patients were playing cards. And then there was also contraband found outside the unit, but for -- right outside 1 West unit.**
Q And were any of the people who were

85

found with contraband Charles Campbell?
**A He was playing cards with the deck of cards where the contraband was found, but not in his possession.**
Q Okay. Do you know if that was his deck of cards?
**A They were state-issued decks of cards.**
Q Okay. So Perkins never determined that Charles Campbell was responsible for the contraband being placed?
**A No. No.**
Q Okay. Were the patients who -- scratch that.
Did Perkins discipline any patients when -- as a result of discovering contraband during the safety time on October 7th, 2022?
**A The patient that actually there was pills found in the room, had a decrease in level.**
Q Do you know what those pills were?
**A No.**
Q Were the pills like prescription medications or like illegal?

86

**A Prescription medications.**
Q Okay. Is that something that they would have likely taken from staff?
**A No. No. During -- during medication administration, the staff gives them their meds and conducts mouth checks. The patient involved in this was known to give his meds to other people.**
Q Do you know which patient that was?
**A Yes.**
Q What's his name, or her name?
**A Oscar.**
Q Oscar --
**A His last name was Oscar.**
Q Oh, his last name was Oscar?
**A Yeah. Yeah.**
Q But you don't know his first name?
**A I don't know it off the top of my head. Yeah.**
Q Okay. Is it possible that the pill was Suboxone?
**A No. Suboxone here is in a strip. The outside -- well, one of the things that they found on the deck of cards was an orange strip that may have or may not have been Suboxone.**

87

Q Is Suboxone something patients might use to get high here?
**A Yes.**
MR. MAGLOUGHLIN: Okay. So we can take a break. We are almost done. I'm going to -- to pull up the video very briefly. Not -- I think we only have one question about it. And then just a little bit more after that, then that's it.
MR. EUBANKS: How long?
MS. CAPON: 10 minutes?
(OFF THE RECORD)
MR. MAGLOUGHLIN: We're back on the record.
MS. CAPON: Oh, sorry.
MR. MAGLOUGHLIN: That's all right. I know. Got too comfortable.
MS. CAPON: Yeah.
MR. MAGLOUGHLIN: Okay. Does Perkins recognize the person currently displayed on the screen? And for the record, this is Exhibit 7, a

88

video, which doesn't have a Bates number because it's a video.
(EXHIBIT 7 MARKED)
THE WITNESS: Yes.
BY MR. MAGLOUGHLIN:
Q Who is that?
**A Mr. C. Charles Campbell.**
Q Okay. Did he go by Mr. C?
**A I'm just using that, but it is Charles Campbell.**
MR. MAGLOUGHLIN: Got you. Okay. All right. Maybe, Mihir, if you want to maybe click the zoom out once. It's the top right corner. That zoomed in.
Okay. So click that, like, three or four times. Maybe one more. Okay. Now you can go ahead and hit play.
Right. Usually don't zoom it in. We're going to keep it running until 12:02 flat in here.
(VIDEO RECORDING WAS PLAYED)
Q Is that Andre Bruce standing next to

Charles Campbell?
**A No.**
Q No? Okay.
**A That's Officer Wiggins (phonetic).**
Q No way.
**A Officer Bruce is shorter.**
MR. MAGLOUGHLIN: I thought Wiggins had like an afro.
MR. EUBANKS: Timestamp for comments.
THE WITNESS: Okay.
MR. MAGLOUGHLIN: That was about 11:59. Oh, yeah. You want to be closer.
Q So about 12:00 flat is the person moving their hands. That -- that's Jordan (phonetic) Wiggins?
**A You know, now that I'm looking at it, that's not Jordan.**
Q Yeah. Do you know who that is?
**A Not -- no.**
Q Okay.
**A I forgot. They -- all the security were given pink masks for breast awareness.**



**That's why they're all wearing the pink.**
MR. MAGLOUGHLIN: Got you. And here be ready to pause in the 45 seconds.
Okay. Get ready here. What?
Kevin --
THE WITNESS: (Indiscernible) he's no longer working there.
MR. MAGLOUGHLIN: Okay. Go ahead and pause. Okay.
BY MR. MAGLOUGHLIN:
Q Is it Perkins position that standing in the manner of -- as Mr. Campbell has been standing here, without any sort of visible hostility, warrants a restraint under Perkins' policy?
MR. EUBANKS: I'm going to object to the basis of the question. You're asking the department to make an assessment that clinicians on the scene made.
But you can go ahead and answer.
THE WITNESS: Well, and, like, Dr. Van Winkle is there and so is the assistant director of nursing and John Mbah. So they made the



decision clinically because they're on the scene at the time and they're engaging him to see how cooperative and if there's any threats at that time.
BY MR. MAGLOUGHLIN:
Q Sure. In the footage you just reviewed from about 11:58:00 to 12:01:58, did Charles Campbell appear aggressive in the video?
MR. EUBANKS: Same objection. You can answer.
THE WITNESS: I wasn't on the scene, so I didn't know what was being said or -- you know, outside of him standing there, I don't know what was being said or anything.
Q How about if you isolate it to just his appearance and ignore anything he might have been saying? Did --
MR. EUBANKS: Same objection. You can answer.
Q Did his body language appear aggressive? Or movements?
**A No.**



Q Okay. Is it Perkins' contention that Charles Campbell acted aggressively prior to the restraint?
**A That would've been a clinical decision made at the time of the incident, and I wasn't there.**
Q Is it Perkins' contention that Charles Campbell threatened staff prior to the restraint?
**A It's a clinical decision and I wasn't at the scene at the time, so I don't know what kind of conversation was being held.**
Q Is there -- yeah. I do want to remind you, you're answering for Perkins, not -- not yourself. So --
**A Right. Based on the statements that I received from Perkins staff --**
Q Okay.
**A -- there was threats.**
Q Okay. And is there anything Perkins can point to other than those statements that would indicate that Charles Campbell made the threats?

**A No. The department can't.**
Q Okay. Is there anything besides the -- those statements that would indicate that Charles Campbell was acting aggressively or combatively?
**A No.**
MR. MAGLOUGHLIN: Okay.
MR. EUBANKS: I'm sorry. Did you say what time we were at? I'm not sure if we put that on the record.
MR. MAGLOUGHLIN: Yeah, I did. I said -- I asked -- on one of the questions, I said --
MR. EUBANKS: 11:58.
THE WITNESS: 11:58.
MR. MAGLOUGHLIN: -- based on the footage you watched from 11:58:00 to 12:01:58.
MR. EUBANKS: All right. That's all.
MR. MAGLOUGHLIN: Okay. Okay. We're going to play until 12:03:15.
MR. DESAI: I think I zoomed it out before I paused last time. You want me to go back in or is this the end?
MR. MAGLOUGHLIN: I think it's fine.



Actually, go to 12:03 flat, to be safe. No, sorry. No, no, no, no. Don't move it. Play until -- my bad. So -- so we were at 12:01:58, I think. Now a minute behind that.
That's good right there.
MR. DESAI: Yeah.
MR. MAGLOUGHLIN: Okay. So we rewind it a little bit to 12:01:35.
Are you ready to pause?
We've played the video until 12:03:00.
It came a weekly meeting. I'm sorry. Take that away. Obviously not today. Monday is the usual team meeting.
BY MR. MAGLOUGHLIN:
Q Based on the footage you just watched until 12:03:00, I guess it should say 12:03 p.m. 00 seconds, does this change anything you previously said about whether Campbell's physical movements and body language indicated aggression?
**A No change in what I said prior.**
MR. MAGLOUGHLIN: Okay. You're going to play another 10 seconds. Okay.



BY MR. MAGLOUGHLIN:
Q Any change? All right.
**A No. I keep forgetting.**
MR. MAGLOUGHLIN: Another five seconds.
Q Any change?
**A No.**
MR. MAGLOUGHLIN: Okay. Another five seconds.
Q Any --
**A No.**
Q Any -- oh, sorry. Just for the record, any change?
**A No. No change.**
MR. MAGLOUGHLIN: Go ahead. Go again. Another -- we'll do 10 seconds here.
Q Any change?
**A No change.**
MR. MAGLOUGHLIN: Okay. Another 10 seconds.
Q Any change?
**A Only the placement of his feet, but no.**
Q What do you mean by that?



**A I noticed he switched his legs. He was -- he was leaning with this one. He put that foot down and then put his other foot up onto the wall.**
Q That could indicate aggression?
**A It could.**
Q How so?
**A Especially if he's -- if there's other patients starting to move into the scene.**
Q What do you mean by that?
**A That he's encouraging other patients -- there is that potential that he's encouraging other patients to not follow direction.**
Q By moving his knee up?
**A Yeah. You have to know Mr. Campbell.**
Q Is that an assertion that he has some sort of ability to communicate with his knee?
**A No, but he has the ability to push off.**
Q Okay. Had he done that before at Perkins?
**A Not to my knowledge. Not to the department's knowledge.**
Q Okay. Okay. I think we're done with

97

the video.
Did Charles Campbell file a grievance related to the October 7th, 2022 restraint?
**A Yes.**
MR. MAGLOUGHLIN: Show you Exhibit 43. This is another one that should have had Bates numbers. Something wrong with the documents we produce to you guys when they print or maybe just what they print around. I don't know.
(EXHIBIT 43 MARKED)
Q Do you recognize this document?
**A Yes.**
Q What is it?
**A It's the grievance -- well, it's the letter that gets sent to -- that follows up with -- and I have to go back. It wasn't Jerry Willis. It was David O'Neal. He was the rights advisor. The actual complaint was filed and sent to David O'Neal and then -- which is attached to this.**
**And these are the forms to get forwarded to the next -- to the department head, because they're all based on Stage 1. That in**

98

**this case, he had filed a complaint. And it went to the doctor responsible. Not the doctor responsible. But it would've gone to the department head of the complaint.**
MR. MAGLOUGHLIN: Got it. And looking at what -- again, this should be Exhibit 43 with Bates number Howard_0000020.
BY MR. MAGLOUGHLIN:
Q I'm looking at the first page, which 0000020. Did the rights advisor that investigated Campbell's grievance find it valid at Stage 1?
**A Yes.**
Q Now we're going to turn to -- should be 23. So that's one, two, three pages farther. It should be a similar looking form titled Re RGS Grievance with a number and then Stage 2 Decision.
Did the unit director that investigated Campbell's grievance find it valid at Stage 2?
**A Yes.**
Q Now we're going to flip five more pages. It should be 28. And it's going to be this page, which should be 0000028.

99

I'm sorry. Okay. Good. Sorry. There was a question that I was looking at and I'm not going to ask it. So this is actually supposed to be 000029 but the page I showed you is the right one, so stay there. What does the handwritten part of this document say, if you can read that?
**A The incident referring to Patient Campbell on October 8th, 2022. We are not able to view footage of the camera due to the camera being inoperable in the restraint room. Case number 037329C P2023. Major Iesha Hall.**
Q Do you know what ultimately happened with Charles Campbell's grievance, in terms of resolving it?
**A No. The department knows because Dr. Moran -- because then at this point, it was forwarded to Dr. Moran. And according to the documentation that came from that, it was inconclusive because of the video.**
Q Okay. So that -- that -- Major Iesha Hall found it inconclusive because of the video. Is that what Dr. Moran found at the --

100

**A Right. That it was inconclusive, yes.**
MR. MAGLOUGHLIN: So I'm now going to show you Exhibit 44. And this should have had Bates number T. Mason_000 -- sorry. Strike.
I'm now showing you Exhibit 44, which should have had Bates number T. Mason 0000014.
(EXHIBIT 44 MARKED)
BY MR. MAGLOUGHLIN:
Q Is this a document created by Perkins?
**A It's created by the Resident Grievance System.**
Q Okay. Do you recognize this document?
**A Yes.**
Q Okay. What is the document?
**A The document is how the complaint went through all the stages to see if it was valid or invalid.**
Q Got it. Looking at the first page, how does Scott Moran -- did Scott Moran resolve Charles Campbell's grievance?
**A No. The investigation was incomplete because the patient was discharged back to DOC.**

Q Okay. And is -- is Scott Moran the person who dismissed the investigation?
**A Yes.**
Q Okay. Understood. So do you want to change your earlier testimony about did Scott Moran and the video footage --
**A Well, with this, there were two different things with this.**
Q What do you mean by that?
**A There was one about security assaulting him and then this is the one about the medical care, whether he received based on because then he felt that he wasn't treated fairly by Dr. Van Winkle.**
Q So those are two separate grievances? And they were both resolved at different stages?
**A Yes.**
Q Okay. So the one I previously was showing you, was that about alleged abuse or use of force? The Exhibit 43, the last document.
**A The -- well, the alleged use of force would've been the second one that had to do with**



**Major Hall coming into play.**
Q Got you. Okay. So this one that Scott Moran reviewed was about medical care?
**A Right. And as to why he wasn't seen in the medical clinic during the time.**
Q Okay. Do you know if Scott Moran investigated the -- the -- the complaint that I showed you in Exhibit 43 that Major Iesha Hall was involved with?
**A Yes.**
Q Okay. He did. And he made a determination?
**A That it was inconclusive because of video footage.**
MR. MAGLOUGHLIN: Okay. Now I understand. Sorry. I was confused, so -- okay.
Do you want to take a break and confer or are we good?
MR. EUBANKS: Yeah. We can take a quick break.
MR. MAGLOUGHLIN: Okay. It's like two-minute break. That -- that might be it.



MR. EUBANKS: Sure. All right.
(OFF THE RECORD)
BY MR. MAGLOUGHLIN:
Q Okay. Have you remembered anything that you were unsure about earlier? The Jerry Willis thing, I think that's --
**A Just Jerry Willis. Yeah.**
Q Got it. Are there any documents or records you believe would help clarify or support your testimony or otherwise relevant to the matters discussed in this deposition that have not been presented today?
**A No.**
Q Have you told the truth to the best of your ability throughout this deposition?
**A Yes.**
Q Do you feel that you have had a full and fair opportunity to provide your testimony?
**A Yes.**
Q Have you understood all the questions asked of you today?
**A Yes.**



Q Did anyone including your attorney -- attorneys suggest or instruct you on how to answer any questions today?
**A No.**
Q You sure? I'm just kidding.
**A Well, outside of just going through the questions and that kind of thing.**
Q I understand that. Yeah. It was a joke.
**A Oh, trying to trip me up, are you?**
Q I almost had you. Did -- did -- did anyone pressure or influence you in any way to testify a certain way?
**A No.**
Q Do you have any questions before we conclude?
**A No.**
MR. MAGLOUGHLIN: If you recall anything later that you admitted any responses today, please have your attorney reach out to me. No further questions at this time. I reserve the right to recall a witness if new evidence emerges.

