Democracy Dies in Darkness

Maryland

# Acting CEO of troubled Md. psych hospital resigns amid mounting problems

The leadership shake-up at Clifton T. Perkins Hospital Center came the same week that a patient advocacy organization sued the Maryland Department of Health for failing to move sick patients from jail to state psychiatric hospitals in accordance with state law.

January 10, 2025

8 min 17

By Katie Mettler and Dan Morse

The interim CEO of Maryland's troubled maximum security psychiatric hospital resigned from his post this week, state officials said Friday in an email to employees, just days after the state health secretary met with staff at the facility during a visit that was abruptly cut short.

Dwain Shaw, who had been running the troubled Clifton T. Perkins Hospital Center for the last year, did not immediately respond to a request for comment.

In the email to employees Friday afternoon, Maryland Health Secretary Laura Herrera Scott said that Shaw resigned Thursday, but she did not offer any information about the circumstances of his departure. A Maryland Department of Health spokesperson said the agency could not comment on the specifics of Shaw's resignation.

Herrera Scott told employees in the email that psychiatrist Aliya Jones, a former deputy secretary within the department, will take over as permanent CEO on Feb. 18.

The leadership shake-up at Perkins came the same week that a patient advocacy organization, Disability Rights Maryland, filed a suit against the Department of Health for failing to move sick patients from jail to one of the state's psychiatric hospitals — which includes Perkins — in accordance with state law.

"The State of Maryland is committed to the safety of all individuals under our care," the department said in a statement about the lawsuit. "Allegations of neglect are taken seriously and investigated to the fullest extent possible, including the involvement of independent oversight, as needed."

Perkins, a 280-bed psychiatric hospital that treats mentally ill people who have been charged with violent felonies, has come under increasing scrutiny in recent months after a Washington Post investigation revealed that state leaders and hospital officials had failed to act on complaints about inadequate staffing, mismanagement and violence there for years — an environment that led to a patient brawl, rape and death in 2023.

In early 2024, Herrera Scott terminated then-CEO Scott Moran after two Department of Health employees filed a restraining order against him and accused the psychiatrist of sending "racially suggestive messages" and making violent threats.

One of those colleagues was Shaw, the deputy director of the department's health-care systems and, at the time, Moran's boss. After Moran was fired, Herrera Scott appointed Shaw as interim CEO of Perkins.

But the problems at the facility, including low internal morale and ongoing violence due to a lack of staffing, have continued.

Earlier this week, Herrera Scott visited Perkins, a drop-in that was supposed to include morning meetings with administrative staff and afternoon tours of the facility's psychiatric units, according to emails obtained by The Post that outlined her time there.

Herrera Scott's afternoon tours were canceled due to "unforeseen circumstances" though, according to an email sent to staff. The next day, Shaw resigned.

The Post's investigation into the facility has prompted reforms, including a new process for reporting serious incidents at the facility to upper management, and a comprehensive audit by external evaluators. Herrera Scott has promised to publicly release the evaluators' final report, which was due to state leaders at the end of 2024.

Perkins employees previously told The Post that the hospital's challenges, including a crisis of leadership and a dangerous working environment, have caused high staff turnover and made it more difficult for medical personnel to give patients the care they deserve.

State lawmakers grilled the secretary on those issues during an oversight hearing in December. They also asked Herrera Scott about the Department of Health's violation of a state law requiring the agency to admit detainees to state hospitals within 10 business days of a ruling that they're too mentally unfit to understand the charges against them.

Herrera Scott told lawmakers that she had inherited a "very, very broken" agency when she took office in 2023 and that the Department of Health alone could not fix the backlog.

But in a lawsuit filed this week in federal court, Disability Rights Maryland said the agency has "continuously failed" to follow state law and has left people "languishing in jails" for "weeks to months at a time."

"Maryland's competency system is deeply broken," Ryan Downer, an attorney who brought the suit, said in a statement Friday. "People determined by state courts to be in need of mental health services are instead left to rot in jail. Our hope is that this lawsuit will jolt state officials awake."

More than 200 such people are backed up in Maryland's local jails, according to the lawsuit, many waiting far longer than the mandated 10-day window to be placed in a psychiatric hospital where they can get appropriate medical care. In the last year alone, judges across the state have leveled at least $1.5 million in fines against the department for violating that law.

"Leaving people with disabilities in jail deprives them of needed services and supports and has no rational relationship to moving them through the criminal process," said Luciene Parsley, litigation director at Disability Rights Maryland.

In specific legal terms, the lawsuit said the practice "directly contravenes the defendants' substantive due process rights" under the 14th Amendment of the U.S. Constitution, including the right to reasonably safe conditions of confinement and freedom from unreasonable bodily restraint.

In describing Maryland's competency process, the suit alleges shortcomings at the Department of Health are broader than its failure to timely treat the detainees in hospitals.

Under the typical process, after a person is booked into jail and displays possible mental illness, a department examiner is often brought in for evaluation.

The two basic questions that examiner must consider are whether the person is competent to stand trial and whether they would pose a danger to themselves or others if released. Too often, the lawsuit asserts, the Department of Health opines that mentally incompetent people are also dangerous.

And because judges generally defer to the department's findings, "this over-designation of criminal defendants as 'dangerous' results in further unnecessary institutionalization," the suit asserts. Without such a designation, a person could more easily be released and treated at community facilities, according to the lawsuit.

"Over 40 percent of the individuals who have been adjudicated incompetent to stand trial and are indefinitely detained were charged with misdemeanor offenses or nonviolent felonies," the litigation asserts, "and these individuals could likely be restored to competency in the community with appropriate supports."

The lawsuit cited several examples of detainees caught up in the system, identifying them by their initials.

One of the detainees, T.D., a 42-year-old father of two who is diagnosed with bipolar disorder and schizophrenia, was charged on May 6 with burglary and theft-related offenses in St. Mary's County.

After a Department of Health evaluator determined him to be mentally incompetent and dangerous, a judge ordered him to be sent to a department hospital. At the same time, though, prosecutors dropped his most serious charge.

A Department of Health examiner "then issued an updated report, assessing T.D. as [incompetent to stand trial] but not dangerous, and recommended community services with supervision upon release," the lawsuit alleges. A judge agreed.

But the department "failed to create the plan of services required [by Maryland code] to guarantee T.D.'s access to the necessary wraparound supports that were required to maintain his competency and secure T.D.'s pretrial release with supervision," the suit alleged.

As a result, T.D. remained stuck in jail for more than five months without access to appropriate mental health care as his mental health worsened. He was ultimately released, having been detained for the maximum sentence on the charged offense despite never being tried for or convicted of a crime, the lawsuit asserted.

In the lawsuit, Disability Rights Maryland is represented by the Washington Lawyers' Committee for Civil Rights and Urban Affairs, as well as the Washington law firm Wiley Rein.

The suit seeks several measures of relief, including a declaration that the department's practices regarding incompetent detainees is unconstitutional.

The suit also calls for improved practices, including a written plan by the Department of Health "for bringing itself into compliance with all applicable laws."

The lawsuit also demands a top-to-bottom review of the detainees stuck in jails "to assess whether impermissible stereotyping or deprivation of accommodations contributed to a prior improper dangerousness finding that led to an unlawful commitment to" the department.

**Make the most of the DMV with our newsletter**

Make living in D.C. a little easier and more fun. Sign up for the Post Local newsletter to get local news, weather and expert advice — where to eat, where to drink and how to get around — every weekday.

(The Washington Post)

**wp EXCLUSIVE**

# How a 'climate of chaos' went unchecked at Maryland's max-security psych hospital

A Washington Post investigation found that officials didn't act on staff complaints about facility violence, which culminated in a patient brawl, rape and death.