105

The witness has the right to read the transcript and make non-substantive corrections.

EXAMINATION BY COUNSEL FOR THE DEFENDANTS

BY MR. EUBANKS:

Q I -- I do have a - a question for you. You recall watching the video a minute ago?

**A Yeah.**

Q And do you recall at about 12:03 in the video, it looks like someone puts their hand on Mr. Campbell's shoulder? And he pulls his hand away, I'll say for lack of a better word, or jerks away; is that fair to say?

MR. DESAI: Objection. Leading.

Q Do you know if that could be -- if that could be viewed as aggressive behavior?

**A Yes.**

MR. DESAI: Same.

THE WITNESS: It could.

MR. EUBANKS: No further questions.

MR. DESAI: Speculation as well.

MR. EUBANKS: And she'll -- she'll read and -- read and sign as well.

106

MR. DESAI: Do you want a redirect?

MR. MAGLOUGHLIN: Me?

MR. DESAI: You're (indiscernible) --

RE-EXAMINATION BY COUNSEL FOR THE PLAINTIFF

BY MR. MAGLOUGHLIN:

Q Okay. Final question. Was there any aggressive behavior in -- in Mr. Campbell's body language or movements prior to somebody putting their hand on him?

**A No.**

MR. MAGLOUGHLIN: That's it. Okay.

(OFF THE RECORD AT 2:46 P.M.)

107

CERTIFICATE OF COURT REPORTER - NOTARY PUBLIC

I, Brendon Cuenca, the officer before whom the foregoing proceedings were taken, do hereby certify that any witness(es) in the foregoing proceedings were fully sworn; that the proceedings were recorded by me and thereafter reduced to typewriting by a qualified transcriptionist; that said digital audio recording of said proceedings are a true and accurate record to the best of my knowledge, skills, and ability; and that I am neither counsel for, related to, nor employed by any of the parties to this case and have no interest, financial or otherwise, in its outcome.


______________________________

BRENDON CUENCA,
NOTARY PUBLIC, FOR THE STATE OF MARYLAND
10/3/2025

108

CERTIFICATE OF TRANSCRIBER

I, Brandi McLean, CET, do hereby certify that this transcript was prepared from the digital audio recording of the foregoing proceeding; that said proceedings were reduced to typewriting under my supervision; that said transcript is a true and accurate record of the proceedings to the best of my knowledge, skills, and ability; and that I am neither counsel for, related to, nor employed by any of the parties to the case and have no interest, financial or otherwise, in its outcome.


______________________________

BRANDI MCLEAN, CET
PLANET DEPOS, LLC
10/3/2025

**A**
**ability**
10:21, 96:16, 96:17, 103:15, 107:11, 108:8
**able**
33:12, 99:8
**about**
7:9, 8:13, 9:8, 15:3, 17:2, 21:5, 27:19, 28:1, 28:7, 30:7, 33:20, 34:8, 35:7, 37:14, 40:4, 40:22, 41:2, 42:19, 42:21, 43:6, 44:18, 45:9, 45:18, 46:5, 46:8, 46:13, 48:6, 49:8, 49:16, 52:2, 52:4, 52:20, 53:2, 59:11, 59:18, 67:10, 72:6, 80:12, 87:9, 89:11, 89:13, 91:7, 91:15, 94:18, 101:5, 101:10, 101:11, 101:19, 102:3, 103:5, 105:8
**above**
20:13
**abraham**
55:3, 55:21
**absence**
76:22
**absolutely**
76:14
**abuse**
101:19
**access**
17:21, 18:12, 18:13, 18:14
**according**
47:19, 75:7, 99:17
**account**
17:19, 18:12, 19:4, 19:5
**accounts**
15:10, 17:16, 18:4, 19:2
**accurate**
50:3, 65:1, 74:13, 80:15, 107:10, 108:7
**accused**
52:11, 52:15, 53:5, 53:9, 54:5, 54:9
**achieve**
80:22
**acted**
92:2
**acting**
26:5, 43:20, 50:14, 64:5, 93:4
**active**
74:4
**activities**
79:20
**actual**
12:18, 41:8, 83:14, 83:16, 97:18
**actually**
27:11, 38:9, 51:1, 52:6, 61:13, 81:8, 85:17, 94:1, 99:3
**acuity**
68:20
**additional**
10:13, 70:15, 80:11
**address**
32:7, 68:13
**addressed**
34:22
**adequate**
75:3
**adequately**
33:13
**administration**
30:18, 30:21, 31:10, 46:9, 46:10, 46:11, 61:21, 67:11, 67:16, 86:5
**administration's**
48:14
**administrative**
60:13, 61:16
**administrators**
46:17
**admitted**
37:2, 104:19
**adult**
19:21, 20:2
**advising**
48:1
**advisor**
58:15, 58:18, 97:17, 98:10
**affirmed**
6:8
**afro**
89:8
**after**
17:8, 25:7, 25:16, 27:6, 28:4, 31:11, 36:13, 37:20, 51:7, 59:4, 70:11, 87:10
**again**
6:3, 8:10, 22:4, 22:8, 23:11, 28:6, 37:17, 48:8, 78:16, 95:14, 98:6
**against**
24:16
**age**
20:13
**agencies**
28:20, 31:21, 34:9
**agency**
34:10, 37:8
**aggression**
94:19, 96:4
**aggressive**
4:16, 76:2, 76:22, 77:16, 80:20, 91:8, 91:21, 105:15, 106:7
**aggressively**
92:2, 93:4
**ago**
19:16, 105:6
**agree**
49:6
**ahead**
24:18, 45:19, 50:18, 88:17, 90:8, 90:19, 95:14
**al**
1:7
**all**
7:21, 8:5, 13:11, 13:16, 14:16, 20:19, 21:22, 29:7, 33:4, 48:3, 64:8, 64:17, 66:2, 67:9, 68:1, 69:7, 72:16, 75:4, 87:17, 88:11, 89:21, 90:1, 93:16, 95:2, 97:22, 100:16, 103:1, 103:20
**allegation**
12:19, 49:2, 58:9
**allegations**
24:7, 24:14, 24:15, 24:20, 24:21, 27:16, 32:6, 36:2, 40:7, 40:18, 41:6

**alleged**
27:3, 40:22, 47:1, 101:19, 101:21
**alleges**
29:19
**alleging**
53:22
**allowed**
44:1, 44:2, 44:4
**allows**
18:12
**almost**
87:7, 104:11
**along**
77:8
**already**
6:21, 7:5, 20:10, 49:15, 49:17, 51:2, 52:7
**also**
16:3, 16:4, 18:21, 25:13, 30:22, 42:17, 60:19, 73:9, 77:13, 77:19, 84:20
**although**
75:12
**always**
34:10, 35:4, 36:5, 60:22, 76:5, 79:3
**amid**
50:15
**andre**
56:7, 88:22
**andrew**
3:4, 6:17, 6:20, 44:12
**angles**
29:13
**another**
94:22, 95:4, 95:7, 95:15, 95:18, 97:6
**answer**
8:3, 9:7, 13:16, 14:10, 15:11, 18:5, 18:7, 22:21, 22:22, 24:3, 24:4, 25:2, 28:13, 28:14, 30:11, 32:21, 33:3, 33:4, 33:13, 40:15, 43:4, 43:8, 43:12, 90:19, 91:10, 91:19, 104:2
**answered**
52:7
**answering**
8:21, 9:16, 11:20, 92:13
**answers**
8:15
**any**
9:5, 10:20, 11:2, 12:13, 15:9, 15:17, 16:1, 16:3, 20:12, 24:20, 30:17, 30:20, 33:1, 35:9, 35:22, 40:21, 44:4, 44:5, 48:13, 49:1, 52:13, 53:22, 54:12, 54:16, 55:9, 56:21, 73:14, 74:6, 77:12, 80:2, 80:11, 82:6, 84:22, 85:14, 90:13, 91:3, 95:2, 95:5, 95:9, 95:11, 95:12, 95:16, 95:20, 103:8, 104:3, 104:12, 104:15, 104:19, 106:6, 107:4, 107:13, 108:10
**anybody**
31:9, 43:21, 48:10
**anyone**
9:12, 104:1, 104:12
**anything**
13:1, 15:1, 16:6, 17:10, 66:13, 91:14, 91:16, 92:19, 93:2, 94:17, 103:4, 104:19
**apart**
33:6, 52:9, 52:14, 53:4, 53:8, 54:1, 54:4, 54:8, 54:14
**apologize**
28:4
**apparatus**
49:22
**apparently**
81:9
**appealed**
40:12
**appear**
91:8, 91:20
**appearance**
91:16
**appropriately**
48:1
**approval**
70:16, 70:21
**approve**
61:15
**april**
20:16
**area**
80:6
**areas**
75:4
**arguing**
84:12
**arise**
24:8
**arms**
75:1
**around**
16:18, 58:10, 97:9
**article**
5:4, 5:5, 24:10, 26:1, 26:16, 26:19, 27:2, 27:13, 28:6, 29:19, 31:14, 32:13, 32:19, 33:4, 33:6, 35:7, 36:22, 39:4, 40:3, 40:6, 41:19, 41:22, 42:3, 42:11, 42:17, 45:12, 45:20, 46:1, 47:19, 49:11, 49:18, 50:11, 50:14, 51:1, 52:1
**asked**
93:11, 103:21
**asking**
7:16, 7:19, 47:7, 47:11, 61:14, 90:16
**assault**
40:6, 40:19, 40:22
**assaulting**
101:10
**assertion**
96:15
**assessment**
90:17
**assistant**
90:21
**association**
42:12
**assume**
7:8, 7:19, 10:3, 83:11
**attached**
97:19

**attempt**
77:7
**attendant**
73:21
**attorney**
3:15, 7:8, 8:2, 8:3, 9:12, 64:13, 64:15, 104:1, 104:20
**attorneys**
9:8, 104:2
**attributable**
46:9
**audio**
107:9, 108:4
**audit**
49:19
**authorize**
71:9
**automated**
27:7
**available**
12:10, 14:16
**avenue**
3:8
**avoid**
59:13
**aware**
13:15, 20:15, 25:4, 26:18, 26:20, 26:21, 33:1, 46:22, 47:9, 52:13
**awareness**
89:22
**away**
27:10, 94:12, 105:11, 105:12

**B**

**back**
25:6, 27:12, 28:3, 28:5, 45:5, 49:5, 65:12, 67:4, 87:14, 93:20, 97:16, 100:22
**bad**
94:3
**baltimore**
3:17, 22:14, 41:18
**barred**
22:13
**based**
17:13, 24:10, 41:9, 60:11, 61:2, 76:21, 92:15, 93:14, 94:15, 97:22, 101:12
**basically**
36:2, 61:8
**basis**
90:16
**bates**
19:14, 21:19, 22:4, 22:7, 25:10, 25:14, 50:16, 62:15, 68:7, 73:2, 75:19, 76:4, 79:9, 88:1, 97:6, 98:7, 100:4, 100:6
**because**
8:1, 8:10, 9:21, 10:7, 10:10, 12:3, 21:9, 21:22, 23:10, 25:2, 29:7, 48:5, 48:19, 60:17, 65:13, 67:20, 69:6, 88:1, 91:1, 97:22, 99:15, 99:16, 99:19, 99:21, 100:22, 101:12, 102:13
**bedroom**
30:3
**bedrooms**
29:22
**been**
15:14, 24:10, 26:12, 40:16, 49:7, 50:17, 52:11, 52:15, 53:5, 53:9, 54:5, 54:9, 56:9, 56:13, 56:17, 57:2, 58:10, 59:17, 63:2, 70:1, 72:15, 79:18, 87:2, 90:12, 91:16, 92:4, 101:22, 103:12
**before**
2:13, 7:17, 7:19, 8:21, 8:22, 9:7, 9:16, 10:10, 13:7, 27:6, 46:3, 46:13, 49:20, 78:21, 93:20, 96:18, 104:15, 107:3
**began**
36:16
**begin**
48:1, 48:3
**behalf**
3:3, 3:12, 11:15, 13:16, 14:1
**behavior**
4:16, 31:19, 32:7, 33:9, 76:2, 76:22, 81:3, 105:15, 106:7
**behaviors**
69:4
**behind**
62:5, 69:17, 69:20, 71:15, 71:18, 94:4
**being**
6:8, 7:6, 77:4, 84:8, 85:10, 91:12, 91:14, 92:11, 99:9
**belief**
30:14
**believe**
11:3, 22:15, 26:14, 29:8, 45:9, 46:3, 53:1, 58:17, 64:18, 67:4, 78:19, 103:9
**believed**
47:12
**believes**
37:19, 46:20
**beneath**
46:10
**besides**
15:11, 93:2
**best**
10:3, 10:21, 11:3, 42:6, 53:16, 103:14, 107:10, 108:7
**better**
105:11
**between**
32:1, 33:10, 79:16
**beyond**
70:17
**big**
75:10
**bigger**
38:13, 76:7
**bill**
5:7, 81:19
**binder**
69:17, 69:20
**binders**
71:15, 71:19
**bit**
87:10, 94:8
**black**
38:7
**blamed**
40:9
**blank**
25:17, 50:19, 51:7, 81:6
**board**
22:11, 22:18,