October 15, 2024

25 min



By Katie Mettler

Tension had been building inside Maryland's maximum-security psychiatric hospital when the news began to circulate among employees: Scott Moran, their CEO, had been banished from the facility.

Moran's boss at Clifton T. Perkins Hospital Center, which houses people diagnosed with serious mental illnesses who have been accused of violence, had applied for a restraining order against the doctor in February, accusing him of sending "racially suggestive messages" and making violent threats.

The doctor was suspended and later fired.

Since then, a Washington Post investigation into Moran's tenure found that the allegations outlined in the restraining order petition were not isolated, but a culmination of years of well-documented but unaddressed complaints about hospital mismanagement and safety that had prompted staff departures and, at times, left employees and patients vulnerable.

The Post found that state officials had been warned many times about conditions at Perkins during the administrations of then-Gov. Larry Hogan (R), who is now running for U.S. Senate, and Gov. Wes Moore (D), widely seen as a political rising star. Complaints began soon after Moran's hiring in 2019, and alarm over dangerous conditions at the facility escalated during his tenure, crescendoing in several violent episodes last year including an out-of-control brawl, a patient rape and a patient death — incidents that have not been reported publicly until now.

Interviews with more than two dozen people with knowledge of the problems at Perkins, many of whom spoke on the condition of anonymity for fear of retaliation from state officials or Moran, along with hundreds of pages of letters, emails, police documents and court records obtained by The Post, revealed the following:

- The death of the woman, 46-year-old Martina Morgan, sparked a six-month police investigation, in which detectives told prosecutors they suspected potential criminal medical neglect at Perkins. Police alleged in documents that Perkins's leadership had failed to comply with a request to preserve surveillance footage from before and after Morgan's death, so its automated system permanently deleted critical evidence. The Howard County State's Attorney's Office declined to file charges.
- Perkins failed to properly report or investigate dangerous incidents — including at least three violent staff assaults, dozens of alleged sexual assaults against patients, the patient brawl last year and the death of Morgan — obfuscating the hospital's need for action and accountability.
- Employees made at least 18 complaints over four years to state officials warning of the facility's critical understaffing, dangerous conditions and Moran's behavior. Those complaints were made to the governor's office, human resources, state oversight agencies, the Health Department's equal employment office, and during meetings between state leaders and the state employees union.
- State officials promoted Moran twice despite those complaints, which included allegations that he engaged in bullying and discriminatory behavior, failed to address concerns over staff safety, and drove high employee turnover during the years he was in leadership.

Perkins, Maryland's only maximum-security forensic psychiatric hospital, is a 289-bed facility in Jessup that mostly treats people who have been charged with violent felonies but who a judge or jury decided should get treatment instead of going to prison. Some patients have been found incompetent to stand trial, while others have been found not criminally responsible because of their mental illness.

Morgan, a mother of three and the oldest of six siblings, was outgoing and musical, but she had struggled with schizophrenia and bipolar disorder throughout her adult life, her family said. After violating a restraining order and allegedly behaving violently at a lower-security psychiatric facility, Morgan was sent to Perkins to get help. But once there, her family said, she began to fade — her colorful nails and makeup gone, her hair cut away, her optimism diminished.

"She always talked about how she was ready to get out of there, that she wanted to go home," said Morgan's sister, Stephanie Jones. "She just didn't feel safe there."

After her death on Nov. 4, 2023, her family demanded an autopsy and criminal investigation — which Maryland State Police and the Health Department's own police agency quickly launched. Weeks later, employees sent an unsigned letter to Moore and Secretary of Health Laura Herrera Scott describing the brawl, rape and drug overdoses and pleading with officials to urgently intervene before "something terrible happens," according to a copy of the letter obtained by The Post. Moran, the letter said, was not taking safety seriously.

"Nobody feels supported by him," the letter said. "Everyone is afraid of retaliation by him."

Herrera Scott confirmed that her office received the letter.

But it wasn't until months later, after The Post brought the findings of its reporting to current state leaders, that Herrera Scott said she began personally investigating. She ultimately confirmed issues The Post raised, she said, which prompted her to change the department's system for reporting serious incidents and hire an independent evaluator to examine the hospital top-to-bottom. Such an exhaustive review was last ordered more than a decade ago, when three Perkins patients were killed by other patients within 13 months.

Pressed on how Health Department leaders could have been in the dark about such serious safety issues at Perkins, Herrera Scott said Perkins officials had downplayed the incidents, including those described in the letter. She also directed blame at Hogan's Health Department, which initially hired Moran as Perkins's clinical director and recommended he become CEO in February 2023 during the administration's transition.

"He would not have been the CEO if I knew what I know today," Herrera Scott, who signed off on that promotion, said in an interview.

**Timeline of problems at Perkins**

**2020**

- **January-February:** Perkins employees and union officials testify before the Maryland General Assembly about pay disparities, high vacancy rates, understaffing, bed shortages and safety. They do the same in 2021 and 2022.
- **March:** Perkins psychiatrists send letter to the then-deputy health secretary complaining the facility's leadership is flouting coronavirus pandemic safety protocols and blocking psychiatrists' attempts to intervene.
- **March:** AFSCME, the state employees union, protests inadequate personal protective equipment, hazard pay and safety conditions at Perkins.
- **May, June:** Two veteran Black female psychiatrists at Perkins file complaints, alleging discrimination by then-Perkins clinical director Scott Moran on the basis of race, gender and disability. Moran says no complaints against him were substantiated; records show one was, before state officials reversed the finding.

A spokesperson for Hogan referred questions related to Moran and the safety conditions at Perkins while Hogan was governor to current Health Department officials. The spokesperson provided a statement asserting that the Hogan administration "made significant strides in expanding mental and behavioral health services," which he said were "focused on alleviating the pressures on forensic facilities like Perkins."

A spokesperson for Moore also referred questions to the Health Department. But Moore said in a statement that his administration is working to "stabilize operations and improve upon the policies and procedures at Perkins that have long been neglected."

Through his attorney, Moran, 54, said he regrets the conduct outlined in the restraining order application, but he denied creating a hostile work environment before then. Court documents say Moran messaged two colleagues who had been involved in his disciplinary process, saying, "You're gonna be in trouble and you're gonna get Moran'd" and "You ain't gonna beat me, I don't lose." The messages came after state officials disciplined Moran for violating the hospital's anti-bullying policies. Moran's attorney, Stanley J. Reed, said the doctor sent the messages because of "stress-induced mental health issues."

Moran, who was terminated from Perkins in May and had his license suspended for one year by the Maryland Board of Physicians in September, stood by much of his work at Perkins and said he received positive performance evaluations from the state, including in December 2023 under Herrera Scott, who he said had visited Perkins as secretary without complaint.

"It's unfair to lay on his doorstep all the problems and issues that occurred at Perkins for years and years, when he and others were paying attention and fully engaged and doing the best they could," Reed said.

The people who spoke with The Post said they blame state leaders and lawmakers for chronically underfunding and understaffing the hospital and failing to intervene as staff turnover mounted. Twenty-four Perkins psychiatrists, psychologists and social workers, considered a patient's core clinical treatment team, left the hospital from 2020 to 2024, a significant blow to the roughly 50-person group, current and former Perkins employees said. The Post was able to independently confirm that seven of those departures were because of Moran or safety concerns.

Nina Diana, a former director of social work at Perkins who felt pushed out by Moran, said she spent 32 years working at the hospital because she was committed to its mission of helping and healing the patients there so they might one day be able to safely leave. That mission is undermined, she said, when the hospital is underfunded and unsafe.

"These folks deserve treatment," Diana said. "They deserve the treatment we promised we'd give them. And if we don't do that, we increase the risk for everyone."

## A 'climate of chaos'

When Moran was hired in October 2019 to be clinical director at Perkins — once featured in an A&E documentary as a national leader among psychiatric facilities — the hospital was facing many challenges.