23:2, 23:13, 23:20, 78:10
**bob**
19:4
**body**
91:20, 94:19, 106:7
**bold**
38:8, 39:2, 76:18
**bones**
82:17, 82:19
**book**
63:16, 63:17, 63:21, 64:1, 64:6, 64:7, 64:9, 67:2
**books**
64:2
**both**
20:7, 101:16
**bottom**
13:11, 36:21, 37:9, 40:1, 41:16, 50:10, 68:8, 68:16, 73:8, 73:19, 75:20, 76:5
**boy**
51:21
**brand**
8:11
**brandi**
108:2, 108:15
**break**
9:5, 9:7, 25:7, 44:21, 49:20, 87:7, 102:17, 102:20, 102:22
**breaks**
9:11, 74:15
**breast**
89:22
**brendon**
1:22, 2:13, 107:2, 107:19
**briefly**
87:8
**bring**
75:14
**brought**
36:5, 36:14, 57:20
**bruce**
56:7, 88:22, 89:6
**building**
33:15
**bullet**
27:2, 28:6, 31:15
**bullying**
32:6
**bunch**
46:15
**business**
16:11
**button**
78:9

**C**

**c2**
76:17
**call**
31:8, 80:5
**called**
45:12
**came**
28:19, 35:1, 59:5, 94:11, 99:18
**camera**
30:2, 57:12, 57:17, 58:1, 58:21, 59:12, 59:15, 59:21, 99:9
**cameras**
29:21, 57:6, 57:9, 57:20, 59:8, 84:5
**campbell**
1:4, 6:22, 14:1, 15:2, 15:20, 20:15, 21:20, 25:11, 26:13, 26:22, 41:15, 45:11, 48:16, 49:11, 50:8, 50:9, 50:17, 58:2, 58:11, 58:18, 64:1, 66:19, 67:17, 75:5, 85:1, 85:9, 88:7, 88:10, 89:1, 90:12, 91:8, 92:2, 92:8, 92:21, 93:4, 96:14, 97:2, 99:8
**campbell's**
15:7, 20:19, 94:18, 98:11, 98:18, 99:13, 100:20, 105:10, 106:7
**can't**
14:10, 15:11, 18:7, 22:22, 29:4, 33:3, 33:4, 39:16, 40:15, 93:1
**cannot**
9:11
**capon**
3:14, 45:3, 87:12, 87:16, 87:19
**captain**
60:13, 61:16
**captured**
29:18, 30:3
**cards**
84:19, 85:2, 85:3, 85:6, 85:7, 87:1
**care**
56:18, 101:12, 102:3
**carefully**
8:20
**carlson**
31:4
**case**
1:6, 12:5, 38:8, 49:7, 52:10, 52:14, 53:4, 53:8, 54:2, 54:4, 54:8, 54:14, 69:5, 98:1, 99:10, 107:13, 108:10
**cell**
71:1
**center**
1:11, 2:1, 2:5, 4:3, 6:5, 6:14, 6:17, 11:7, 11:16, 13:22, 64:19, 69:16
**ceo**
26:5, 34:20, 43:20, 44:1, 50:14
**certain**
104:13
**certificate**
107:1, 108:1
**certified**
5:13
**certify**
107:4, 108:2
**cet**
108:2, 108:15
**chair**
11:20
**change**
36:19, 39:20, 81:3, 94:17, 94:20, 95:2, 95:5, 95:12, 95:13, 95:16, 95:17, 95:20, 101:5
**changed**
59:21
**changes**
39:6, 39:8
**chaos**
26:1, 26:10,

38:8
**charge**
78:20, 79:2
**charles**
1:4, 6:21, 14:1, 15:7, 48:15, 58:2, 64:1, 66:18, 67:17, 75:5, 85:1, 85:9, 88:7, 88:9, 89:1, 91:7, 92:2, 92:7, 92:21, 93:3, 97:2, 99:13, 100:20
**checks**
86:6
**chief**
21:4, 67:7, 67:8
**circle**
61:22
**circulation**
75:3
**circumstance**
73:14
**claims**
40:4
**clarification**
8:22
**clarify**
10:14, 41:6, 52:18, 103:9
**clean**
7:22
**clearly**
7:13
**click**
88:12, 88:15
**client**
21:21
**clifton**
1:11, 2:1, 2:5, 4:3, 6:5, 6:14, 6:16, 11:6, 11:15, 13:22, 17:21, 64:18
**climate**
26:1, 26:10, 38:7
**clinic**
4:18, 78:14, 79:4, 82:3, 102:5
**clinical**
21:8, 21:13, 34:20, 38:17, 67:8, 70:16, 70:20, 70:22, 71:5, 71:8, 72:12, 72:14, 79:12, 92:4, 92:9
**clinically**
91:1
**clinicians**
90:17
**close**
17:4
**closer**
89:12
**coffee**
80:7
**collected**
35:15
**columns**
20:7
**combatively**
93:4
**come**
25:6, 35:2, 41:7
**comes**
34:13, 81:20
**comfortable**
87:18
**coming**
102:1
**comments**
89:9
**committee**
43:5, 44:5
**common**
7:18
**communal**
18:16
**communicate**
96:16
**complained**
34:4, 40:22
**complaining**
27:22
**complains**
33:19
**complaint**
12:19, 33:16, 34:6, 34:9, 34:15, 35:3, 35:4, 35:22, 36:3, 59:5, 97:18, 98:1, 98:4, 100:15, 102:7
**complaints**
27:19, 31:17, 31:20, 32:5, 33:2, 33:8, 33:11, 34:19, 34:22, 35:9, 35:12, 35:14, 36:7, 37:3, 37:14, 37:20, 38:3, 46:5, 50:2, 52:20, 59:22
**complete**
8:15
**completeness**
78:21
**compliance**
60:12, 60:19
**compliant**
80:19
**complied**
29:9
**comply**
27:5, 28:10, 28:13, 40:10, 49:13
**computer**
18:9, 18:14, 18:15, 63:14
**concerns**
32:8, 42:19, 42:21
**conclude**
104:16
**concluded**
37:21
**conclusion**
37:13
**conditions**
31:19, 32:16, 33:2, 33:9
**conducted**
39:18, 42:13, 42:14
**conducts**
86:6
**confer**
102:17
**confirmed**
36:17, 37:1, 40:7
**confused**
102:16
**connecticut**
3:8
**considerations**
73:11
**considered**
38:16
**constitutes**
8:7
**contact**
35:7, 70:22, 83:16
**contained**
15:14, 64:7
**containing**
66:17
**contains**
66:10
**content**
50:20
**contention**
92:1, 92:7
**context**
8:11, 69:1
**continuation**
70:12
**continues**
73:9

**contraband**
69:7, 84:6, 84:8, 84:15, 84:17, 84:18, 84:20, 85:1, 85:3, 85:10, 85:15
**contracts**
82:12
**control**
15:15, 69:16
**conversation**
7:18, 92:11
**coo**
34:20, 64:5
**cooperative**
91:3
**copied**
64:12
**copy**
22:7, 44:3, 63:15, 64:9, 69:16, 83:18
**copying**
62:11
**core**
38:16
**corner**
41:16, 76:5, 88:13
**corporate**
1:12, 6:6, 6:15, 7:6, 11:16
**correct**
7:10, 7:11, 20:8, 29:15, 29:21, 31:2, 38:12, 46:18, 74:18, 76:15, 79:1, 81:4, 83:20
**corrections**
10:19, 105:2
**could**
8:1, 45:19, 69:7, 73:6, 73:15, 77:13, 77:18, 79:20, 80:3, 96:4, 96:5, 105:14, 105:15, 105:18
**couldn't**
18:5, 80:3
**counsel**
4:9, 5:2, 6:11, 45:6, 105:3, 106:4, 107:12, 108:9
**couple**
53:18
**course**
16:11, 31:5
**court**
1:1, 6:20, 7:13, 8:1, 107:1
**courtroom**
8:5
**cover**
65:5, 66:6
**cover-up**
45:18, 52:2
**covered**
49:17
**covers**
65:21, 66:11
**create**
16:14
**created**
16:10, 16:18, 20:10, 100:9, 100:10
**creating**
80:20
**criteria**
43:10, 80:11
**critical**
27:8, 31:18
**ctphc**
64:17
**cuenca**
1:22, 2:13, 107:2, 107:19
**culmination**
27:17
**culture**
50:1
**current**
36:14, 43:22, 47:18
**currently**
63:21, 87:21
**cut**
22:5

D

**danger**
68:21, 68:22, 77:1, 77:3, 77:8, 77:13
**dangerous**
31:19, 32:16, 33:2, 33:8, 77:19
**date**
17:4, 24:10, 51:17, 62:19, 63:3
**dated**
17:3
**david**
97:17, 97:18
**dc**
3:7
**death**
27:7, 28:8, 31:11, 39:3, 47:2
**december**
14:1, 45:21
**decide**
34:11, 61:17
**decided**
75:13
**decision**
28:10, 91:1, 92:4, 92:9, 98:16
**deck**
84:18, 85:2, 85:5, 87:1
**decks**
85:7
**decrease**
85:18
**def**
62:15, 63:6, 67:6, 68:7, 69:10, 73:2, 73:9, 73:10, 73:18, 74:9, 75:19, 76:16, 78:12
**defendants**
1:8, 3:12, 105:3
**defense**
78:7
**definitely**
48:20
**definition**
73:7
**deleted**
27:8, 29:20
**demonstrate**
74:22
**demotion**
40:11, 40:14
**denard**
55:3, 55:21
**denial**
54:13
**dental**
82:7
**denying**
54:6, 54:9, 56:18
**department**
16:2, 16:4, 20:9, 23:15, 24:1, 24:9, 24:19, 25:2, 26:18, 36:4, 36:19, 46:22, 47:9, 47:21, 49:3, 49:4, 52:13, 90:17, 93:1, 97:21, 98:4, 99:15
**department's**
17:5, 17:13, 31:22, 34:14, 64:15, 96:21

**departures**
27:20
**depos**
108:16
**deposition**
1:11, 2:1, 4:10, 5:3, 9:22, 12:6, 12:14, 13:10, 46:16, 103:11, 103:15
**desai**
3:5, 6:18, 93:19, 94:6, 105:13, 105:17, 105:20, 106:1, 106:3
**describe**
12:16, 62:17
**designee**
1:12, 6:6
**despite**
32:5
**destroy**
16:6
**detailed**
24:14
**determination**
49:4, 102:12
**determine**
70:12, 79:14, 79:19
**determined**
85:8
**device**
18:11, 18:17
**diagnostic**
83:6
**diana**
40:4, 40:7, 40:14, 40:18
**differences**
79:16
**different**
28:17, 28:20, 28:21, 29:12, 29:13, 37:10, 84:13, 101:8, 101:16
**differently**
21:11
**digital**
107:8, 108:3
**direct**
76:17
**directed**
40:3
**direction**
96:12
**director**
11:11, 21:8, 21:13, 22:13, 60:18, 60:22, 61:10, 64:21, 67:6, 67:9, 67:15, 70:16, 70:21, 71:1, 71:5, 71:8, 72:12, 72:14, 90:21, 98:17
**directors**
42:13
**disagree**
37:12
**discarded**
70:2, 83:12, 83:19
**discharge**
20:3
**discharged**
20:16, 100:22
**discipline**
43:1, 43:11, 56:21, 85:14
**disciplined**
55:9, 56:9, 56:13, 56:17
**discover**
58:20
**discovering**
85:15
**discriminatory**
32:7
**discuss**
9:11, 16:19
**discussed**
32:13, 32:17, 36:7, 78:7, 103:11
**discussing**
49:20
**dishonesty**
55:10, 56:10
**dismiss**
34:12
**dismissed**
101:2
**disorganized**
28:4
**displayed**
87:21
**disposal**
20:9
**dispute**
37:16, 37:22
**disregarded**
40:8
**district**
1:1, 1:2
**doc**
100:22
**doctor**
98:2
**document**
4:19, 4:22, 5:6, 9:15, 9:17, 13:7, 16:4, 16:9, 16:10, 17:11, 19:14, 19:18, 22:1, 44:3, 44:4, 52:5, 62:7, 62:15, 63:6, 65:4, 65:12, 65:17, 66:6, 68:7, 68:9, 70:2, 73:2, 73:3, 75:20, 76:6, 76:10, 78:13, 79:10, 79:13, 81:18, 97:11, 99:6, 100:9, 100:12, 100:14, 100:15, 101:20
**documentation**
12:19, 14:14, 17:14, 66:2, 70:13, 75:7, 99:18
**documented**
17:7, 71:3, 71:5
**documents**
12:13, 12:17, 14:17, 15:7, 15:18, 16:15, 21:21, 27:4, 97:7, 103:8
**doing**
42:6, 47:22, 74:7, 80:13, 80:16, 80:18
**done**
7:16, 13:13, 42:1, 87:7, 96:18, 96:22
**dorsey**
2:6
**down**
38:12, 39:5, 96:3
**download**
78:8
**downloaded**
61:18
**dr**
19:3, 31:4, 31:7, 38:19, 48:19, 48:20, 49:7, 52:10, 53:1, 54:4, 54:17, 55:11, 72:15, 90:20, 99:15, 99:17, 99:22, 101:13
**dranghon**
3:6, 6:18, 43:16, 44:12, 44:18, 44:21
**drink**
80:7
**drove**
32:8

**due**
51:13, 99:9
**duly**
6:8
**during**
9:11, 16:20, 32:1, 32:9, 64:2, 74:12, 85:16, 86:4, 102:5
**dwight**
3:6, 6:18