For nearly a decade, Perkins staff and the state employees union had been warning of unsafe conditions for patients and employees. Officials ordered an independent evaluation of the facility following the patient homicides in 2010 and 2011 and implemented some of the recommended improvements, including bolstering the depleted staff.

During the transition period to the Hogan administration in 2015, the outgoing secretary of health warned that scaling back those resources would again endanger staff and patients. In 2017, as the state system wrestled with a shortage of beds and staff, a judge held the state hospital system in contempt for failing to quickly move people from jail to a mental health facility. The Hogan administration added beds, but current and former employees said they still felt staffing was inadequate.

> **What is Clifton T. Perkins Hospital Center?**
>
> Perkins is the only maximum-security forensic psychiatric facility among the hospitals managed by the Maryland Department of Health. Perkins, a 289-bed facility, treats people who have been charged with violent felonies but who a judge or jury decided should get psychiatric treatment at a hospital instead of going to prison.

Moran's arrival, some employees said, gave them hope that the career military psychiatrist would turn the hospital around. After deployments in Iraq and Afghanistan, he had served in various leadership roles at Walter Reed National Military Medical Center and was the training director for military psychiatric residents. Unlike some of his peers, he was unafraid of the challenges that come with running a place like Perkins, Moran's former employees said. Their administration, Moran and then-Perkins CEO Marian Fogan said during meetings, would be a new "regime," those employees recalled.

But almost immediately, Moran and his staff clashed, prompting complaints to state officials — early signs of what employees said would become a pattern of alienating behavior from the doctor.

In March 2020, the entire psychiatric department sent a signed letter to the deputy secretary of health on behalf of the hospital's medical staff, airing concerns that leadership was endangering patient lives during the coronavirus pandemic by flouting safety protocols, ignoring critical emails and blocking psychiatrists' attempts to intervene. The then-secretary of health responded by promising that Perkins leadership would "address challenge areas and employee needs in a systematic way."

That same week, representatives from the state employees union, AFSCME Maryland Council 3, brought concerns about Moran to Fogan after he threatened to discipline members and call the police on union staff while they tried to take a photo with signs advocating for adequate personal protective equipment, according to witnesses. Then he attempted to involuntarily transfer one of the campaign organizers, a social worker named Miriam Doyle, to a hospital two hours away, according to three people with knowledge of the matter, though ultimately the transfer did not go through. Doyle declined to comment.

Days later, Fogan, who did not respond to requests for comment, sent an email to the entire hospital staff chastising them for skirting the "chain of command" and saying that Health Department leadership kept Perkins management "up to speed" on "misinformed" complaints.

Soon after, two veteran Black female psychiatrists filed complaints against Moran to the Maryland Department of Health's equal employment office, alleging race and gender discrimination.

Through his lawyer, Moran said the pandemic was a trying time for hospital leadership, that the employee group photo was not "productive" or "helpful" and that he did not try to transfer Doyle. He also said that no complaints about him were substantiated. In fact, one case was, according to documents and those with knowledge of the complaint. But state officials later reversed the discrimination finding and instead flagged it only as possible "bullying."

Weeks later, Moran was promoted to chief medical director of Maryland's nine state hospitals and facilities.

What followed his promotion, current and former staff said, was an era of discontent exacerbated by employee departures — including trusted psychiatrists — that destabilized and endangered the facility.

Patients, who require consistent and stable care, were being shuffled between doctors, according to internal emails between Moran and staff. The understaffed security team could not cover their shifts, despite a 2020 state law that had allocated $15.6 million to ensure there was one security guard for every three patients at Perkins. Instead of hiring more security staff, though, the hospital spent millions on overtime, state health officials acknowledged.

Outdoor "fresh air" breaks for patients were canceled because there weren't enough security guards to supervise them, current and former staff said, and often employees assigned to closely observe patients were pulled prematurely for the same reason. All the while, the facility's security team was struggling to contain an influx of street drugs, including K2, suboxone and marijuana, according to a retired security supervisor, who spoke on the condition of anonymity because they weren't authorized to share internal matters.

And hospital leadership had stopped inviting employees to internal incident reviews, a process historically conducted at Perkins and most hospitals after significant safety or medical events. Moran said the move was a part of "streamlining the process … so meaningful changes could be made," but staff said it sowed doubt over whether serious incidents were being properly handled.

Concerns escalated in 2022 after multiple serious assaults on staff.

Christopher Yelen, a former Perkins social worker, said he had just come out of a session when a patient punched him in the face. The force slammed him into a wall, he said, and briefly knocked him out before he was rushed to an outside hospital with serious injuries. No security guards were there to help him, he said, and another patient saved him from the attack.

In the year before his assault, Yelen said nearly every full-time member of the core treatment team on his maximum-security unit had left the hospital. The only other social worker on his unit, Stephanie Reid, had resigned after she said she was punched in the face by a patient and Moran refused her transfer request — something Moran denied doing. The hospital, Yelen said, had become "a climate of chaos."

"I was a sitting duck," he said.

Then, Yelen said he learned from a colleague that the night before he was attacked, the patient who punched him had been accused of strangling someone else. The patient had been placed on close observation, Yelen said, but someone had canceled the order without telling him.

He emailed hospital leadership asking for an internal investigation, according to a copy reviewed by The Post, but said he never received a response. He filed a complaint with the Joint Commission, the hospital's accrediting agency, and Maryland Occupational Safety and Health (MOSH). Then he quit, too.

Weeks later, a third social worker was punched in the face by a patient, according to three people familiar with the assault. She sent an email to hospital leadership requesting a transfer and asking officials to address the "deficits" that led to her assault, according to a copy of the message obtained by The Post. Moran responded to everyone but her. "Do not reply verbally or in any other way to this," he wrote. "That is a direct order."

In the email, Moran said leaders would discuss the matter with human resources and follow up. But that social worker never heard anything more, the people familiar with the assault said, and she, too, eventually quit.

At the time, union leaders accused Hogan's Health Department of endangering employees by violating state staffing laws, which a Hogan spokesperson denied. The union said they echoed their concerns in a safety petition signed by 200 people and in a dozen subsequent meetings with Moran. After an inspection at Perkins prompted by Yelen's complaint, MOSH officials made numerous safety suggestions, according to a copy of their report.

Many of the requested changes, staff said, including reinstituting transparent reviews of major incidents, were ignored or rebuffed. Moran disputed that Perkins had a severe staffing shortage and asserted that he tried to mitigate contraband problems by implementing new protocols for patient mail and visits, including bringing in drug dogs and contracting with a security-approved vendor for commissary items. He said his recollection was that the MOSH inspector told him the hospital was "doing a good job."

In February 2023, just weeks into the Moore administration, Moran was promoted again — this time to Perkins CEO.

# A 'riot,' a rape, a death

A few months later, Disability Rights Maryland, a patient advocacy organization, contacted hospital leadership with a concern about the reporting process for patient sexual assault allegations.

Moran ordered Nina Diana, then the director of social work, to investigate.

What Diana found, she said, confirmed the group's suspicion: For more than a year, Perkins leadership had not investigated dozens of sexual assault allegations from patients in a timely manner, violating the terms of a lawsuit settlement mandating immediate police notification of such incidents and coordinated follow-up care. In a meeting, Diana said, Moran disregarded her findings and instead blamed her for not updating hospital policies to comply with the settlement. Then he handed her a pre-written demotion letter — which she appealed.

Through his lawyer, Moran stood by the move. Feeling forced out, Diana retired. After she left, she won the appeal, and the demotion was withdrawn.

"I felt guilty, very guilty, for leaving, because everything was such a mess," Diana said. "I was thinking, 'How is it going to get better?'"

On her last day, May 30, 2023, a patient brawl erupted.