**E**

**e-mail**
15:10, 16:3, 17:16, 17:19, 18:12, 19:2, 19:3, 19:4, 62:3, 63:13, 64:20, 66:10, 66:14, 66:17, 67:11, 67:18, 67:19
**e-mailed**
19:15
**e-mails**
15:19, 17:21, 18:4, 18:6, 18:22, 46:16, 66:11
**each**
7:15, 76:4
**earlier**
21:11, 67:10, 101:5, 103:5
**efficient**
70:18
**electronic**
18:11, 63:11
**electronically**
22:6
**elevated**
68:20
**else**
13:1, 43:21
**embattled**
45:14
**emergencies**
68:12, 68:14
**emergency**
73:7, 73:16
**emerges**
104:22
**emphasize**
7:12
**employed**
6:20, 17:20, 30:22, 31:11, 37:10, 107:12, 108:9
**employee**
17:20, 18:13, 20:21, 32:8, 49:22, 56:9, 56:13, 56:17, 57:2
**employee's**
32:2
**employees**
16:14, 17:16, 17:18, 23:22, 27:21, 27:22, 31:16, 46:10, 48:5
**employment**
11:9, 31:22, 34:15, 56:11, 56:15, 56:19, 56:22, 57:3, 75:13
**encouraging**
96:10, 96:11
**end**
13:11, 42:8, 46:5, 48:1, 48:3, 48:4, 51:13, 93:21
**ended**
72:6
**engaged**
32:6
**engaging**
91:2
**english**
82:2
**ensure**
7:22, 42:6, 64:22
**enter**
22:1
**entered**
17:8
**entire**
8:20, 28:18, 69:6
**entities**
29:13
**entitled**
10:3, 53:16
**entry**
17:9, 17:11, 17:12
**environment**
42:8, 69:6, 76:12
**episode**
60:1
**equal**
31:22, 34:15
**error**
81:6
**escalating**
69:3
**especially**
96:7
**esquire**
3:4, 3:5, 3:6, 3:13, 3:14
**estimate**
10:4, 10:7, 53:17
**et**
1:7
**eubanks**
3:13, 4:5, 22:20, 23:18, 24:3, 24:17, 25:18, 26:4, 28:12, 30:8, 30:11, 32:18, 32:21, 43:3, 43:12, 43:17, 44:16, 50:12, 87:11, 89:9, 90:15, 91:9, 91:18, 93:7, 93:12, 93:16, 102:19, 103:1, 105:4, 105:19, 105:21
**evaluated**
41:10
**evaluation**
41:21
**evaluator**
36:21
**evaluator's**
51:12
**even**
11:20, 78:10
**event**
16:20, 29:17
**events**
8:13, 16:19, 47:4, 47:5, 47:12
**eventually**
39:20, 81:2
**ever**
52:11, 52:15, 53:5, 53:9, 54:5, 54:9, 54:16, 55:9, 84:15
**every**
16:8, 17:20, 18:13, 74:2, 74:3, 74:5, 81:21, 82:1
**everybody**
6:19, 41:8, 67:19
**everything**
8:12, 14:14, 14:17, 14:22, 16:6, 41:7, 43:6, 63:4, 64:12, 66:14, 67:20, 68:2
**evidence**
27:8, 104:22

**ex-official**
22:12
**exact**
24:9
**exactly**
58:6
**examination**
4:2, 6:11, 105:3
**examine**
36:21
**examined**
6:10
**example**
10:5, 15:6, 15:14, 15:19, 16:22, 19:3, 33:18, 53:1
**examples**
80:2
**excellent**
17:10, 73:6
**except**
45:14
**excessive**
52:11, 52:16, 53:6, 53:10, 54:1
**executive**
21:4, 67:7
**exhibit**
4:10, 4:11, 4:13, 4:15, 4:17, 4:18, 4:19, 4:20, 4:21, 4:22, 5:3, 5:4, 5:5, 5:6, 5:7, 5:8, 5:9, 13:5, 13:6, 13:20, 14:2, 19:8, 19:9, 21:19, 22:2, 25:10, 25:12, 41:13, 44:9, 44:11, 45:11, 49:10, 50:6, 62:5, 62:6, 67:5, 68:4, 68:5, 72:21, 72:22, 75:10, 75:11, 78:1, 78:2, 81:9, 81:12, 81:13, 87:22, 88:3, 97:5, 97:10, 98:6, 100:3, 100:5, 100:7, 101:20, 102:8
**exhibits**
9:21
**exist**
58:5
**existed**
36:8
**expected**
13:15
**extending**
70:17
**extension**
71:9
**extreme**
68:21, 68:22, 77:10

**F**

**facilities**
74:2
**facility**
17:22
**facility's**
31:18, 41:9
**facts**
8:13, 12:2, 12:7, 46:4, 46:19, 47:3, 47:11, 48:10
**fail**
78:3
**failed**
27:4, 32:7, 49:13
**failing**
45:13
**fair**
28:22, 29:17, 103:18, 105:12
**fairly**
101:13
**fake**
36:2, 36:3
**far**
47:5
**farther**
31:15, 40:6, 98:14
**fault**
47:17
**faxed**
69:16
**feel**
79:15, 103:17
**feet**
95:21
**felt**
101:13
**few**
7:12, 26:9, 52:19
**fighting**
84:13
**file**
15:7, 16:7, 43:13, 56:11, 56:15, 56:19, 56:22, 57:3, 65:16, 75:13, 82:20, 83:5, 83:13, 97:2
**filed**
58:11, 69:16, 97:18, 98:1
**files**
65:17
**final**
51:12, 106:6
**financial**
107:14, 108:11
**find**
31:15, 51:21, 84:15, 98:11, 98:18
**finding**
8:12
**findings**
36:14, 40:9
**fine**
45:1, 93:22
**finish**
7:20
**fire**
48:9, 54:16
**fired**
48:5, 48:13, 57:2
**firm**
13:21, 16:10
**first**
6:8, 19:21, 24:8, 24:15, 25:15, 25:17, 26:9, 27:12, 29:7, 46:16, 49:2, 50:13, 50:17, 51:7, 51:22, 53:14, 58:8, 62:14, 73:20, 76:6, 76:10, 78:19, 86:16, 98:9, 100:18
**fist**
75:2, 75:3
**five**
10:14, 10:15, 38:13, 73:19, 95:4, 95:7, 98:20
**flat**
88:19, 89:13, 94:1
**flexing**
75:1
**flip**
13:9, 22:10, 23:8, 41:17, 51:21, 51:22, 69:10, 76:3, 98:20
**fluids**
74:3, 74:15
**folded**
81:15
**folder**
75:17

**follow**
16:2, 20:8, 20:9, 61:15, 96:12
**followed**
61:4
**following**
20:3, 40:2, 54:17, 64:22, 73:22
**follows**
6:10, 97:15
**folowosele**
53:5, 54:21, 55:15
**foot**
96:2, 96:3
**footage**
27:6, 28:7, 28:11, 29:18, 58:1, 58:7, 60:10, 61:12, 62:18, 63:10, 64:19, 65:2, 91:6, 93:15, 94:15, 99:9, 101:6, 102:14
**force**
52:12, 52:16, 53:6, 53:10, 54:1, 56:14, 101:20, 101:21
**forego**
81:10
**foregoing**
107:3, 107:5, 108:4
**forget**
49:16, 52:6
**forgetting**
23:8, 95:3
**forgot**
89:21
**form**
62:19, 62:22, 69:15, 98:15
**format**
22:15
**former**
22:12
**forms**
64:20, 97:20
**forward**
36:5
**forwarded**
97:21, 99:17
**found**
27:15, 59:1, 84:17, 84:18, 84:20, 85:1, 85:3, 85:18, 86:22, 99:21, 99:22
**four**
31:17, 70:10, 70:11, 70:18, 72:1, 78:19, 88:16
**four-year**
32:12
**fourth**
27:13, 38:12
**frame**
64:3
**free**
79:15
**front**
73:8
**full**
8:15, 103:17
**fully**
7:17, 107:5
**funny**
53:14
**further**
104:21, 105:19
**future**
51:17

**G**

**gather**
37:11
**gathering**
14:13
**gave**
7:8
**general**
3:15
**generally**
12:16
**give**
10:21, 11:3, 86:7
**given**
89:22
**gives**
86:5
**go**
7:4, 22:3, 24:18, 28:3, 28:5, 43:7, 43:13, 45:19, 50:18, 60:22, 73:10, 78:8, 79:7, 79:21, 80:4, 80:6, 82:20, 83:6, 84:11, 84:14, 88:8, 88:17, 90:8, 90:19, 93:20, 94:1, 95:14, 97:16
**goes**
49:5, 49:6
**going**
7:12, 8:16, 13:4, 13:20, 19:7, 21:18, 23:11, 25:10, 32:18, 36:10, 37:17, 38:22, 41:12, 41:13, 41:17, 43:3, 43:7, 43:12, 45:11, 50:5, 51:21, 51:22, 52:19, 59:13, 62:5, 65:9, 65:22, 67:4, 68:4, 72:20, 75:9, 76:17, 77:22, 79:6, 81:7, 81:8, 81:10, 81:12, 84:13, 87:7, 88:19, 90:15, 93:18, 94:21, 98:13, 98:20, 98:21, 99:3, 100:2, 104:6
**gold**
79:16, 80:3, 80:12, 80:22
**gone**
48:4, 98:3
**good**
20:1, 26:8, 26:14, 42:2, 44:19, 44:21, 50:22, 80:13, 80:16, 94:5, 99:1, 102:18
**governor's**
31:20, 33:19, 33:20
**great**
45:3, 62:13, 79:13
**green**
69:15
**grievance**
5:8, 5:9, 49:1, 58:11, 97:2, 97:14, 98:11, 98:16, 98:18, 99:13, 100:10, 100:20
**grievances**
101:15
**grill**
45:17, 52:1
**grove**
53:2, 53:3
**guards**
18:1, 18:10
**guess**
10:3, 10:9, 94:16
**guys**
44:17, 81:17, 97:8

**H**

**half**
44:14, 60:6,

81:15
**hall**
31:5, 99:11, 99:21, 102:1, 102:8
**hallway**
30:4
**hand**
6:3, 21:19, 40:13, 41:12, 41:14, 44:9, 45:11, 72:20, 78:1, 81:12, 105:9, 105:10, 106:9
**handed**
40:11
**hands**
75:2, 89:14
**handwrite**
22:8
**handwritten**
99:5
**hang**
77:7
**happen**
27:9
**happened**
17:1, 17:6, 47:4, 47:5, 47:12, 99:12
**hard**
25:1, 63:15, 64:9, 78:16
**harm**
72:18
**harming**
77:11
**hat**
23:8
**head**
9:5, 29:4, 49:3, 49:4, 79:15, 86:17, 97:21, 98:4
**heading**
38:7, 39:2
**health**
31:22, 34:14, 42:3, 42:4, 42:12, 45:10, 45:17, 46:2, 47:21, 48:9, 52:2, 76:11
**healthy**
42:8
**hear**
7:14
**heard**
7:5, 12:4, 21:11
**held**
2:2, 92:11
**help**
65:11, 103:9
**here**
7:21, 9:21, 10:7, 10:22, 11:3, 11:19, 12:7, 14:15, 22:3, 23:8, 27:12, 30:15, 34:12, 37:8, 38:8, 38:11, 39:4, 45:16, 50:7, 53:17, 66:1, 73:19, 78:18, 86:21, 87:4, 88:20, 90:2, 90:4, 90:13, 95:15
**hereby**
107:4, 108:2
**herrera**
36:15, 36:22, 37:3, 37:6, 37:13, 37:19, 46:2, 47:20, 48:6, 51:11
**high**
32:8, 87:4
**higher**
34:21, 35:2
**hipaa**
60:12, 60:19
**hipaa-compliant**
61:14
**hire**
36:20
**hit**
88:17
**hold**
14:22, 15:1, 15:3
**home**
10:9
**honest**
65:22
**hopefully**
50:22
**hoping**
50:19
**hospital**
1:11, 2:1, 2:5, 4:3, 4:11, 4:13, 6:5, 6:14, 6:17, 11:7, 11:16, 12:9, 13:22, 18:11, 22:13, 23:4, 23:5, 26:3, 26:12, 27:19, 28:1, 33:1, 35:7, 36:1, 36:21, 37:12, 38:17, 40:10, 41:10, 41:20, 42:19, 42:21, 43:2, 45:14, 45:18, 50:15, 52:3, 64:18
**hospital's**
35:21, 49:21
**hostility**
90:13
**hour**
73:22
**hours**
10:15, 10:20, 70:10, 70:11, 70:15, 70:18, 72:1, 74:2, 74:3, 74:5, 74:17
**house**
36:15
**howard**
98:7
**however**
9:6
**hr**
35:1
**human**
31:21, 34:1, 34:5
**hvac**
45:13

**I**

**identify**
15:18
**iesha**
99:11, 99:20, 102:8
**ignore**
91:16
**ignored**
39:10
**ignoring**
40:5
**illegal**
85:22
**images**
83:11
**imagine**
34:1, 58:4
**imaging**
82:14
**impact**
10:21, 69:7
**implies**
39:15
**important**
7:14, 9:20
**impossible**
23:10
**improvement**
11:11, 60:18, 61:1, 61:11, 64:21, 67:7, 67:15, 80:19
**inaccurate**
30:15
**incident**
17:7, 20:12,

28:16, 29:1, 29:14, 30:1, 30:22, 39:17, 66:3, 66:18, 67:21, 92:5, 99:7
**incidents** 36:20, 39:10, 39:12, 76:14
**included** 32:5, 56:10, 56:14, 57:3
**including** 9:12, 39:6, 39:9, 104:1
**incomplete** 100:21
**inconclusive** 99:19, 99:21, 100:1, 102:13
**independent** 36:20
**indicate** 92:21, 93:3, 96:4
**indicated** 94:19
**individuals** 46:13, 54:17, 55:10
**influence** 104:12
**information** 10:13, 30:13, 37:11
**inherently** 34:5
**initial** 12:18, 70:8, 70:11, 70:17
**initiating** 73:11
**initiation** 69:14
**inoperable** 58:21, 59:12, 59:15, 99:10
**instead** 40:9
**instruct** 104:2
**instructions** 7:5, 7:9
**interest** 107:14, 108:11
**interested** 8:12
**internal** 63:14
**intersecting** 8:1
**interview** 37:9
**invalid** 100:17
**investigate** 35:4, 36:5, 40:4, 40:18, 42:5
**investigated** 36:4, 41:1, 41:4, 98:10, 98:17, 102:7
**investigating** 36:17
**investigation** 27:15, 37:21, 42:13, 42:15, 42:20, 43:19, 44:7, 48:20, 48:22, 51:10, 100:21, 101:2
**involved** 28:10, 30:18, 35:1, 43:11, 86:6, 102:9
**involvement** 48:14
**involving** 28:8, 33:2, 33:8, 66:18, 67:17
**iris** 1:13, 6:7, 6:15, 7:3, 11:13, 12:8, 60:14, 60:17
**isolate** 91:15
**isolated** 27:17
**issue** 17:15, 68:13
**issued** 13:21, 15:4, 83:22, 84:3
**issues** 22:4, 36:18, 37:1, 59:7, 70:14, 80:20
**itself** 6:20, 12:9, 33:7, 36:3, 39:18, 83:1, 83:2