Three male patients on a maximum-security unit had broken into a social worker's office during the Memorial Day holiday weekend and stolen a laptop, candy and other office supplies — all considered contraband at Perkins, according to four people with knowledge of the incident. The social worker discovered the break-in upon returning to work, those people said, so hospital security found the patients, separated them and cleared the unit while it was searched.

The unit's lead psychiatrist asked that the three patients remain separated, according to two people with knowledge of the incident. But those people said Moran ordered all patients — including the suspects — back to the unit, which Moran denied. That's when the brawl broke out.

"There were so many patients involved and we couldn't control it," said the same retired security supervisor who had tried to help combat drug issues in the facility.

More than 15 officers responded, the supervisor said, and security had to call over the hospital intercom for "all male staff" to help — a request several longtime Perkins employees said they had never before heard. A Health Department spokesman, who initially disputed an employee letter that characterized the incident as a "riot," later confirmed "riot shields" were used to separate patients.

"It was basically a free-for-all," said one Perkins employee.

Five patients were put in restraints, witnesses said, and at least two patients were injured.

The unit's lead psychiatrist later asked for an internal incident review, according to the December 2023 staff letter to Health Department leaders. Again, a review involving staff was never held, the letter said.

That psychiatrist left Perkins, too.

The Health Department declined to comment on the brawl. Moran said he had no memory of the fight and that staff never lost control of the unit, but that the break-in was reviewed extensively by Perkins leadership.

A few months after the brawl, in September, a male patient was raped by another male patient on a maximum-security unit, according to investigative records from Maryland State Police. Just before midnight on Sept. 15, the victim reported to Perkins staff that his roommate had pinned him down in bed and sexually assaulted him, according to police documents. The roommate was charged with first-degree rape in a case that remains ongoing, court records show.

Then in early November, records show, Martina Morgan was found in her room in medical distress.

For several days, Morgan, 40, had been experiencing dizziness, dehydration and low blood pressure, according to medical records provided to The Post by her family. On Oct. 31, she was rushed to an outside emergency room and sent back to Perkins the next day. She fell ill again on Nov. 3, according to medical records, but the treatment she received is not clear. In one police report, detectives wrote she had a seizure and was treated by EMS at Perkins. Detectives wrote in another police report that she was taken to an outside hospital. Yet another police report doesn't mention a seizure or EMS at all.

Hospital employees placed her under close staff observation, records show. Throughout that night, two security guards told investigators they heard her moaning from her room, while other employees told them she slept without apparent breathing trouble, according to a police report.

Early the next morning, a Perkins employee found Morgan in bed, her breathing labored and a brownish-red liquid coming from her mouth and nose, according to the report. Doctors identified it as coffee ground emesis — a kind of vomiting that often signals internal bleeding and a potential medical emergency.

Perkins staff did not call 911 for about 30 minutes, according to police records reviewed by The Post, and gave conflicting information in those calls about whether CPR was in progress. Records show Perkins staff performed sternum rubs and gave Morgan nasal oxygen. When EMS arrived, according to a paramedic report, staff again could not say if anyone had done CPR. First responders spent 24 minutes trying to resuscitate Morgan.

At 7:50 a.m., she was pronounced dead.

The Office of the Chief Medical Examiner declined to do an autopsy after Perkins doctors and state police said it did not appear the woman's death was "suspicious." Moran then called a private funeral home to pick up Morgan's body, Maryland State Police said in a report. One funeral home employee told investigators that Perkins staff told them the woman was a ward of the state with no family, the report says.

Morgan's mother, who had been regularly involved in her care, said she did not get a call about her daughter's death until late that evening. Morgan's family said the funeral home staff told them her death seemed suspicious, so the family demanded an autopsy.

Although state law mandates that Perkins notify Disability Rights Maryland of patient deaths, the group said Morgan's death was not reported to it by hospital leadership. Advocates said they independently learned of it and repeatedly asked for a copy of her death report — which they did not receive until late December.

By then, Maryland State Police and the Maryland Department of Health Police had opened a criminal inquiry, issuing a written request within a week of Morgan's death for 16 hours' worth of surveillance footage from cameras near her room, and a court subpoena in December seeking that, as well as her full medical records and all internal investigative reports related to her death.

But the hospital handed over only Morgan's discharge papers and three hours of video. When police confronted Health Department officials during a meeting about the missing material, Perkins leadership said staff had forgotten to send Morgan's full records and would do so immediately, according to police documents.

But the video, Perkins leadership said in the meeting, had been auto-deleted after 30 days, per hospital policy.

Despite investigators' requests to retain the footage on Nov. 17 — less than two weeks after the Nov. 4 death — Perkins had failed to do so.

The Health Department declined to comment.

After a six-month investigation, detectives met with the Howard County State's Attorney's Office to present their findings, telling prosecutors they suspected possible criminal medical neglect, according to Maryland State Police documents. Evidence for that relied upon the Office of the Chief Medical Examiner's autopsy report, which said Morgan die "acute intoxication" from prescribed medications that had built up over time. Her manner of death was undetermined.

Prosecutors declined to file criminal charges, so police referred their investigative files to two oversight groups: Disability Rights Maryland and the Maryland Department of Health's Office of Health Care Quality (OHCQ).

The state's attorney's office said in a statement it had found "no evidence of foul play" but that prosecutors would re-examine the case if "new evidence were to come to light."

## 'Grave concerns'

For 11 days in June, OHCQ officials embedded at Perkins — reviewing policies, interviewing staff and inspecting patient records, including Morgan's.

The unannounced inquiry found two violations of state law and five violations of standard procedures, issues outlined in a 15-page report provided to The Post by the Health Department describing an incident that appears to match Morgan's death.

The report said "Patient #1" received inadequate medical care at Perkins. Staff gave the patient pain medication without proper evaluation or documentation, evaluators wrote, and did not give proper follow-up care after her visit to the emergency room the week of her death.

The report said that hospital leadership had failed to mitigate known safety risks, including a broken pager system; failed to maintain adequate files on the training certifications of staff; and failed to provide ongoing emergency resuscitation training. Perkins had not conducted a medical emergency drill in a year — even though hospital policy requires them to be held quarterly — and had failed to fix problems identified during the most recent drill in June 2023, officials said.

In a statement, Disability Rights Maryland said its independent inquiry is ongoing and that advocates have "grave concerns about a number of issues affecting patients at Perkins" that "change in leadership has not abated." The Office of the Public Defender, which legally represents many of the patients at Perkins, said in a statement that Morgan's death is "horrifying" and "highlights the systemic failures that underscore the need for greater oversight and accountability."

"This is an immense tragedy that we hope will spur corrective action and immediate attention," said Maryland Public Defender Natasha M. Dartigue.

Herrera Scott said she is "absolutely committed" to doing right by the people the Health Department serves, including patients and staff at Perkins. The OHCQ report mandated urgent action to correct the violations found, she said, and the Health Department secured budget funding in this fiscal year for 90 more security jobs at Perkins.

But the state employees union president, Patrick Moran, who is not related to Scott Moran, said Health Department officials have a long way to go to build trust after years of inaction on well-known issues. The union was not initially involved in crafting Herrera Scott's reforms, he said, but state officials met with union leaders in recent weeks to outline the changes they are planning.

"We are cautiously optimistic," Patrick Moran said. "We'll see."

Democracy Dies in Darkness

# 'Absolute scandal': Md. fails to promptly hospitalize mentally ill defendants

Judges across Maryland have fined the Health Department $1.5 million for breaking state law by delaying care for weeks, or months.

Updated December 11, 2024

10 min 55

By Dan Morse and Katie Mettler

Maryland has repeatedly failed to quickly transfer mentally ill defendants who need treatment from local jails to state psychiatric hospitals, a violation of state law that has prompted judges across the state to level $1.5 million in fines against the state Health Department over the past year.