**J**

**jerks** 105:11
**jerry** 58:19, 97:16, 103:5, 103:7
**jessup** 1:14, 2:7
**job** 1:20
**jobs** 47:22
**john** 1:7, 19:4, 52:14, 54:8, 54:19, 55:13, 90:22
**join** 32:10
**joke** 104:9
**jordan** 55:5, 56:1, 89:14, 89:17
**judge** 43:13

**K**

**keep** 16:6, 77:10, 80:13, 80:16, 80:18, 88:19, 95:3
**keeping** 81:1
**keeps** 83:15
**kept** 30:5, 63:15, 67:2, 69:17, 69:20, 81:1, 83:14
**kevin** 53:8, 53:12, 55:1, 55:17, 90:5
**kidding** 104:5
**kind** 14:16, 16:3, 49:1, 79:20, 80:7, 92:11, 104:7
**kinds** 66:2
**knee** 96:13, 96:16
**knew** 84:7
**know** 8:12, 9:6, 10:15, 12:3, 12:8, 12:9, 13:12, 14:4, 14:13, 15:3, 15:12, 15:19, 15:22, 17:4, 19:22, 23:1, 23:2, 23:4, 23:6, 23:15, 24:1, 24:20, 25:2, 25:3, 28:9, 29:16, 30:9, 30:12, 31:3, 32:21, 33:11, 34:12, 37:5, 39:14, 40:17, 42:1,

44:13, 46:7, 46:14, 46:19, 51:14, 52:6, 58:7, 58:13, 59:11, 63:17, 63:22, 65:7, 65:9, 65:20, 66:16, 69:11, 70:5, 72:3, 79:14, 79:15, 79:22, 80:2, 85:5, 85:19, 86:8, 86:16, 86:17, 87:18, 89:16, 89:18, 91:12, 91:13, 92:10, 96:14, 97:9, 99:12, 102:6, 105:14
**knowledge**
29:3, 35:22, 96:20, 96:21, 107:11, 108:8
**known**
86:7
**knows**
99:15

**L**

**lab**
18:15
**lack**
105:11
**language**
91:20, 94:19, 106:8
**last**
9:22, 10:2, 13:11, 47:18, 86:13, 86:14, 93:20, 101:20
**late**
17:9, 17:11, 17:12
**later**
10:15, 36:13, 42:11, 49:9, 49:11, 104:19
**laura**
46:2
**law**
13:21
**lawmakers**
45:17, 52:1
**lawsuit**
8:14
**leaders**
28:9, 30:17, 32:1, 36:15, 47:20, 48:2, 51:13
**leadership**
27:4, 32:9, 42:19, 42:21, 43:2, 49:12, 49:21
**leading**
105:13
**leaning**
96:2
**learning**
48:10
**least**
22:13, 31:16, 74:2, 74:3, 74:5, 74:6
**led**
24:8
**left**
27:21, 38:17, 64:5
**legislature**
46:3
**legitimate**
37:14
**legs**
75:1, 96:1
**length**
10:6, 10:8
**less**
32:13, 59:19
**let's**
20:5, 58:9, 69:10, 76:16
**letter**
5:8, 40:11, 40:14, 97:15
**level**
34:21, 35:2, 68:20, 85:18
**lexis**
22:15
**license**
22:12
**likely**
17:4, 36:6, 86:3
**limit**
76:13
**limited**
74:8
**line**
5:14, 24:18, 38:14, 46:10
**lines**
38:13, 77:8
**linking**
47:18
**list**
13:10, 14:12, 25:6
**listed**
14:14, 66:1
**listen**
8:20
**literally**
11:21
**little**
9:20, 10:1, 49:9, 52:3, 59:19, 60:3, 87:10, 94:8
**living**
12:11
**llc**
108:16
**llp**
3:7, 13:21
**located**
34:2, 63:18
**location**
62:20
**log**
61:17
**long**
19:16, 59:11, 59:14, 65:7, 81:16, 87:11
**longer**
10:1, 26:17, 74:16, 80:13, 90:7
**look**
20:5, 38:10, 45:15, 45:16, 68:16, 73:18, 75:12, 76:6, 78:11, 78:22
**looking**
8:14, 8:17, 25:22, 26:9, 50:13, 64:16, 67:3, 67:5, 89:16, 98:5, 98:9, 98:15, 99:2, 100:18
**looks**
50:11, 51:4, 52:3, 62:18, 105:9
**lost**
38:8
**lot**
9:21
**loudly**
7:13
**lunch**
74:11
**lunchtime**
74:12
**lying**
8:6

**M**

**machines**
82:6
**made**
16:18, 24:20, 24:21, 25:3, 31:16, 31:20, 33:9, 34:15, 49:2, 60:22,

90:18, 90:22, 92:5, 92:21, 102:11
**madhaven**
31:5
**magloughlin**
3:4, 4:4, 6:12, 6:17, 13:4, 13:19, 14:3, 19:7, 19:11, 19:13, 21:18, 22:9, 23:3, 23:16, 23:19, 25:9, 25:20, 26:7, 26:15, 32:20, 43:9, 43:15, 44:9, 44:15, 44:20, 45:1, 45:7, 45:8, 62:4, 68:3, 68:6, 72:9, 72:20, 73:1, 75:9, 75:16, 77:22, 78:5, 81:5, 87:6, 87:14, 87:17, 87:20, 88:5, 88:11, 89:7, 89:11, 90:2, 90:8, 90:10, 91:5, 93:6, 93:10, 93:14, 93:17, 93:22, 94:7, 94:14, 94:21, 95:1, 95:4, 95:7, 95:14, 95:18, 97:5, 98:5, 98:8, 100:2, 100:8, 102:15, 102:21, 103:3, 104:18, 106:2, 106:5, 106:11
**main**
41:20
**maintaining**
42:7
**major**
31:5, 39:10, 39:11, 39:17, 99:11, 99:20, 102:1, 102:8
**make**
10:19, 16:3, 24:3, 24:4, 44:4, 49:15, 50:22, 71:17, 75:3, 84:8, 90:17, 105:2
**makes**
49:4
**making**
80:19
**management**
4:15, 28:1, 35:11, 35:17, 36:1, 44:1, 76:2
**manner**
90:12
**manual**
4:16, 76:1
**many**
39:5, 39:7, 39:8
**marisa**
3:14
**mark**
17:11, 41:17, 43:16
**marked**
13:5, 13:6, 14:2, 19:9, 19:21, 20:6, 22:2, 25:12, 44:11, 62:6, 68:5, 72:22, 75:11, 78:2, 81:13, 88:3, 97:10, 100:7
**martina**
31:10
**maryland**
1:2, 1:14, 2:7, 2:14, 22:18, 23:13, 23:20, 45:12, 45:17, 46:1, 47:21, 50:15, 52:1, 107:20
**maryland's**
26:2, 26:11
**masks**
89:22
**mason**
100:4, 100:6
**material**
26:14, 51:4
**matter**
9:8, 66:15
**matters**
51:6, 103:11
**matthew**
38:19, 52:10, 54:5, 54:17, 55:11
**max**
26:2, 26:11
**maybe**
25:6, 50:9, 52:4, 53:20, 59:18, 60:3, 88:12, 88:16, 97:8
**mbah**
1:7, 52:15, 54:8, 54:19, 55:13, 90:22
**mcfee**
56:3
**mclean**
108:2, 108:15
**md**
3:17, 45:12, 45:17
**mdh**
13:2, 41:7, 61:18
**meals**
73:22
**mean**
24:11, 37:2, 43:9, 46:13, 48:21, 57:19, 64:10, 67:18, 68:22, 71:5, 74:10, 74:14, 74:19, 76:13, 79:2, 95:22, 96:9, 101:9
**meaning**
12:3
**means**
11:18, 60:14, 64:18
**meant**
63:5
**measure**
68:19
**measures**
77:10
**medical**
4:18, 17:13, 18:21, 43:5, 49:21, 54:6, 54:10, 54:13, 56:18, 66:4, 78:14, 82:3, 82:20, 83:5, 101:11, 102:3, 102:5
**medication**
86:4
**medications**
10:20, 85:22, 86:1
**meds**
86:5, 86:7
**meeting**
94:11, 94:13
**meetings**
32:1
**members**
30:21, 74:7
**mental**
42:4, 42:12, 76:10
**met**
6:20
**method**
15:17
**methods**
16:1

**middle**
51:9
**mielke**
1:13, 6:7,
6:15, 7:3,
11:13, 12:8,
60:15, 60:17
**might**
15:14, 30:2,
44:19, 65:16,
78:16, 87:3,
91:16, 102:22
**mihir**
3:5, 6:18,
88:12
**million**
21:21
**mind**
45:2, 81:17
**mine**
15:11, 15:12
**minute**
49:14, 94:4,
105:6
**minutes**
10:14, 69:14,
87:12
**misconduct**
24:16
**mismanagement**
27:19
**misrepresentatio-**
**ns**
46:8, 48:7
**misrepresented**
46:4, 46:21,
47:13, 48:11
**missed**
27:11
**missing**
25:21, 26:14
**monday**
1:15, 94:12
**monitor**
60:12
**months**
36:13
**morale**
50:1
**moran**
20:21, 22:17,
23:12, 23:21,
24:16, 31:4,
32:4, 32:10,
40:3, 40:8,
40:13, 40:17,
46:15, 48:19,
48:20, 49:7,
72:15, 99:16,
99:17, 99:22,
100:19, 101:1,
101:6, 102:3,
102:6
**moran's**
21:2, 24:8,
27:15, 31:19,
33:9
**more**
9:20, 9:21,
32:13, 49:9,
52:3, 60:4,
70:9, 72:1,
80:12, 87:10,
88:16, 98:20
**morgan**
27:10, 32:3
**morgan's**
27:7, 28:8,
31:11
**most**
53:21
**motion**
43:13, 74:4,
74:16, 74:19
**mounting**
50:16
**mouth**
86:6
**move**
74:22, 75:1,
80:12, 94:2,
96:8
**moved**
59:21
**movements**
91:21, 94:19,
106:8
**moving**
52:9, 76:11,
89:14, 96:13
**msp**
41:11
**much**
51:5, 80:9
**musa**
3:13, 19:15
**musa's**
29:8
**muscular**
53:21
**must**
8:6, 9:7, 12:7,
69:13, 74:7
**myself**
31:5

**N**

**name**
7:1, 11:12,
86:10, 86:13,
86:14, 86:16
**national**
42:4, 42:12
**natural**
23:10
**nd**
6:13
**necessarily**
25:3
**necessary**
76:14, 83:8
**need**
9:5, 9:8,
43:13, 70:12,
83:15, 83:16
**needed**
12:21, 18:19
**needs**
16:5
**neither**
107:12, 108:9
**never**
10:10, 34:12,
36:1, 71:22,
85:8
**new**
7:6, 8:11,
57:20, 104:22
**next**
36:11, 38:6,
40:2, 49:7,
49:12, 52:19,
67:4, 88:22,
97:21
**nice**
7:22
**night**
31:8
**nina**
40:4, 40:7,
40:13, 40:18
**nisha**
31:4
**nodded**
24:4
**nodding**
9:4
**non-aggressive**
77:4, 77:14,
77:20
**non-dental**
82:10
**non-substantive**
105:2
**none**
54:3
**noon**
44:12
**notary**
2:14, 107:1,
107:20
**note**
71:13
**notes**
44:4
**nothing**
6:9, 81:7
**notice**
2:13, 67:14,
67:18
**noticed**
84:6, 96:1
**notified**
41:11

**notify**
61:20, 62:2, 67:7
**november**
24:11
**number**
19:15, 21:19, 22:7, 25:11, 50:16, 62:15, 68:7, 73:2, 73:10, 75:19, 76:5, 78:18, 79:9, 88:1, 98:7, 98:16, 99:10, 100:4, 100:6
**numbers**
22:5, 25:14, 76:4, 97:7
**nurse**
78:21, 79:2
**nurse's**
69:17, 69:21
**nursing**
71:15, 71:18, 73:21, 74:1, 90:22
**nw**
3:8

O

**o'clock**
72:5
**o'neal**
97:17, 97:19
**oath**
8:5, 8:6
**object**
32:18, 43:3, 43:7, 78:17, 90:15
**objection**
22:20, 23:18, 24:17, 28:12, 29:8, 30:8, 91:9, 91:18, 105:13
**objects**
8:2
**obligations**
7:10
**observed**
12:3
**obtain**
70:20
**obtained**
69:13
**obviously**
94:12
**occurred**
30:1
**octavia**
55:19
**october**
17:2, 17:3, 20:22, 21:3, 24:11, 30:22, 31:12, 32:11, 41:19, 48:15, 57:12, 64:7, 66:19, 69:19, 72:2, 72:13, 75:6, 84:1, 84:4, 85:16, 97:3, 99:8
**offer**
73:21, 74:11, 74:15
**offered**
75:8
**office**
3:15, 31:20, 31:22, 33:19, 33:20, 34:15, 63:21, 71:1
**officer**
6:19, 21:4, 60:20, 67:8, 89:4, 89:6, 107:2
**officers**
12:21, 84:5
**offices**
2:2
**official**
33:14
**officials**
31:17, 32:3, 32:4, 33:12
**oh**
14:20, 15:21, 23:5, 25:16, 26:7, 38:11, 47:9, 49:14, 50:7, 51:21, 64:19, 71:18, 78:3, 81:14, 82:8, 86:14, 87:16, 89:12, 95:11, 104:10
**omitted**
50:19, 51:4, 81:7
**once**
19:22, 22:4, 49:3, 66:13, 88:13
**one**
9:22, 14:11, 19:15, 22:13, 26:17, 38:13, 38:19, 41:15, 43:9, 45:15, 47:1, 47:18, 50:8, 50:9, 50:19, 60:6, 67:21, 72:1, 73:10, 74:7, 74:9, 75:10, 75:14, 76:7, 78:6, 79:6, 81:14, 84:17, 86:22, 87:9, 88:16, 93:11, 96:2, 97:6, 98:14, 99:5, 101:10, 101:11, 101:18, 101:22, 102:2
**one's**
13:12
**ones**
7:6, 10:1, 31:3
**only**
21:9, 64:6, 87:9, 95:21
**open**
18:6
**operable**
57:5, 57:8, 57:11, 59:2
**operating**
67:8
**opportunity**
10:18, 103:18
**orange**
87:1
**order**
27:16, 62:22, 69:13, 69:15, 70:8, 70:15, 71:12, 77:9
**ordered**
40:18, 42:4
**orders**
69:17, 69:19, 69:20
**ordinary**
16:11
**organization**
11:19, 39:21, 42:5, 42:14, 42:18
**oscar**
86:11, 86:12, 86:13, 86:14
**other**
7:16, 8:17, 11:2, 23:22, 24:20, 24:21, 46:16, 59:8, 59:22, 77:19, 86:7, 92:20, 96:3, 96:7, 96:10, 96:12
**others**
72:19, 77:13
**otherwise**
17:8, 103:10, 107:14, 108:11
**out**
8:12, 16:4, 35:1, 41:10, 81:20, 88:13,