The latest legal lashings came on Thursday, when a Montgomery County judge issued $213,187 in penalties against the department, and an Anne Arundel judge said it was scandalous that nearly 230 mentally ill people are stuck in Maryland jails — even though they've been ordered to get help at a hospital.

The judges were acting on a Maryland state law that requires the Health Department to admit detainees to state hospitals within 10 business days of a ruling that they're too mentally unfit to understand the charges against them.

Instead, according to recent state data, people wait in jail an average of two-and-a-half months. Some stays, corrections officials say, exceed six months.

At separate hearings just hours apart Thursday, Montgomery County District Court Judge Amy Bills and Anne Arundel County Circuit Court Judge Richard Trunnell admonished the state Health Department for failures they said are causing great harm to Maryland's most vulnerable residents.

"It seems to me that this is an absolute scandal on the part of the department that they can't do a better job of getting their act together on this," Trunnell said.

"It's a civil rights violation," he said. "We are reliving past times here with mental health."

The backlogs have been a chronic problem for more than a decade and last flared under Gov. Larry Hogan (R) in 2017, when a Baltimore City judge held the state in contempt of court for what she called “knowing, intentional and voluntary” failures to increase hospital capacity.

Now Gov. Wes Moore (D) and Health Secretary Laura Herrera Scott are facing similar scrutiny. Herrera Scott will likely be questioned about the backlog by state lawmakers on Dec. 11, when she is scheduled to testify in front of the General Assembly’s joint oversight committee on state personnel and fair practices.

Pressure is mounting on Moore and Herrera Scott to rectify these issues, primarily at Clifton T. Perkins Hospital Center in Jessup, the state’s only maximum security psychiatric facility, where people accused of violent felonies are treated. The hospital is being audited by outside evaluators after a Washington Post investigation exposed its struggles with serious violence, contraband drugs and high staff turnover, which Perkins employees blamed on chronic understaffing, toxic leadership and lax oversight.

While Perkins houses those accused of serious violence, Maryland’s jail backlogs are affecting people facing charges ranging from simple theft to first-degree murder. In Montgomery County, a woman accused of killing her mother and then calling 911 to report it remains jailed 28 days after a judge ordered her to be hospitalized, and a woman who is in jail after being accused of punching a stranger on a Metro platform was ordered to be hospitalized 91 days ago.

“A defendant who has been deemed incompetent and dangerous should not be held in a detention facility,” Bills said from the bench while issuing penalties that ultimately could top $300,000. “More importantly,” she said, people should not “languish in a detention facility when they so desperately need that medical attention.”

State hospitals treat patients with a team of psychiatrists, psychologists and social workers whose goal is to stabilize their mental health and teach them about the court system, care that isn’t available for those waiting in jail. Another critical difference: Hospitals can force those under their care to take psychiatric medications much more easily than jails can.

A spokesperson for the Health Department declined to comment, referring to the agency’s legal arguments in court, where lawyers have said the agency is overwhelmed and underfunded.

On that point, officials and state hospital employees agree. They say discharging patients to make room for new ones is challenging because of a shortage of workers and scarce outpatient treatment options at a time when state data shows that commitment orders have spiked from 582 in 2020 to 1,126 last year.

The solution — and what will motivate state leaders and lawmakers to act on the problem — is less straightforward.

In a court hearing regarding the Montgomery County complaint against health officials, which was filed jointly by the prosecutors’ and public defenders’ offices, a Health Department attorney said fines aren’t a viable deterrent given the harsh reality the department faces.

"Sanctioning an already cash-strapped department, I don't think, achieves what the parties want to achieve," said Musa Eubanks, who has traversed Maryland this year defending the Health Department in similar cases. "Across the state, there just aren't any additional beds."

But fines are one of the only accountability tools at the disposal of judges, who oversee just one part of a multilayered state psychiatric hospital system that spans the judicial, executive and legislative branches of Maryland government. Bills, the Montgomery judge, said the fines are intended to compel the Health Department to do better.

The Health Department says it can't add more beds or more staff without more money or significant cuts to other functions. And in the upcoming legislative session, officials are bracing for cuts as the state reckons with a projected $2 billion deficit for fiscal 2026.

In 2017, when the Health Department was held in contempt, the Hogan administration responded by adding more beds and the state legislature passed a law mandating the 10-day transfer window. That law empowered judges to sanction health officials for failing to comply with the timetable, including forcing the Health Department to reimburse local governments for the cost of housing people in their jails when they should have been in a state hospital.

Christopher Klein, superintendent of the Anne Arundel Department of Detention Facilities and vice president of the Maryland Correctional Administrators Association, said judges have ordered the Health Department to pay more than $200,000 to his department to reimburse the cost of housing defendants past the 10-day mark. But the money appears to be hung up in court appeals.

"We have yet to see one cent," Klein said, while testifying in a recent hearing.

He sees the effect daily of keeping mentally ill defendants inside the jails. Those in particular despair kick repeatedly on the cell doors, scream out during the night and stop eating.

"It's inhumane," Klein said.

He and his corrections colleagues are well aware of the Health Department's limited bed space and staffing shortages. But they, too, have challenges, he said, and don't get to turn away people brought to them by police or sentenced to them by judges. They're growing increasingly frustrated, Klein added, by a department that for years has ignored the state law mandating quick transfers.

"Our business is rooted in adhering to laws," Klein said. "We're dealing with a department that doesn't do that."

The Health Department tries to manage the backlog by communicating with jails to move the least stable defendants to the top of the waiting lists. While that makes sense, Klein said, it keeps some stuck on the list for 200 days or more.

"They're considered 'low acuity,' therefore they become low priority," Klein said.

Still, so many severely unwell people remain stuck in his jail, Klein said, that he'd like the same authority that state hospitals have to be able to force them to take medication. While that may sound extreme in a jail, he says, so is keeping people who are deteriorating by the day.

Klein said that his jail could set up protections: Two medical doctors would have to sign off on the forced medication and the detainee would be given an advocate to speak on their behalf.

"If the Health Department wants to pretend I am a hospital," Klein said, "I should have the tools that hospitals have."

Employees at the state's psychiatric hospitals, including those represented by the state employee union AFSCME Maryland Council 3, have said that a failure to hire and retain enough staff is in part to blame for the ongoing patient backlog.

At a union rally Tuesday outside the Health Department's headquarters in downtown Baltimore, Perkins social worker Miriam Doyle said her work "benefits the entire state of Maryland because if I can help successfully rehabilitate our patients and help them safely transition back to the community with care and support, then we are reducing violence and recidivism."

But that work is made much harder without sufficient staffing. There should be two social workers on every unit at Perkins, she said. But in the seven years she has worked at the hospital, "that has never been the case." Instead, she said, she has spent periods of more than a year managing a unit alone.

"When I'm the only social worker on my wards, there's only so many patients I can discharge, which in turn slows down how many new patients we can admit," Doyle said. "This means that there are people who desperately need treatment but are instead languishing away in our jails."

She said this leaves the hospital "spending resources dealing with fines and sanctions from the courts."

"No one wins," Doyle said.

Maryland's problems mirror those nationwide — with more than 5,500 defendants in local jails across the United States waiting for court-ordered transfer to treatment at state hospitals.

"These numbers are exploding all over the country," said Lisa Dailey, executive director of the Treatment Advocacy Center, a nonprofit organization that tracks the backups. "It's a national disgrace."

A core cause of the crisis, she said, is a societal failure to get people community mental health support — including committing people to mental health hospitals for care before they get into trouble.

"They just bump around the community until they get arrested," Dailey said.

The issue dates back decades to the sins of institutionalized psychiatric hospitals, she said, which were too easy to get into and too hard to get out of. Society moved to close them down even as it didn't set aside enough money for local treatment or housing for people dealing with mental illness. As a result, according to a Treatment Advocacy Center report earlier this year, the United States had about six times more state psychiatric hospital beds in 1980 than it does now.