93:19, 104:20
**outcome**
107:15, 108:11
**outline**
27:12, 81:5
**outlined**
27:16
**outside**
14:13, 37:8, 39:21, 84:14, 84:20, 84:21, 86:22, 91:13, 104:6
**over**
7:15, 31:17, 32:8, 34:12
**overall**
53:20
**oversight**
31:21, 34:8, 34:10
**own**
12:5, 18:8, 18:10, 81:17

**P**

**page**
4:3, 4:10, 5:3, 5:14, 13:9, 13:12, 19:21, 20:5, 22:10, 25:15, 25:17, 27:1, 27:3, 27:13, 28:5, 31:14, 36:11, 38:6, 38:12, 39:1, 40:2, 40:6, 41:17, 41:18, 45:16, 49:12, 50:13, 50:17, 51:7, 51:22, 62:14, 64:17, 67:4, 68:17, 73:8, 73:19, 75:13, 76:4, 76:6, 76:9, 76:18, 78:9, 78:19, 98:9, 98:22, 99:4, 100:18
**pages**
1:21, 25:17, 26:9, 39:1, 50:19, 51:8, 81:6, 98:14, 98:21
**paper**
81:15
**paragraph**
27:13, 32:17, 36:8, 36:12, 37:18, 38:12, 39:5, 39:15, 51:9, 76:10
**parentheses**
74:5
**part**
29:17, 48:19, 48:22, 61:22, 64:6, 66:3, 66:11, 66:12, 84:10, 99:6
**parties**
107:13, 108:10
**party**
41:20, 82:4, 82:13
**passed**
27:10, 84:9
**passing**
84:6
**passive**
74:4
**past**
10:20
**patient**
5:7, 15:7, 16:17, 20:2, 20:12, 40:19, 47:2, 49:5, 49:6, 50:1, 54:6, 54:9, 57:10, 72:18, 74:11, 74:16, 77:19, 79:17, 81:19, 81:21, 83:9, 83:13, 84:18, 85:17, 86:6, 86:8, 99:7, 100:22
**patient's**
30:3, 38:16, 82:20
**patients**
27:21, 27:22, 29:22, 40:5, 40:21, 42:7, 68:21, 69:2, 69:8, 74:5, 80:6, 84:13, 84:19, 85:12, 85:14, 87:3, 96:8, 96:10, 96:12
**pause**
90:3, 90:9, 94:9
**paused**
93:20
**pen**
41:16
**pender**
55:19
**pending**
9:6
**people**
7:19, 37:10, 38:19, 46:14, 46:15, 48:4, 48:8, 48:13, 77:19, 84:11, 84:22, 86:7
**perceive**
10:8
**perform**
74:3
**performance**
11:11, 60:18, 61:1, 61:11, 64:21, 67:6, 67:15
**period**
29:1, 32:12, 46:14
**perjury**
8:7
**permanent**
45:13
**permanently**
27:8, 29:19
**permission**
71:2, 71:8
**person**
8:11, 11:19, 12:11, 53:12, 53:17, 80:2, 80:3, 80:22, 83:7, 87:21, 89:13, 101:2
**personally**
12:2, 12:8, 36:16
**personnel**
74:1
**persons**
43:18
**petition**
27:17
**philadelphia**
45:20
**phone**
18:9, 71:1, 71:2
**phonetic**
31:7, 40:4, 55:3, 55:5, 55:7, 55:19, 56:3, 58:19, 89:4, 89:15
**physical**
14:18, 94:18
**physician**
31:8, 69:13, 69:19, 70:8, 70:15, 70:20, 71:7
**physicians**
22:19, 23:2, 23:14, 23:21
**picked**
61:19
**picture**
83:16

**pictures**
82:16, 82:19
**pill**
86:19
**pills**
85:18, 85:19, 85:21
**pink**
89:22, 90:1
**place**
48:2
**placed**
15:1, 57:20, 83:4, 85:10
**placement**
95:21
**placing**
68:20
**plaintiff**
1:5, 3:3, 6:11, 106:4
**planet**
108:16
**platinum**
79:17, 80:3, 80:12, 81:2
**play**
88:17, 93:18, 94:2, 94:22, 102:1
**played**
88:21, 94:10
**playing**
84:19, 85:2
**please**
6:3, 7:1, 7:12, 7:16, 9:3, 19:20, 29:6, 73:6, 104:20
**point**
27:2, 28:7, 31:16, 51:15, 69:3, 92:20, 99:16
**police**
13:2, 27:3, 41:7, 61:18, 68:2
**policies**
40:10, 74:10, 74:14
**policy**
4:21, 17:13, 19:18, 20:10, 20:18, 41:9, 62:10, 65:5, 66:6, 66:11, 66:13, 68:14, 70:3, 74:20, 74:21, 90:14
**position**
11:9, 90:11
**possession**
35:10, 66:17, 85:4
**possibility**
69:6
**possible**
11:21, 34:11, 66:5, 84:6, 86:19
**post**
25:22, 27:14, 30:6, 30:9, 35:6, 35:14, 36:1, 36:13, 36:18, 37:1, 50:10, 51:10
**posted**
82:1
**potential**
69:4, 96:11
**practice**
16:14
**pre-written**
40:11, 40:14
**premise**
63:3
**preparation**
12:14
**prepared**
108:3
**prescription**
85:21, 86:1
**present**
64:22, 74:7
**presented**
103:12
**preservation**
29:10, 65:5, 65:17, 66:6, 70:2
**preserve**
27:5
**preserved**
65:8
**pressure**
104:12
**preston**
3:16
**prevent**
72:18
**prevention**
4:15, 76:2
**previously**
49:19, 78:6, 94:18, 101:18
**print**
22:7, 76:4, 78:9, 97:8, 97:9
**printed**
81:16
**printer**
22:4, 81:16
**prior**
24:22, 52:8, 73:11, 92:2, 92:8, 94:20, 106:8
**privilege**
9:9, 43:5
**privileged**
43:10
**probable**
51:19
**probably**
50:7
**problem**
26:8, 47:17
**problems**
50:16
**procedure**
4:12, 4:14, 4:18, 5:6, 17:6, 61:2, 61:3, 62:11, 62:14, 73:4, 78:15, 79:11
**procedures**
7:9
**proceeding**
108:4
**proceedings**
107:3, 107:5, 107:6, 107:9, 108:5, 108:7
**process**
16:21
**produce**
14:16, 21:21, 97:8
**produced**
16:9, 16:15, 22:5
**program**
42:13
**programs**
49:22
**progress**
71:13
**promised**
51:11
**promoted**
32:4
**prompted**
27:20, 32:3, 36:18
**protect**
77:9
**protection**
57:10
**provide**
9:3, 73:21, 103:18
**provided**
18:11, 67:16
**provider**
82:13, 82:14
**providers**
76:11, 82:4
**psych**
26:2, 26:11,

45:18, 50:15,
52:2
**psychiatric**
22:12, 41:20,
68:12, 68:14,
73:7, 73:16
**psychiatrists**
38:15
**psychologists**
38:15
**public**
2:14, 51:15,
107:1, 107:20
**publicly**
51:11
**pull**
87:8
**pulled**
65:11
**pulls**
105:10
**purpose**
72:16
**purposes**
51:6
**pursuant**
2:13
**push**
96:17
**pushed**
60:2
**put**
14:22, 71:11,
83:12, 93:8,
96:2, 96:3
**puts**
105:9
**putting**
106:8
**puzzled**
65:14

**Q**

**qualified**
107:8
**question**
7:17, 8:3,
8:20, 8:22, 9:6,
25:1, 27:12,
41:3, 43:4,
47:18, 66:21,
77:18, 87:9,
90:16, 99:2,
105:5, 106:6
**questions**
5:13, 8:15,
11:20, 52:19,
93:11, 103:20,
104:3, 104:7,
104:15, 104:21,
105:19
**quick**
102:20
**quiet**
24:5, 71:10
**quote**
42:5, 42:8,
46:4, 46:5,
47:22, 48:1,
48:2, 48:3,
48:4, 49:20

**R**

**raise**
6:2
**raised**
24:16, 36:18,
37:1
**random**
81:6
**range**
74:4, 74:16,
74:19
**rape**
39:2, 39:3,
41:8, 46:6, 47:2
**rather**
9:4
**rationale**
76:18
**re-ask**
29:5
**re-examination**
106:4
**re-hand**
50:5
**re-object**
23:17
**reach**
81:2, 104:20
**read**
13:10, 13:17,
19:20, 19:22,
20:6, 21:22,
22:11, 26:16,
37:18, 41:22,
45:19, 50:18,
50:21, 51:1,
62:13, 69:11,
70:5, 73:6,
73:10, 73:19,
76:19, 78:17,
79:13, 99:6,
105:1, 105:21,
105:22
**reading**
78:17
**ready**
14:4, 69:12,
70:6, 70:7,
90:3, 90:4, 94:9
**really**
14:10, 18:5,
33:4, 33:13,
72:2
**reason**
7:14, 8:14,
11:2, 62:20,
69:8, 78:7
**reasonably**
12:10
**reassessment**
70:10
**rebuffed**
39:10
**recall**
9:17, 47:1,
104:18, 104:22,
105:6, 105:8
**receive**
14:6, 18:3,
18:6, 33:16,
34:16, 34:18,
34:21, 60:11,
61:6, 61:11,
81:21, 82:14
**received**
35:11, 43:18,
44:6, 92:16,
101:12
**receives**
33:15, 35:3,
60:9
**recognize**
9:17, 62:7,
68:8, 73:3,
75:20, 78:13,
79:10, 81:18,
87:21, 97:11,
100:12
**record**
4:21, 7:2,
17:2, 17:14,
19:10, 19:12,
25:22, 43:16,
43:17, 45:4,
45:5, 62:15,
66:4, 78:12,
83:15, 87:13,
87:15, 87:22,
93:9, 95:11,
103:2, 106:12,
107:10, 108:7
**recorded**
1:22, 29:1,
107:6
**recording**
88:21, 107:9,
108:4
**records**
14:19, 15:13,
16:18, 20:3,
20:19, 49:13,
83:15, 103:9
**recount**
47:8
**redirect**
106:1
**redoing**
65:13
**reduced**
107:7, 108:5

**referral**
4:18, 78:14, 78:20
**referrals**
79:3
**referring**
99:7
**regarding**
44:4, 67:21
**regret**
21:20
**regular**
16:14
**regularly**
18:3, 73:22
**reinstituting**
39:6, 39:9
**relate**
43:1
**related**
15:1, 42:18, 45:10, 49:10, 58:2, 59:22, 64:1, 97:3, 107:12, 108:9
**relativity**
78:9
**release**
51:12, 51:15, 74:7
**released**
51:18
**relevance**
22:21
**relevant**
103:10
**rely**
79:15
**remember**
10:13
**remembered**
103:4
**remind**
92:12
**repeat**
66:20
**rephrase**
18:10, 30:19, 32:22, 37:15, 37:17, 48:7, 48:8
**report**
5:9, 13:2, 13:3, 43:6, 51:12, 51:14, 51:18, 68:2, 83:1, 83:2, 83:7
**reported**
30:9, 33:5, 33:12, 37:5
**reporter**
6:2, 7:13, 45:5, 72:10, 107:1
**reporting**
36:14, 36:19
**reports**
20:12, 40:5, 46:1, 53:22, 54:12, 66:3
**represent**
6:21
**representative**
6:16, 7:7, 11:16
**reproduced**
22:15
**request**
27:5, 28:11, 28:17, 29:10, 57:22, 59:5, 60:9, 60:11, 60:12, 60:22, 61:7, 61:12, 61:15, 61:17, 61:21, 62:2, 62:18, 63:4, 64:20, 65:2, 67:20
**requested**
29:13, 39:5, 39:8, 58:8, 58:14, 63:4
**requesting**
62:20, 62:21, 71:7
**requests**
28:19, 63:10, 63:22, 64:9, 64:19, 67:9
**require**
74:11, 74:15, 80:9
**required**
70:11, 70:16
**requires**
69:13, 70:13
**reserve**
104:21
**residence**
19:21
**resident**
5:8, 49:1, 100:10
**resigns**
50:15
**resolve**
100:19
**resolved**
101:16
**resolving**
99:14
**resources**
31:21, 34:1, 34:5
**respond**
14:8
**responding**
7:17, 8:22
**response**
19:6, 48:10, 58:4, 68:19
**responses**
8:6, 9:3, 104:19
**responsible**
79:3, 85:9, 98:2, 98:3
**responsive**
15:18
**restarting**
49:14
**restrain**
57:12
**restrained**
74:16
**restraining**
27:16
**restraint**
48:15, 57:6, 57:9, 58:1, 58:2, 58:8, 58:21, 59:8, 59:12, 59:14, 60:1, 66:18, 67:17, 72:17, 73:5, 73:12, 73:15, 90:14, 92:3, 92:8, 97:3, 99:10
**restraint-free**
76:12
**restraints**
4:14, 74:6, 74:12, 76:13, 76:21
**result**
85:15
**results**
43:19, 44:6
**retain**
20:2
**retained**
4:9, 5:2
**retains**
20:11
**retention**
4:21, 19:10, 19:12, 19:18, 20:10
**revelations**
48:6
**review**
9:16, 10:18, 12:13, 37:9, 39:17, 43:5, 44:2, 48:14, 61:13, 64:21, 65:18
**reviewed**
12:17, 12:18, 42:21, 78:20,