"We went too far and overcompensated for the abuses of the past," Dailey said.

At the same time, there are rising rates of severe mental illness nationwide. More defendants, after arriving at jails and receiving psychiatric evaluations, are deemed not mentally competent enough to go through a trial, Dailey said. In turn, judges are ordering more transfers from jails to psychiatric hospitals.

And with little to no available bed space at those hospitals, defendants remain where they are — in jails. Nationwide, they spend an average of two months there before the transfer, according to Dailey. The result is a system doing the opposite of what it was designed for, she said, often making people's mental health worse.

While more psychiatric hospital bed space is clearly needed, Dailey said, she doesn't see enough state health agencies making spirited requests to their legislatures.

"There is a certain kind of fatalism out there they won't get what they need," Dailey said. "We try every solution except the most basic and obvious one."

*Democracy Dies in Darkness*

**Maryland**

# After Post report, Md. health secretary says changes coming to mental hospital

Maryland's Health Secretary told employees that the allegations are a "serious concern" and described what the department is doing to fix problems.

October 16, 2024

7 min 26



By Katie Mettler

Maryland's top health official told employees in a letter Wednesday that she is implementing reforms to address "critical deficiencies" at the state's maximum security psychiatric hospital, a move that comes in the wake of a Washington Post investigation into chronic understaffing and violence at the facility.

The letter from Health Secretary Laura Herrera Scott said that the allegations raised by the Post investigation were "of serious concern" to her and the administration of Gov. Wes Moore (D), and that officials were conducting a "top-to-bottom review and investigation into all aspects of policy and procedure" at Clifton T. Perkins Hospital Center.

The Post detailed how officials had ignored employee complaints about staffing and other issues at the facility for years, and how violence escalated in 2023, Moore's first year in office, when patients brawled, a patient was raped by his roommate and another patient died under suspicious circumstances. The death prompted Maryland State Police to launch an investigation into possible criminal medical neglect that was ultimately closed without anyone being charged.

"The Maryland Department of Health is fully committed to the safety and security of both employees and the patients that we serve at Clifton T. Perkins Hospital Center," Herrera Scott wrote.

**Make the most of the DMV with our newsletter**

Make living in D.C. a little easier and more fun. Sign up for the Post Local newsletter to get local news, weather and expert advice — where to eat, where to drink and how to get around — every weekday.

(The Washington Post)

The letter could be a harbinger of increased scrutiny on Perkins. Separately, patient advocacy organization Disability Rights Maryland is conducting an independent investigation into issues at the facility, and State Sen. Clarence Lam (D), co-chair of the General Assembly's joint oversight committee on state personnel and fair practices, called for Herrera Scott to come before lawmakers in a public setting — in a briefing or hearing — to answer questions on the problems at Perkins.

"This exemplifies an abysmal failure of leadership that spans multiple administrations and multiple levels of leadership in the department that really begs the question of why this wasn't addressed sooner," Lam said in an interview. "It's unconscionable that the state allowed this to fester for this long."

"Because there's some deep-rooted problems that have obviously manifested themselves here and they've become public," the lawmaker added, "I don't think it's sufficient to simply provide background briefings or written responses to address the concerns that have arisen."

Herrera Scott said that recent internal investigations at Perkins, some of which she had previously acknowledged came as a result of the Post's findings, revealed a "severe lack of oversight" at the hospital and a "failure to follow standardized incident reporting procedures and protocols that obfuscated serious, life-threatening incidents." In one instance, after a 40-year-old mother named Martina Morgan died, police alleged that Perkins's leadership failed to comply with a request to preserve surveillance footage that might have captured staffers' actions that night.

An internal probe by the state's Office of Health Care Quality — which included a review of Morgan's care and medical records — found two violations of state law and five violations of standard procedures on issues related to patient care, hospital safety, staff medical training and recordkeeping.

Herrera Scott said in the letter that the Health Department hired a third-party evaluator, the National Association of State Mental Health Program Directors, to audit Perkins. She also said she plans to hire a clinical director who will report directly to her and provide medical oversight at Perkins and the state's other psychiatric hospitals and juvenile facilities.

Herrera Scott's letter said clinical oversight "eroded under the prior administration," seeming to point to officials who worked during the tenure of Gov. Larry Hogan (R), who was in office from 2015 to 2023 and is now running for U.S. Senate. A spokesperson for Hogan did not immediately respond to a request for comment Wednesday night. Herrera Scott was appointed by Moore.

Perkins, a 28[illegible]-bed facility in Jessup, Md., houses people who have been accused of committing serious felony crimes but, because of serious mental illness, have been found not criminally responsible for their actions or incompetent to stand trial.

The Post report on the psychiatric hospital, which published Wednesday, highlighted chronic issues related to staff and patient safety from 2020 to 2024, including violent staff assaults, high employee turnover, security understaffing and persistent challenges stopping contraband drugs from entering the hospital, including K2, marijuana and suboxone.

The Post found that for years, state officials failed to address complaints from hospital employees about safety and the leadership of former Perkins CEO Scott Moran, many of which were flagged to the facility's leadership and state government officials under both Hogan and Moore's administrations.

Those complaints included concerns over the management and behavior of Moran, according to documents obtained by The Post and interviews with more than two dozen people with knowledge of the problems at Perkins. The Post investigation found that under Moran, who worked for the state from 2019 to 2024, safety conditions at the hospital had deteriorated, those people said.

Moran, 54, was terminated in May after he was accused of making threats and sending "racially suggestive messages" to two colleagues, both people of color, in early February. The messages, which followed a disciplinary action Moran faced, prompted his colleagues to obtain a restraining order that banned him from Perkins and other health department properties.

In a statement for The Post's previous report, Moran denied creating a hostile work environment during his four years in Perkins leadership, but he expressed remorse for his alleged actions in the restraining order, saying through his attorney that he was experiencing "stress-related mental health issues."

Herrera Scott promoted Moran to CEO in 2023. She said in an interview that she did so on the advice of outgoing officials, and she would have never elevated him if she knew then what she knows now.

In her letter, Herrera Scott said the department has launched a nationwide search for a new CEO at Perkins.

Moran's boss, Dwain Shaw, has been serving as acting CEO since Moran departed.

The Maryland Board of Physicians opened an investigation into Moran in March, then in September suspended the doctor's medical license for a year as part of a consent order. The investigation's findings did not mention any incidents beyond the allegations of the February restraining order.

A spokesperson for the Board declined to comment on The Post's investigation, including whether additional charges could be brought against the doctor, and said in a statement that board investigations are confidential.

The National Association of State Mental Health Program Directors conducted their first site visit at Perkins last week, spending Oct. 8 and Oct. 9 meeting with employees. The Health Department said the evaluators have been asked to audit the hospital's leadership team; medical treatment programs; the security apparatus; employee and patient morale; and culture and patient complaints.

The evaluators plan to meet with Disability Rights Maryland, which told The Post in a statement it has "grave concerns about a number of issues affecting patients at Perkins" that "change in leadership has not abated." The Health Department said that a report with "key findings and recommendations" from evaluators is due by Jan. 1, and that state officials are "committed" to sharing those with the public "while also protecting patient medical information."

Representatives from AFSCME Maryland, the state employees union, met with the evaluators last week.

Union president, Patrick Moran, said his members are "cautiously optimistic" by Herrera Scott's intervention at Perkins and praised Health Department leaders for asking for staff input, something "they haven't done in the past."

"That's a big shift," Moran said. "I'm going to give the secretary credit. She is getting her arms around things. But we are watching."

*Democracy Dies in Darkness*

# Md. lawmakers grill state health secretary about ‘cover-up’ at psych hospital

Laura Herrera Scott testified Wednesday before a joint oversight committee about violence and other problems at the maximum security Clifton T. Perkins Hospital Center.