91:6, 102:3
**reviewing**
42:18
**reviews**
39:9, 39:11
**revisit**
10:16
**rewind**
94:7
**rgs**
12:18, 48:20, 48:22, 59:5, 98:15
**richard**
56:3
**rid**
15:1
**right**
6:2, 14:13, 18:20, 22:22, 34:7, 35:16, 35:18, 35:20, 41:16, 47:10, 52:22, 63:9, 66:8, 69:21, 71:20, 72:16, 76:5, 76:8, 78:3, 78:22, 82:11, 83:10, 84:21, 87:17, 88:12, 88:13, 88:18, 92:15, 93:16, 94:5, 95:2, 99:4, 100:1, 102:4, 103:1, 104:22, 105:1
**rights**
5:7, 58:15, 58:17, 81:19, 97:17, 98:10
**riot**
39:2, 39:3, 46:6, 47:1
**rioting**
69:4
**road**
2:6
**role**
21:2
**rom**
74:4, 74:7
**room**
15:15, 57:12, 57:17, 58:1, 58:8, 58:21, 59:14, 84:12, 85:18, 99:10
**rooms**
57:6, 57:9, 59:8, 84:14
**run**
2:6
**running**
88:19

**S**

**safe**
16:8, 16:13, 16:17, 28:22, 42:7, 94:1
**safety**
27:19, 32:8, 57:10, 68:17, 68:18, 69:7, 69:9, 69:12, 69:15, 70:9, 70:13, 70:14, 70:17, 72:3, 83:22, 84:3, 84:10, 85:16
**sag-**
1:6
**said**
19:17, 24:5, 36:16, 36:18, 39:6, 39:9, 44:16, 50:9, 53:15, 58:16, 63:5, 67:10, 91:12, 91:14, 93:10, 93:11, 94:18, 94:20, 107:8, 107:9, 108:5, 108:6
**same**
7:14, 23:18, 24:17, 28:6, 41:2, 63:3, 64:17, 66:9, 77:20, 80:13, 80:16, 80:18, 81:6, 91:9, 91:18, 105:17
**save**
58:22, 59:5, 60:13, 61:16, 66:14
**saved**
28:16, 28:18, 64:6
**saw**
12:3, 46:15, 53:14
**say**
9:17, 16:8, 16:13, 16:17, 17:12, 19:2, 28:22, 29:17, 50:8, 60:14, 61:18, 65:9, 71:4, 71:8, 72:5, 75:12, 77:7, 93:7, 94:16, 99:6, 105:11, 105:12
**saying**
7:20, 35:13, 91:17
**says**
21:19, 26:10, 27:2, 27:14, 31:15, 36:12, 36:22, 39:2, 39:4, 39:5, 39:14, 40:3, 40:6, 40:8, 42:3, 42:11, 42:17, 49:12, 49:18, 51:11, 64:17, 67:6, 68:18, 69:12, 70:8, 73:20, 75:19, 76:10, 78:19, 83:8
**scene**
90:18, 91:1, 91:11, 92:10, 96:8
**scheduled**
73:22
**scott**
20:21, 21:2, 22:17, 23:12, 23:21, 32:10, 33:9, 36:15, 37:1, 37:4, 37:6, 37:19, 40:3, 40:13, 40:17, 46:15, 47:20, 51:11, 100:19, 101:1, 101:5, 102:2, 102:6
**scott's**
37:13, 46:2, 48:6
**scratch**
85:12
**screen**
78:11, 87:22
**screwing**
61:7
**scrunched**
78:10
**scrutinize**
49:21
**search**
15:6, 15:9, 15:13, 59:3, 69:5, 84:8
**searched**
14:18
**searching**
15:19, 15:20, 58:22
**seclusion**
4:13, 73:5, 73:12, 76:12
**second**
20:5, 27:1, 27:3, 28:5, 38:14, 41:13,

51:10, 101:22
**seconds**
90:3, 94:17, 94:22, 95:4, 95:8, 95:15, 95:19
**secretary**
36:16, 37:3, 37:13, 37:19, 42:4, 45:10, 45:18, 46:2, 48:9, 52:2
**section**
19:20, 20:6, 62:13, 64:16, 69:11, 70:5, 73:19, 74:9, 76:17, 76:21
**secured**
16:5
**securitas**
57:21
**securities**
84:5
**security**
12:21, 18:1, 18:10, 26:2, 26:11, 49:22, 57:6, 57:8, 57:11, 57:22, 58:7, 59:7, 60:10, 61:12, 69:15, 73:20, 89:21, 101:10
**see**
17:1, 25:20, 38:7, 58:9, 59:4, 61:13, 65:21, 66:1, 66:2, 75:2, 91:2, 100:16
**seeks**
45:13
**seen**
10:10, 13:7, 102:4
**self**
42:7, 77:7, 77:11
**send**
34:10, 34:12, 37:8, 49:3, 61:16, 67:11
**sends**
83:19
**senses**
12:5
**sent**
13:2, 16:4, 33:20, 41:7, 41:10, 60:13, 61:19, 64:20, 82:17, 97:15, 97:18
**sentence**
27:3, 28:7, 38:15, 51:10
**separate**
66:11, 66:12, 101:15
**september**
1:15, 6:13, 22:14, 24:11
**serious**
36:20
**services**
80:5, 82:4, 82:13
**settlement**
40:10
**seven**
65:10
**several**
28:15, 28:19, 37:9, 69:2
**severely**
68:19
**sexual**
40:5, 40:19, 40:22
**shaking**
9:4
**shared**
43:22
**she'll**
105:21
**sheet**
78:20, 81:15
**shorter**
89:6
**shortly**
17:8
**should**
8:2, 19:2, 20:18, 22:6, 25:16, 26:12, 26:22, 38:5, 38:7, 39:1, 50:8, 50:17, 51:8, 51:22, 57:3, 57:5, 57:8, 67:2, 94:16, 97:6, 98:6, 98:13, 98:15, 98:21, 98:22, 100:3, 100:6
**should've**
50:9
**shoulder**
105:10
**show**
13:5, 13:20, 19:8, 25:10, 35:9, 62:5, 68:4, 75:9, 79:6, 80:18, 81:8, 97:5, 100:3
**showed**
35:14, 36:1, 99:4, 102:8
**showing**
100:5, 101:19
**shown**
9:15
**sic**
64:17
**sign**
71:6, 105:22
**signature-mig2k**
108:13
**signature-p1kal**
107:17
**similar**
98:15
**since**
27:14
**sitting**
10:6, 11:19
**situation**
70:10
**six**
20:3, 20:12
**sixth**
39:4
**size**
53:20
**skills**
107:11, 108:8
**slated**
51:15
**smelled**
12:4
**snacks**
80:6
**social**
38:16
**solution**
45:13
**some**
7:5, 9:22, 10:1, 29:1, 30:3, 51:15, 51:17, 63:14, 96:15
**somebody**
33:19, 34:4, 34:9, 61:7, 106:8
**somehow**
35:14
**someone**
7:19, 57:22, 105:9
**something**
10:14, 12:4, 17:1, 34:2, 39:18, 60:6, 70:1, 71:6, 71:14, 77:8, 80:1, 80:2,

86:2, 87:3, 97:7
**something's**
25:21
**sometime**
17:4
**sorry**
18:9, 22:3, 23:5, 27:11, 30:14, 30:18, 32:4, 37:16, 39:7, 47:7, 47:16, 49:14, 58:16, 59:12, 64:19, 70:18, 71:17, 72:11, 79:10, 81:14, 87:16, 93:7, 94:2, 94:11, 95:11, 99:1, 100:4, 102:16
**sort**
44:5, 63:14, 90:13, 96:16
**sound**
78:22
**spanish**
82:2
**speak**
7:13, 7:15
**speaker**
78:4
**speaking**
7:15, 46:8
**specific**
7:6, 70:14
**specifically**
46:6, 46:20, 52:10, 68:17, 80:1
**speculation**
105:20
**spitting**
77:15
**spoke**
71:8
**spring**
53:2, 53:3
**stack**
50:6
**staff**
15:9, 18:21, 27:20, 31:6, 32:8, 39:6, 39:8, 68:21, 69:8, 73:21, 74:6, 74:11, 74:15, 86:3, 86:5, 92:8, 92:16
**staffers**
46:4
**stage**
97:22, 98:11, 98:16, 98:18
**stages**
100:16, 101:16
**standalone**
19:16
**standard**
4:11, 4:14, 5:6, 17:6, 61:2, 61:3, 62:10, 73:4, 78:15, 79:11
**standing**
24:17, 84:14, 88:22, 90:11, 90:12, 91:13
**start**
44:14
**started**
72:3, 84:11, 84:12
**starting**
27:14, 41:18, 96:8
**starts**
13:10, 38:14, 51:9, 73:8
**state**
2:14, 7:1, 22:11, 22:18, 23:13, 23:20, 31:17, 31:21, 32:1, 32:2, 32:3, 32:4, 33:12, 33:14, 34:8, 34:10, 36:15, 42:12, 45:17, 51:13, 52:2, 107:20
**state's**
41:19
**state-issued**
85:7
**stated**
16:5
**statement**
12:22, 30:15, 42:9, 50:3
**statements**
12:20, 67:20, 68:2, 92:15, 92:20, 93:3
**states**
1:1
**station**
69:18, 69:21, 71:15, 71:19
**stationed**
33:15
**status**
79:12, 79:17
**statutory**
43:10
**stay**
99:5
**staying**
31:14
**step**
49:3, 49:7
**steps**
14:8
**steptoe**
3:7, 6:18, 6:19, 6:21, 13:21, 16:9
**still**
8:3, 20:19, 51:15, 66:16, 67:14
**stipulated**
6:19
**stored**
63:13
**story**
22:11, 22:14, 24:15, 27:1
**straight**
29:4
**street**
3:16
**strike**
39:7, 70:18, 100:4
**strip**
86:21, 87:1
**stuff**
51:5
**subjects**
45:10
**submission**
78:21
**submit**
12:21, 62:21
**submits**
34:9
**submitted**
12:20, 36:2, 64:8, 64:10, 64:12
**submitting**
79:3
**subordinate**
40:16
**suboxone**
86:20, 86:21, 87:2, 87:3
**subpoena**
4:20, 13:21, 14:6, 14:9, 49:13
**substance**
37:2, 37:20, 38:2
**substances**
10:20
**suggest**
104:2
**sun**
22:14, 41:19
**supervision**
74:1, 80:9,

108:6
**supervisor**
40:16
**support**
103:9
**supposed**
12:2, 25:13, 25:15, 38:6, 47:22, 65:8, 82:20, 99:3
**sure**
16:3, 21:5, 21:14, 21:17, 24:3, 24:4, 49:15, 71:17, 75:3, 84:8, 91:6, 93:8, 103:1, 104:5
**surrounding**
12:19, 47:3
**surveillance**
27:6, 28:7, 28:11, 28:18, 28:20, 29:9, 62:12, 66:2
**suspected**
84:16
**suspended**
22:18, 23:1, 23:13, 23:21
**suspends**
22:12
**suspension**
24:8
**switched**
96:1
**sworn**
6:8, 107:5
**system**
27:7, 36:19, 49:2, 57:16, 57:18, 63:14, 79:12, 100:11

**T**

**table**
10:6, 10:9
**tablet**
18:9
**tabon**
55:7, 56:5
**take**
7:15, 9:15, 14:8, 87:6, 94:12, 102:17, 102:19
**taken**
10:19, 86:3, 107:4
**talk**
9:8
**talked**
46:13
**talking**
45:9, 52:20, 53:2
**tall**
53:15, 53:19
**tallest**
53:12, 53:17, 53:20
**taste**
12:4
**team**
38:17, 49:21, 67:12, 78:7, 94:13
**tell**
10:5, 10:8, 43:18, 71:22
**telling**
81:16
**tells**
8:4
**temitope**
53:4, 54:21, 55:15
**temporary**
68:19
**tenure**
27:15
**terms**
99:13
**testified**
6:10, 28:13, 29:12, 47:20
**testify**
6:8, 12:1, 12:2, 12:7, 104:13
**testifying**
8:4, 11:15
**testimony**
9:12, 10:19, 10:22, 11:3, 11:18, 46:2, 52:8, 101:5, 103:10, 103:18
**th**
14:1, 22:14, 32:11, 45:21
**thank**
21:10, 79:8
**themself**
72:19, 77:2, 77:9
**thereafter**
107:7
**thing**
28:18, 80:7, 103:6, 104:7
**things**
17:6, 42:18, 79:20, 80:13, 80:17, 80:18, 86:22, 101:8
**think**
38:5, 49:5, 65:16, 65:20, 66:22, 67:4, 78:18, 87:8, 93:19, 93:22, 94:4, 96:22, 103:6
**thinking**
21:20
**third**
31:15, 41:20, 82:4, 82:13
**third-party**
49:19
**thompson**
53:9, 53:12, 55:1, 55:17
**thought**
81:8, 89:7
**threatened**
92:8
**threatening**
23:21
**threats**
77:15, 91:3, 92:18, 92:22
**three**
38:22, 88:15, 98:14
**through**
1:12, 6:6, 7:4, 14:18, 52:5, 64:7, 100:16, 104:6
**throughout**
103:15
**tighten**
75:2
**till**
72:4
**time**
9:5, 9:16, 10:2, 16:19, 17:7, 19:16, 30:21, 31:7, 31:10, 41:13, 43:20, 44:19, 46:14, 53:14, 57:17, 58:11, 59:9, 59:16, 62:19, 63:4, 64:2, 64:5, 68:17, 68:18, 69:9, 69:12, 69:15, 70:9, 70:13, 70:17, 71:9, 71:10, 72:3, 74:8, 77:12, 77:20, 80:14, 83:22, 84:3, 84:10, 85:16, 91:2, 91:4, 92:5, 92:10, 93:8, 93:20, 102:5, 104:21
**timeframes**
28:16