Updated December 11, 2024

7 min 4



By Katie Mettler

Maryland Health Secretary Laura Herrera Scott said Wednesday that top staffers had “misrepresented the facts” about troubling complaints of violence at the state’s only maximum security psychiatric hospital, delaying a more robust and immediate response that might have abated some of the facility’s problems.

Testifying before state lawmakers at an oversight committee hearing, Herrera Scott said she only learned the full circumstances surrounding a riot, rape and brawl at Clifton T. Perkins Hospital Center last year after The Washington Post began inquiring about the incidents for an investigative report that published in October. A team of Health Department officials were “supposed to be doing their jobs and advising appropriately” about matters at the facility, Herrera Scott said, but “unfortunately, I had leaders in place that were not.”

“And all those people are now gone,” she said.

Herrera Scott’s comments before the General Assembly’s joint oversight committee on state personnel and fair practices marked her first formal accounting of critical failures at Perkins since the Post investigation revealed that for years, state leaders and hospital officials had ignored well-documented complaints about safety at the facility.

The co-chairs of the committee, state Del. Dalya Attar (D-Baltimore City) and state Sen. Clarence K. Lam (D-Howard), questioned how Herrera Scott and the Health Department allowed problems at Perkins to fester for so long.

“It sounds as though a lot of these concerns have been long-standing,” Lam said. “I’m trying to understand how it got to this point.”

**What is Clifton T. Perkins Hospital Center?**

Perkins is the only maximum-security forensic psychiatric facility among the hospitals managed by the Maryland Department of Health. Perkins, a 289-bed facility, treats people who have been charged with violent felonies but who a judge or jury decided should get psychiatric treatment at a hospital instead of going to prison.

Those documented complaints, which went largely unaddressed until this year, spanned the administrations of Gov. Larry Hogan (R) and later Gov. Wes Moore (D). Overseeing Perkins through that turbulent era was psychiatrist Scott Moran, a former military doctor who served as the hospital's clinical director before Herrera Scott promoted him to CEO in early 2023 — despite employee allegations of bullying, abrasive and discriminatory behavior that had driven high staff turnover and left patients vulnerable.

Over the following year, The Post found, one patient was raped by his roommate, another patient died under suspicious circumstances and others brawled in what witnesses called an uncontrolled "riot." The death — of Martina Morgan, 40 — prompted Maryland State Police to launch an investigation into possible criminal medical neglect that was ultimately closed without anyone being charged.

In December 2023, employees sent an unsigned letter to Moore and Herrera Scott giving detailed descriptions of contraband drug overdoses, staff assaults, the rape and "riot," pleading with them to urgently intervene. The secretary told lawmakers that letter was investigated by department officials, who told her the allegations "could not be corroborated."

The brawl was downplayed, she testified, and she was initially told Morgan's death was due to complications from a chronic medical condition. She trusted the word of her staff, she said, because she has no choice when running such a sprawling agency.

"Only in hindsight did I look under the hood based on what was shared with me, quite frankly, from The Washington Post reporter," Herrera Scott said. It was then, she said, that she started to "see the holes in the story" that department officials had shared and begin to "understand what happened."

**Timeline of problems at Perkins**

**2020**

- **January-February:** Perkins employees and union officials testify before the Maryland General Assembly about pay disparities, high vacancy rates, understaffing, bed shortages and safety. They do the same in 2021 and 2022.
- **March:** Perkins psychiatrists send letter to the then-deputy health secretary complaining the facility's leadership is flouting coronavirus pandemic safety protocols and blocking psychiatrists' attempts to intervene.
- **March:** AFSCME, the state employees union, protests inadequate personal protective equipment, hazard pay and safety conditions at Perkins.

- **May, June:** Two veteran Black female psychiatrists at Perkins file complaints alleging discrimination by then-Perkins clinical director Scott Moran on the basis of race, gender and disability. Moran says no complaints against him were substantiated; records show one was, before state officials reversed the finding.

The Post first reported on the bubbling issues at Perkins in February, when Moran was banished from Perkins after two colleagues — one Black and one Indian — obtained a restraining order against the CEO after accusing him in court documents of sending "racially suggestive messages" and making violent threats.

The doctor was suspended and later fired.

A lawyer representing Moran declined to comment on Herrera Scott's Wednesday testimony, but said previously that the doctor denied creating a hostile work environment during his four years in Perkins leadership and expressed remorse for his alleged actions in the restraining order. Through his attorney, Moran said he was experiencing "stress-related mental health issues" at the time.

During her testimony, Herrera Scott said that she promoted Moran to CEO on the advice of outgoing Hogan administration officials and did so soon after she came into office because the position had been vacant for months.

When pressed by lawmakers about whether she made a hasty decision — one that jeopardized the safety of patients and staff — she said "hindsight is 2020."

"In retrospect, could I have waited?" she said. "Absolutely."

Perkins, she said, is undergoing a leadership overhaul. They've hired a new CEO and CFO, the second of whom will start in early January, and the department is still searching for a COO.

"We've changed the whole leadership structure of Perkins," she said.

Other than Moran, Herrera Scott did not name or offer details on any other officials whom she contends misled her.

Herrera Scott told lawmakers that she had inherited a "very, very broken" agency from the previous administration, where under Hogan's Health Department hospital oversight declined — creating an environment where serious incidents, including those involving patient harm, were not being appropriately handled nor flagged to the secretary's office.

She blamed that structure — paired with the misrepresentations from staff — for the accountability breakdowns cited in The Washington Post's reporting.

But Attar took it a step further.

"This sounds like a total cover up," she said. "It seemed like this was a full cover up to make sure you and maybe others weren't aware of what's actually going on."

Herrera Scott did not contest the delegate's characterization.

The Post investigation cited numerous examples where Perkins leaders had failed to properly report or investigate dangerous incidents — including at least three violent assaults of employees, dozens of alleged sexual assaults against patients, the patient brawl last year and the death of Morgan. During the state police probe into Morgan's death, investigators alleged that Perkins's leadership failed to comply with a subpoena for records and a request to preserve surveillance footage that might have captured staffers' actions that night.

In the hearing, Lam asked Herrera Scott if she could assure lawmakers that those involved in the "coverup" were no longer working at Perkins.

"No," Herrera Scott said, telling the committee "I can't fire my way" out of the problem "without decimating the facility."

But she did cite a host of reforms that the department has implemented in recent months, including a new process for reporting incidents at Health Department facilities that separates them by the seriousness of the problem — with those involving a death or serious injury labeled as a "Priority 1" issue to address.

The Health Department also used grant money to hire the National Association of State Mental Health Program Directors to conduct a third-party audit at Perkins. The evaluators have visited the hospital four times since early October and have been asked to scrutinize the hospital's leadership team; medical treatment programs; the security apparatus; employee and patient morale; and culture and patient complaints.

Herrera Scott said the evaluators shared preliminary findings with the department on Nov. 18, and will deliver a completed report with recommendations by Jan. 1, 2025 — which the secretary pledged to share publicly.

Running parallel to the state's formal audit of Perkins is a separate, independent investigation into the facility by patient advocacy organization Disability Rights Maryland.

**Make the most of the DMV with our newsletter**

Make living in D.C. a little easier and more fun. Sign up for the Post Local newsletter to get local news, weather and expert advice — where to eat, where to drink and how to get around — every weekday.

(The Washington Post)

*Democracy Dies in Darkness*

# Violent beating under investigation at troubled Md. psych hospital

It took 75 seconds for security to arrive while authorities say a patient was brutally stomped by two other patients at Clifton T. Perkins Hospital Center.

December 31, 2024

8 min 40



By Katie Mettler

A patient at Maryland's troubled maximum security psychiatric hospital suffered a brain bleed this month after authorities say two other patients stomped on his head nearly 20 times before security and nursing staff intervened — an attack that came just days after the state's health secretary faced critical questions from lawmakers about safety at the facility.