**times**
27:20, 28:21, 88:16
**timestamp**
89:9
**timestamps**
29:13
**titled**
22:11, 26:1, 41:19, 50:14, 98:15
**today**
7:10, 10:22, 11:4, 75:14, 94:12, 103:12, 103:21, 104:3, 104:20
**together**
78:10
**toilet**
74:2, 74:15
**told**
43:6, 103:14
**took**
75:12
**top**
13:12, 20:7, 27:2, 27:3, 31:16, 36:12, 36:21, 37:9, 46:3, 76:9, 79:15, 86:17, 88:13
**topic**
10:16, 25:5
**topics**
13:10, 13:16, 14:11
**tort**
66:13
**touched**
12:4
**towards**
31:16, 51:8, 76:9, 76:11
**transcriber**
108:1
**transcript**
7:22, 105:1, 108:3, 108:6
**transcriptionist**
107:8
**transition**
44:19
**transparent**
39:9, 39:11
**treat**
42:6
**treated**
12:10, 101:13
**treatment**
38:17, 49:22, 54:6, 54:10, 54:13
**tribune**
45:20
**tries**
76:13
**trip**
104:10
**troubled**
50:15
**troubling**
46:5
**true**
22:17, 23:12, 23:20, 33:7, 36:7, 37:3, 37:21, 38:3, 42:9, 42:20, 107:10, 108:6
**truth**
6:9, 6:10, 8:18, 18:1, 103:14
**truthful**
8:6
**trying**
14:15, 66:22, 104:10
**turn**
25:16, 26:10, 36:11, 38:22, 73:18, 76:16, 98:13
**turning**
49:18
**turnout**
32:9
**turns**
7:15
**tv**
80:7
**twice**
32:3, 32:4
**two**
25:17, 52:18, 60:4, 64:2, 74:2, 74:3, 74:5, 74:6, 74:17, 75:17, 76:4, 81:6, 98:14, 101:7, 101:15
**two-minute**
102:22
**two-thirds**
52:4
**type**
16:15, 17:18, 56:21, 69:4, 74:6
**typewriting**
107:7, 108:5
**typical**
82:9
**typically**
12:1, 33:16, 60:9, 61:3

**U**

**uh-huh**
72:8
**ultimately**
36:17, 38:3, 99:12
**unaddressed**
27:18
**unchecked**
26:2, 26:11
**under**
8:4, 8:6, 20:18, 62:14, 70:2, 73:10, 74:1, 74:9, 78:18, 78:19, 90:14, 108:5
**undergo**
41:20
**underlies**
8:13
**understaffing**
31:18, 33:8
**understand**
8:8, 8:18, 8:21, 9:1, 9:13, 9:18, 10:11, 10:16, 11:14, 11:21, 12:11, 66:21, 77:12, 102:16, 104:8
**understood**
17:15, 36:10, 40:1, 49:8, 63:5, 101:4, 103:20
**unfortunately**
48:2
**union**
32:2
**unit**
31:6, 68:17, 68:18, 68:20, 69:9, 69:12, 69:14, 69:17, 69:20, 70:9, 70:12, 70:14, 70:17, 80:21, 82:1, 83:22, 84:3, 84:7, 84:10, 84:21, 98:17
**united**
1:1
**unless**
8:3, 9:7, 77:1
**unsure**
103:5
**until**
7:16, 13:11, 31:11, 36:13, 88:19, 93:18, 94:3, 94:10,

94:16
**updated**
57:17, 63:2
**updating**
40:9
**upgrade**
57:18, 57:19, 59:16
**upgraded**
57:16
**upper**
35:11, 35:12, 44:1
**usb**
61:19
**use**
18:19, 54:1, 56:14, 62:11, 77:10, 82:4, 87:4, 101:19, 101:21
**using**
52:11, 52:15, 53:5, 53:9, 88:9
**usual**
94:13
**usually**
88:18

**V**

**valid**
98:11, 98:18, 100:16
**van**
19:3, 38:19, 52:10, 53:1, 54:5, 54:17, 55:11, 90:20, 101:13
**vendor**
83:15, 83:17, 83:18
**verbal**
9:3, 19:6, 77:15
**via**
64:20
**video**
4:17, 14:15, 28:18, 28:20, 29:2, 59:1, 59:6, 62:12, 64:8, 64:19, 64:20, 65:2, 66:1, 66:3, 87:8, 88:1, 88:2, 88:21, 91:8, 94:10, 97:1, 99:19, 99:21, 101:6, 102:14, 105:6, 105:9
**videos**
28:15
**view**
99:9
**viewed**
62:22, 105:15
**viewing**
62:12, 64:9, 64:11
**violence**
46:5
**visible**
90:13
**volunteer**
80:5
**vrf**
65:1, 65:7, 65:21, 66:10, 66:17
**vrfs**
65:5, 66:7
**vrs**
64:17
**vulnerable**
27:21

**W**

**wait**
7:16, 26:4, 49:14, 84:12
**wall**
96:3
**want**
7:4, 7:21, 10:2, 10:14, 13:9, 22:10, 23:16, 25:6, 25:15, 28:3, 28:5, 38:9, 44:15, 45:15, 45:16, 66:20, 72:4, 73:9, 76:3, 76:6, 79:14, 88:12, 89:12, 92:12, 93:20, 101:4, 102:17, 106:1
**wanting**
28:20
**wants**
61:18
**ward**
79:21
**warning**
31:18
**warrants**
90:14
**washington**
3:9, 25:22, 27:14, 30:6, 30:9, 35:6, 35:13, 35:22, 50:10
**wasim**
31:7
**watch**
80:7
**watched**
93:15, 94:15
**watching**
105:6
**way**
13:11, 35:1, 52:4, 89:5, 104:12, 104:13
**we'll**
95:15
**we're**
6:14, 8:11, 8:17, 25:22, 26:9, 26:13, 36:10, 38:8, 38:22, 41:16, 43:12, 50:13, 51:20, 51:22, 65:13, 81:10, 87:14, 88:19, 93:17, 96:22, 98:13, 98:20
**we've**
71:22, 94:10
**wearing**
90:1
**weekly**
94:11
**weird**
29:16
**well-documented**
27:18
**went**
26:1, 26:11, 98:1, 100:15
**weren't**
44:3, 84:13
**west**
3:16, 54:1, 54:13, 57:12, 58:1, 58:8, 58:21, 59:11, 59:14, 79:18, 84:1, 84:4, 84:21
**whatever**
7:20, 16:5, 78:7, 83:6, 84:8
**whereupon**
6:4
**whether**
10:14, 18:6, 18:14, 43:10, 43:11, 94:18, 101:12
**whole**
6:9, 8:18, 24:18
**wide**
84:7
**wiggins**
55:5, 56:1, 89:4, 89:7, 89:15

**williams**
55:7, 56:5
**willis**
58:19, 97:16, 103:6, 103:7
**winkle**
19:3, 38:20, 52:10, 53:1, 54:5, 54:17, 55:11, 90:21, 101:14
**wisner**
31:4
**within**
33:15, 34:2, 43:19, 52:20, 69:14, 82:6
**without**
73:15, 90:13
**witness**
19:10, 19:12, 22:22, 24:5, 24:19, 25:19, 26:6, 28:15, 30:10, 30:12, 72:11, 75:15, 75:18, 88:4, 89:10, 90:6, 90:20, 91:11, 93:13, 104:22, 105:1, 105:18
**witness(es**
107:4
**word**
15:20, 76:18, 105:11
**words**
8:17, 48:11
**work**
11:6, 17:15, 17:18, 18:3, 50:22
**workers**
38:16
**working**
31:6, 90:7
**workplace**
24:15
**works**
53:2
**workstation**
18:15
**worries**
23:9
**would've**
19:3, 19:4, 24:10, 35:11, 40:15, 49:7, 58:13, 59:4, 59:17, 60:1, 67:16, 70:1, 72:6, 72:14, 79:17, 92:4, 98:3, 101:22
**wouldn't**
25:2, 25:3, 30:10, 30:12, 56:22, 77:16
**wow**
75:15
**write**
25:14, 32:19, 33:3
**writes**
83:7
**writing**
52:11, 52:15, 53:5, 53:9, 54:5, 54:9
**written**
17:2, 53:22, 54:12, 62:17, 63:10, 70:9
**wrong**
30:6, 78:18, 97:7
**wrote**
41:15

**X**

**x-ray**
82:4, 82:6, 82:13

**Y**

**yeah**
14:17, 14:20, 16:21, 16:22, 21:12, 23:18, 24:19, 25:18, 25:19, 26:6, 26:21, 29:6, 44:18, 47:2, 47:10, 49:14, 49:16, 50:10, 51:19, 60:5, 60:8, 61:22, 63:3, 63:7, 65:13, 65:15, 65:19, 67:5, 67:19, 71:18, 81:10, 83:3, 86:15, 86:18, 87:19, 89:12, 89:18, 92:12, 93:10, 94:6, 96:14, 102:19, 103:7, 104:8, 105:7
**year**
22:13, 24:12, 27:9, 40:13, 40:17, 59:18
**years**
20:3, 20:12, 27:18, 31:17, 32:9, 60:4, 60:6, 65:10
**yep**
68:15
**yourself**
62:14, 73:7, 73:20, 77:3, 92:14

**Z**

**zero**
76:16
**zeros**
21:22
**zoom**
88:13, 88:18
**zoomed**
88:14, 93:19

**0**

**0/3/2025**
107:21, 108:17
**00**
44:16, 89:13, 91:7, 93:15, 94:10, 94:16, 94:17
**000**
100:4
**00000**
45:12
**0000001**
21:20
**0000013**
45:12
**0000014**
100:6
**0000016**
49:12
**0000020**
25:11, 50:17, 98:7, 98:10
**0000021**
51:8
**0000024**
26:13
**0000025**
27:1
**0000027**
38:6
**0000028**
98:22
**0000030**
39:1
**0000031**
40:3
**000006**
22:11
**000029**
99:4
**01**
91:7, 93:15, 94:3, 94:8
**0153**
75:19
**0177**
76:16
**02**
88:19
**03**
93:18, 94:1,

94:10, 94:16, 105:8
**037329**
99:11
**07**
1:16, 6:13

**1**

**10**
72:5, 87:12, 94:22, 95:15, 95:18
**100**
5:9
**105**
4:5
**106**
4:4
**108**
1:21
**11**
1:16, 6:13, 89:11, 91:7, 93:12, 93:13, 93:15
**12**
44:16, 45:21, 70:15, 88:19, 89:13, 91:7, 93:15, 93:18, 94:1, 94:3, 94:8, 94:10, 94:16, 105:8
**13**
4:19, 45:12
**1330**
3:8
**14**
4:20
**15**
45:16, 93:18
**158**
76:3, 76:9
**17**
14:1, 49:18
**18**
31:16, 33:2, 33:7, 36:7, 37:20
**1861**
3:18
**19**
4:18, 4:21, 78:1, 78:2
**1a**
19:21, 78:19
**1b**
62:13
**1c**
64:16
**1e**
67:3, 67:5

**2**

**2**
106:12
**20**
25:15, 32:11, 50:9
**20036**
3:9
**202**
3:10
**2020**
32:11, 32:13, 33:10, 38:18
**2021**
57:16, 59:17
**2022**
17:2, 17:3, 20:22, 21:3, 28:1, 31:1, 31:12, 39:12, 39:18, 40:22, 48:15, 54:1, 54:13, 57:13, 66:19, 69:20, 72:2, 72:13, 72:14, 75:6, 79:18, 84:1, 84:4, 85:16, 97:3, 99:8
**2023**
19:16, 20:16, 27:10, 41:2, 59:22, 99:11
**2024**
14:1, 22:15, 32:14, 33:10, 38:18, 41:19, 45:21, 51:13
**2025**
1:15
**20794**
2:7
**21**
20:13, 81:9
**21202**
3:17
**22**
1:15, 4:22, 6:13, 40:20
**23**
1:6, 40:20, 98:14
**24**
10:20, 24:13, 25:16, 38:15
**25**
5:4, 22:14
**28**
98:21
**2947**
78:12
**2970**
79:9
**2988**
68:8
**2992**
69:10, 69:11
**2995**
73:3
**2996**
73:9
**2997**
73:10

**3**

**30**
44:16, 69:14
**300**
3:16
**3000**
2:8, 3:10, 73:18
**3001**
74:9
**31**
40:6
**3272**
62:16
**3273**
67:6
**3277**
63:6
**3278**
63:8
**35**
4:19, 13:5, 13:6, 94:8
**36**
4:20, 13:20, 14:2
**37**
4:21, 19:8, 19:9, 65:16
**38**
4:22, 21:19, 22:2, 41:13
**39**
5:4, 25:10, 25:12, 50:6
**3b**
69:11
**3c**
70:5

**4**

**40**
5:5, 44:10, 44:11, 45:11
**41**
5:6, 62:5, 62:6, 67:5
**410**
2:8, 3:18
**42**
5:7, 81:12, 81:13
**429**
3:10
**43**
5:8, 5:14,

97:5, 97:10,
98:6, 101:20,
102:8
**44**
5:5, 5:9, 52:1,
100:3, 100:5,
100:7
**45**
90:3
**46**
106:12
**478**
1:6

**5**

**58**
91:7, 93:12,
93:13, 93:15,
94:3
**59**
89:11
**592360**
1:20

**6**

**601**
41:15
**62**
5:6
**68**
4:12

**7**

**72**
4:14
**724**
2:8
**75**
4:16
**767**
3:18
**78**
4:18
**7th**
17:2, 17:3,
20:22, 21:3,
30:22, 31:12,
48:15, 57:12,
66:19, 69:20,
72:2, 72:13,
75:6, 84:1,
84:4, 85:16,
97:3

**8**

**81**
5:7
**8450**
2:6
**860**
75:13
**88**
4:17
**8th**
41:19, 99:8

**9**

**97**
5:8