It wasn't until 75 seconds into the beating, which authorities described as unprovoked, that security employees at Clifton T. Perkins Hospital Center arrived and the attackers stopped, according to a state police investigator's account of the beating, which was based on a review of surveillance footage.

In that time, the investigator wrote, the two attackers lifted up the victim and slammed him on the ground twice, repeatedly kicked him in the head and stomach, spat in his face, and stomped on his head. Perkins medical staff then began treating the victim as he lay motionless on the ground, the investigator wrote.

> **What is Clifton T. Perkins Hospital Center?**
>
> Perkins is the only maximum-security forensic psychiatric facility among the hospitals managed by the Maryland Department of Health. Perkins, a 289-bed facility, treats people who have been charged with violent felonies but who a judge or jury decided should get psychiatric treatment at a hospital instead of going to prison.

Records reviewed by The Washington Post show that the two patients charged in the incident, Eric King and Eric Gemmill, had been deemed a possible danger to others before the Dec. 14 attack and had been assigned one-on-one nursing attendant to supervise them. Those nursing staffers — who, according to state policies, may "physically restrain" patients in dangerous situations — were supposed to be within 10 feet of the patients on their maximum security ward at Perkins.

It is unclear whether any trained security guards were on duty in the unit at the time of the attack. Maryland state law mandates there be one security guard on staff for every three patients at the facility; current and former staffers had previously told The Post that the facility did not have adequate security staffing.

Perkins, a 289-bed psychiatric hospital that treats mentally ill people who have been charged with violent felonies, has been facing increasing scrutiny since The Post revealed in October that state leaders and hospital officials had ignored complaints about violence, mismanagement and inadequate staffing at the hospital for years, culminating in a patient death, rape and brawl in 2023. The Post's investigation prompted an ongoing, external review and a series of reforms, including a new process for reporting serious incidents at the facility to upper management.

Three days before the attack, Maryland Health Secretary Laura Herrera Scott had faced questions from lawmakers at an oversight committee hearing about Perkins' problems, including about security staffing. She suggested she had not been fully informed of incidents at Perkins and that top staffers who had "misrepresented the facts" were no longer employed with the Health Department.

**Timeline of problems at Perkins**

**2020**

- **January-February:** Perkins employees and union officials testify before the Maryland General Assembly about pay disparities, high vacancy rates, understaffing, bed shortages and safety. They do the same in 2021 and 2022.
- **March:** Perkins psychiatrists send letter to the then-deputy health secretary complaining the facility's leadership is flouting coronavirus pandemic safety protocols and blocking psychiatrists' attempts to intervene.
- **March:** AFSCME, the state employees union, protests inadequate personal protective equipment, hazard pay and safety conditions at Perkins.
- **May, June:** Two veteran Black female psychiatrists at Perkins file complaints, alleging discrimination by then-Perkins clinical director Scott Moran on the basis of race, gender and disability. Moran says no complaints against him were substantiated; records show one was, before state officials reversed the finding.

An agency spokesperson said in a statement that the Health Department is investigating the Dec. 14 beating, including reviewing the “clinical and security responses” to the attack, and that state leaders are “committed to protecting all patients in state facilities as well as the staff who care for them.”

The spokesman noted that Herrera Scott was notified in “near to real time” of the attack, based in part on new procedures instituted in the wake of The Post’s reporting. Court records show that Perkins staff immediately gave security footage of the beating to state police investigators. After the death of a patient in 2023, police alleged hospital leadership failed to comply with a request to preserve surveillance footage.

The Health Department did not answer a host of questions from The Post about the beating, including how many on-duty security guards were assigned to the unit where the attack occurred; how many total security guards are currently employed at Perkins; and whether medical and security staff are required to intervene when a patient is in danger, and what that intervention should entail.

The hospital’s standard procedure for psychiatric emergencies states that all Perkins employees have a duty to keep the facility safe and “recognize early signs” of escalating patient behavior. The policy also says it is the “responsibility of every available staff member” at Perkins to “immediately respond to any psychiatric/behavioral emergency that they are witnessing, occasionally serving as the first responder.”

State Sen. Clarence Lam (D), co-chair of the General Assembly’s joint oversight committee on state personnel and fair practices, sent a letter to Herrera Scott days after the beating on behalf of a group of other senators, requesting a briefing on the incident and information about the Health Department’s internal investigation.

In that meeting, which happened Dec. 23, Herrera Scott told the senators she is taking the matter very seriously, Lam said in an interview.

“They have assured us that they will be doing an analysis to make sure that incidents like this aren’t able to occur again in the future,” he said.

The advocacy group Disability Rights Maryland said it is conducting a separate, independent investigation into the beating — an extension of an ongoing inquiry into patient safety at the facility.

The man injured in the December attack was rushed to the Shock Trauma Center at the University of Maryland Medical Center in Baltimore, where he was hospitalized in critical condition. Investigators said in court records that the man suffered neurological deficits from the beating, including uncontrollable hand tremors and impeded speech.

When contacted by The Post, the victim’s father said he did not know his son had been admitted to Perkins or attacked at the facility. The Post generally does not identify victims of crime without their consent.

The two other patients, King and Gemmill, have been charged with felony assault, according to court documents. Attorneys representing the men did not return requests for comment.

King, 27, was admitted to Perkins in March, after he was charged with murder in the stabbing death of his girlfriend in Prince George's County. Gemmill, 31, had been serving a state prison sentence when he was charged in October 2023 in Alleghany County with arson and assault and was admitted to Perkins. In both cases, a judge found the men incompetent to stand trial and ordered them to get psychiatric care.

**Make the most of the DMV with our newsletter**

Make living in D.C. a little easier and more fun. Sign up for the Post Local newsletter to get local news, weather and expert advice — where to eat, where to drink and how to get around — every weekday.

(The Washington Post)

According to the state police investigator's account of the Dec. 14 attack in charging documents, surveillance footage shows King rocking back and forth on a chair before standing, pushing the victim and "getting behind his body, putting his hands around his waist and slamming him to the floor." Soon after, according to the documents, Gemmill began "striking" the victim with his right hand.

King then picked up the victim, moved him against a wall in the room and began kicking him in the head with his "full strength," the investigator wrote, describing the blows as "lace kicks" like those used in soccer. At the same time, Gemmill began kicking the victim in the stomach, according to the documents.

King then started "forcefully" stomping on the victim's head with the sole of his foot — 14 times, to start — the state police investigator wrote, before bending over him and spitting on his head, then stomping it five more times. He stopped again, spat again, then began hitting the victim in the face with an open hand, according to court documents.

King then picked up the victim's "lifeless body," dragged him across the floor and slammed him into the ground face first, the investigator wrote.

Security staff arrived, and the two men walked away from the victim, according to the state police investigator's account. After that, according to the charging documents, the video shows Perkins employees beginning to provide the victim assistance.

The documents do not note the time of security's arrival. The state police investigator wrote that he was notified of the attack at 9:15 p.m., about 11 hours after it.

When the state police investigators tried to ask the victim questions about what happened, the man could not respond coherently, so the trooper ended the conversation as not to cause more damage, according to court documents.

In an email to Perkins staff after the assault that was reviewed by The Post, the hospital's acting CEO praised the hospital's handling of a "particularly complex" situation.

"The response was outstanding," he wrote.

The assault came in the final weeks of a months-long audit by the National Association of State Mental Health Program Directors, third-party evaluators who were hired by Herrera Scott to complete a comprehensive inquiry and report by the end of the year.

The secretary has pledged to share that report publicly once it is submitted. Lam said lawmakers would watch the results closely as the state's legislative session begins next month.

"We have a window of opportunity here to be able to provide any legislative fixes that might be needed," he said.